IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

---

SCOTT WYNN, an individual,

      Plaintiff,

        v.

TOM VILSACK, in his official capacity as
U.S. Secretary of Agriculture; ZACH
DUCHENEAUX, in his official capacity
as Administrator, Farm Service Agency,

      Defendants.

Civil Action
No. 3:21-cv-00514-MMH-JRK

---

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff Scott Wynn moves pursuant to Fed. R. Civ. P. 65 for a preliminary injunction enjoining Defendants Tom Vilsack, in his official capacity as U.S. Secretary of Agriculture, and Zach Ducheneaux, in his official capacity as Administrator of the Farm Service Agency, from enforcing the "socially disadvantaged" provisions of Section 1005 of the American Rescue Plan Act of 2021. Defendants should be enjoined from limiting loan assistance to only "socially disadvantaged" farmers and ranchers under Section 1005 or, in the alternative, enjoined from enforcing Section 1005 in its entirety.

**INTRODUCTION**

Section 1005 of the American Rescue Plan Act of 2021 provides loan assistance to a subset of farmers and ranchers based on a single characteristic: their race. It assumes that all farmers and ranchers who are Black/African American, American Indian, Alaskan native, Hispanic/Latino, Asian American, or Pacific Islander are "socially disadvantaged," and it requires Defendants to provide them with a payment of up to 120 percent of their outstanding farm loans as of January 1, 2021. White farmers and ranchers are categorically excluded, regardless of their individual circumstances. Plaintiff Scott Wynn, a Florida farmer, is ineligible for loan assistance under Section 1005 because he is white.

This Court should issue a preliminary injunction preventing Defendants from implementing a racially discriminatory loan assistance program. All four elements of the preliminary injunction standard are satisfied. Most importantly, Mr. Wynn is likely to succeed on the merits of his claims. Because Section 1005 distributes benefits by race, it is subject to strict scrutiny. Under this stringent standard, Defendants must show that Section 1005's racial classifications are narrowly tailored to further a compelling governmental interest. They cannot do so. Although the government may be allowed to use racial classifications to redress specific instances of racial discrimination, Section 1005 grants loan assistance to *every* farmer and rancher that belongs

to a "socially disadvantaged" racial group, while excluding every farmer and rancher that does not. Section 1005's crude treatment of individuals violates the equal protection component of the Fifth Amendment.

The other preliminary injunction factors are also met. Mr. Wynn will suffer irreparable harm in the absence of preliminary injunctive relief because, due to sovereign immunity, monetary relief is unavailable. And because his constitutional rights hang in the balance, the equities are in his favor and an injunction is in the public interest. A preliminary injunction is warranted to ensure that any distribution of funds under Section 1005 is done in a manner consistent with the Constitution.

## BACKGROUND

### I.   Section 1005 of the American Rescue Plan Act of 2021

#### A.   Text and Operation of Section 1005

Section 1005[1] directs the Secretary of Agriculture to "pay off" the outstanding farm loans[2] of each "socially disadvantaged farmer or rancher . . . in an amount up to 120 percent of the outstanding indebtedness . . . as of January 1, 2021." § 1005(a)(2). A "socially disadvantaged farmer or rancher" is "a farmer or rancher who is a member of a socially disadvantaged group."

---

[1] All citations to "Section 1005" or "§ 1005" refer to § 1005 of the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4.

[2] Qualifying farm loans include most loan types issued or guaranteed by the Farm Service Agency, including direct ownership loans, operating loans, and farm storage facility loans. *See* § 1005(a)(2), (b)(1).

§ 1005(b)(3) (incorporating the definition in 7 U.S.C. § 2279(a)(5)). A "socially disadvantaged group" is "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." 7 U.S.C. § 2279(a)(6).

USDA's website makes clear what this means in practice: "Eligible borrowers include those who identify as one or more of the following: Black/African American, American Indian, Alaskan native, Hispanic/Latino, Asian American, or Pacific Islander."[3] That list mirrors USDA regulations that define the term "socially disadvantaged group."[4] It also includes every race/ethnicity recognized by USDA except for "White."[5]

## B.   Congressional Purpose in Enacting Section 1005

Congress did not include findings to explain its purpose in enacting the race-based loan assistance provisions in Section 1005. Yet the proposed (but never enacted) Senate Bill 278, which included a "debt forgiveness" provision similar to Section 1005's, may shed light on congressional intent. *See*

---

[3] U.S. Dep't of Agric., *American Rescue Plan Debt Payments*, https://www.farmers.gov/americanrescueplan (last visited May 24, 2021). Plaintiff requests that the Court take judicial notice of all government websites cited in this motion. *See Coastal Wellness Ctrs., Inc., v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216, 1220 & n.4 (S.D. Fla. 2018) ("The Court may take judicial notice of government publications and website materials.").

[4] *See, e.g.*, 7 C.F.R. § 760.107(b)(1) ("Socially disadvantaged groups include the following and no others unless approved in writing . . . : (i) American Indians or Alaskan Natives, (ii) Asians or Asian–Americans, (iii) Blacks or African Americans, (iv) Native Hawaiians or other Pacific Islanders, and (v) Hispanics."); *id.* § 1410.2(b) (same).

[5] *See* U.S. Dep't of Agric., Customer Data Worksheet (form AD-2047) at 1, https://www.farmers.gov/sites/default/files/documents/AD2047-01192021.pdf.

Emergency Relief for Farmers of Color Act of 2021, S. 278, 117th Cong. §§ 3, 4 ("SB 278") (introduced February 8, 2021).

The stated purpose of SB 278's proposed debt forgiveness provision was "to address the historical discrimination against socially disadvantaged farmers and ranchers and address issues relating to the Coronavirus Disease 2019 (COVID-19)." *Id.* § 4(a). SB 278 included proposed findings on alleged "systemic racism that has hindered farmers of color for generations" and an alleged "pattern of discrimination at the Department of Agriculture against Black farmers, Indigenous farmers, and farmers of color." *Id.* § 2(3), (10).

To support these broad assertions, SB 278 listed an assortment of factors, everything from the historical removal of Native Americans from their traditional lands, to title issues arising from Black farmers' distrust of the legal system during Reconstruction and Jim Crow, to USDA's discrimination against Hispanic farmers in credit and loan transactions. *Id.* § 2(2)–(9). It also stated that "numerous reports over 60 years have shown a consistent pattern of discrimination at the Department of Agriculture against Black farmers, Indigenous farmers, and farmers of color." *Id.* § 2(10).

SB 278 did not, however, include any specific findings or examples of discrimination against farmers or ranchers who are Asian American, Hawaiian, or Pacific Islander. And despite its stated goal of "address[ing] issues relating to" COVID-19, it did not include any proposed findings about

COVID-19, such as an assertion that "socially disadvantaged" farmers and ranchers have been unable to access pandemic-related relief funds.

### C.   The Federal Government's Response to Alleged Historical Discrimination Against Minority Farmers

For decades, there has been an extensive federal response to allegations of discrimination by USDA against minority farmers and ranchers. As one example, the 1990 Farm Bill established the Outreach and Assistance for Socially Disadvantaged Farmers and Ranchers Program (known as the "2501 Program"). *See* Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. No. 101–624, § 2501, 104 Stat. 3359. According to USDA, the 2501 Program is intended to "provide outreach and technical assistance for underserved farmers, ranchers, and foresters" and "has awarded 533 grants totaling more than $138 million."[6] These grants "have helped reach socially disadvantaged agricultural producers—farmers and ranchers who have experienced barriers to service due to racial or ethnic prejudice."[7] The 2018 Farm Bill substantially expanded funding for the 2501 Program. *See* Agricultural Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490.

Additionally, USDA has paid massive sums to settle class action lawsuits alleging that it engaged in lending discrimination. Perhaps best known is the

---

[6] *Socially Disadvantaged Farmers and Ranchers*, https://www.usda.gov/partnerships/socially-disadvantaged-farmers-and-ranchers (last visited May 24, 2021).

[7] *Id.*

*Pigford* litigation, where USDA paid out around $1 billion to a class of approximately 23,000 Black farmers under a consent decree. *See Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999) (approving consent decree), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000). A subsequent class action settlement provided relief for Black farmers who were too late to file claims under *Pigford*. *See In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1 (D.D.C. 2011), as amended (Nov. 10, 2011) (approving settlement). Similarly, in *Keepseagle v. Veneman*, the court approved a class action settlement in a case brought by Native American farmers and ranchers. *See* Order, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Apr. 28, 2011). And the Department of Justice and USDA have established an administrative process to resolve the claims of Hispanic farmers and ranchers who asserted that they were discriminated against when seeking USDA farm loans.[8]

Congress has strongly supported these settlement efforts. In 1998, Congress suspended application of the two-year statute of limitations, allowing claimants to assert decades-old instances of discrimination. *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L.

---

[8] *See* Press Release, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), https://www.justice.gov/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women; *see also* Defs.' Eleventh Status Report, *Cantu v. United States*, No. 1:11CV00541 (D.D.C. Oct. 26, 2015) (explaining that the administrative process had approved 3,210 claims made by women and Hispanic farmers and ranchers).

No. 105–277, § 741, 112 Stat. 2681 (1998). The 2008 Farm Bill stated that it was the "sense of Congress" that all pending discrimination claims and class actions brought against USDA should be "resolved in an expeditious and just manner." Food, Conservation, and Energy Act of 2008, Pub. L. No. 110–246, § 14011, 122 Stat. 1651. Accordingly, that bill (1) imposed a moratorium on acceleration and foreclosure proceedings against farmers or ranchers who alleged discrimination by USDA and (2) appropriated $100 million to settle the *Pigford* discrimination claims. *Id.* § 14012. Just two years later, Congress appropriated an additional $1.15 billion for that purpose. Claims Resolution Act of 2010, Pub. L. No. 111-291, § 201, 124 Stat. 3064.

## II.   Plaintiff and Procedural History

Plaintiff Scott Wynn is a farmer in Jennings, Florida. Wynn Decl. ¶¶ 2–3. He has owned a farm since 2006. *Id.* ¶ 3. In the past, he has farmed peanuts, sweet potato, corn, and cotton, but he now primarily farms cattle and hay. *Id.* ¶ 4. To finance his farming operations, Mr. Wynn has obtained multiple farm loans, including farm operating loans from the Farm Service Agency. *Id.* ¶ 5. These loans had outstanding balances as of January 1, 2021. *Id.* Mr. Wynn's payments for outstanding farm loans constitute a large portion of his monthly income. *Id.* ¶ 6. Without those payments, he could use those funds to invest in his farm, expand his business, or support his family. *Id.* Mr. Wynn would be eligible for repayment or forgiveness on his farm loans under Section 1005 if

he were any race other than white; he is ineligible solely because he is white. *Id.* ¶¶ 7–9.

Mr. Wynn filed a Complaint for declaratory and injunctive relief on May 18, 2021. Compl., ECF No. 1. Mr. Wynn alleges that Section 1005 violates both the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution and the Administrative Procedure Act (APA) by unlawfully discriminating against Mr. Wynn on the basis of race. *Id.* ¶¶ 50–67. Mr. Wynn seeks an injunction preventing Defendants from distributing benefits under Section 1005 in a race-based manner—either by enjoining them from providing those benefits only to "socially disadvantaged" farmers and ranchers or, in the alternative, enjoining them from enforcing Section 1005 in its entirety.

## STANDARD OF DECISION

To obtain a preliminary injunction, the moving party must establish four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Friedenberg v. Sch. Bd. of Palm Beach Cty.*, 911 F.3d 1084, 1090 (11th Cir. 2018) (quotation omitted). The balance-of-harms and public interest factors "merge" when "the Government is the opposing party." *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020).

## ARGUMENT

### I.    Mr. Wynn Is Likely to Prevail on the Merits

Mr. Wynn will likely be able to prove that Defendants' implementation of the "socially disadvantaged" provisions of Section 1005 violates both the Fifth Amendment's Due Process Clause and the Administrative Procedure Act. *See* Compl. ¶¶ 50–67. "Both the Supreme Court and [Eleventh Circuit] have made clear that racial classifications, whatever the motivation for enacting them, are highly suspect and rarely withstand constitutional scrutiny." *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1243 (11th Cir. 2001). All such classifications are subject to strict scrutiny because they are "simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (internal quotations omitted).

Both the statute and the USDA are clear that "social[ ] disadvantage" refers to a person's membership in a racial group, rather than his individual characteristics. Defendants thus must show that the racial classification both (1) furthers a compelling governmental interest and (2) is narrowly tailored to further that interest. *Adarand Constructors, Inc. v. Pena.*, 515 U.S. 200, 220 (1995). They cannot do either.

## A.      Section 1005 Does Not Further a Compelling Interest

The compelling interest requirement is designed to "assur[e] that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1564–65 (11th Cir. 1994) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality op.)). The Supreme Court has recognized only one relevant interest compelling enough to justify racial classifications: remedying the effects of past or present de jure discrimination. *Parents Involved*, 551 U.S. at 720–22; *see also Ensley*, 31 F.3d at 1577 ("The Constitution tolerates race-based remedies only when they are necessary either to remedy past discrimination or to correct present discrimination . . . .").[9] To establish a compelling interest in remedying the effects of de jure discrimination, Defendants cannot simply rely on an "amorphous claim," but must set forth "a strong basis in evidence for their conclusion that race-based affirmative action is necessary." *Ensley*, 31 F.3d at 1552, 1565. Defendants cannot make such a showing here, for three main reasons.

***First***, "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine

---

[9] The Supreme Court has also discussed obtaining the educational benefits of diversity in higher education as a compelling interest, *see Parents Involved*, 551 U.S. at 722, but that is plainly inapplicable here.

the precise scope of the injury it seeks to remedy." *Croson*, 488 U.S. at 498. Here, Congress provided no findings as to how many minority farmers and ranchers have suffered racial discrimination in any "relevant market"—be it farming in general or farm loans in particular. *Id.* at 502. And Congress failed to credit the federal government's significant and sustained efforts to remedy the historical lending discrimination alleged in proposed SB 278.[10] As discussed above, *supra* Background Part I.C, the 2501 Program has awarded over $100 million in grants in an effort to assist "farmers and ranchers who have experienced barriers to service due to racial or ethnic prejudice." And the federal government has paid out over $1 billion to settle and resolve *Pigford*, *Keepseagle*, and other litigation regarding alleged loan discrimination against Black, Native American, and Hispanic farmers and ranchers. Congress has supported these efforts by suspending statutes of limitation and allocating funds to settle discrimination claims.

These efforts undermine any current interest in enacting the loan assistance plan in Section 1005 to remedy past lending discrimination by USDA. *Cf. Parents Involved*, 551 U.S. at 721 (noting that once the defendant school district "achieved unitary status" and thereby "remedied the

---

[10] Section 1005 does not explain the basis for its loan assistance program, making Congress's purpose uncertain. However, Defendants presumably will seek to justify the statute using the interests referenced in SB 278.

constitutional wrong that allowed race-based assignments," "[a]ny continued use of race must be justified on some other basis").

***Second***, the assertion (such as can be found on a USDA website)[11] that "socially disadvantaged farmers and ranchers have faced systemic discrimination with cumulative effects" does not provide a compelling interest that can justify Section 1005's race-based distinction. *See also* SB 278 § 2(3) (alleging "systemic racism that has hindered farmers of color for generations"). More than 40 years ago, the Supreme Court rejected the use of race-conscious remedies to combat "systemic injustice" because it was "an amorphous concept of injury that may be ageless in its reach into the past." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978) (controlling opinion of Powell, J.); *see also Shaw v. Hunt*, 517 U.S. 889, 909–10 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest."). The same is true here: amorphous allegations of "systemic discrimination" cannot substitute for a concrete showing of specific instances of discrimination. *See Ensley*, 31 F.3d at 1552, 1565 (an "amorphous claim of societal discrimination" is insufficient).

A federal district court in Texas recently granted a temporary restraining order against the Small Business Administration's (SBA) implementation of a similar provision of the American Rescue Plan Act of 2021.

---

[11] *AskUSDA – American Rescue Plan of 2021* (May 14, 2021), https://ask.usda.gov/s/article/American-Rescue-Plan-Act-of-2021.

*See* Order, ECF No. 11, *Greer's Ranch Café v. Guzman*, No. 4:21-cv-00651-O (N.D. Tex. May 18, 2021). That provision directed the SBA to prioritize grants to restaurant owners who are members of socially disadvantaged groups, which included racial minorities. *Id.* at 2–3.[12] The court rejected SBA's argument that it had a compelling interest in applying race-based remedies because Congress had failed to identity the "industry specific evidence" that is necessary to show "a strong basis in evidence." *Id.* at 12 (quotation omitted). The same is true here.

**Third**, although SB 278 indicated it was intended to "address issues relating to the Coronavirus Disease 2019 (COVID-19)," SB 278, § 4(a), that cannot provide a compelling interest for Section 1005's race-based distinction. SB 278 does not mention COVID-19 again or provide any evidence—let alone a "strong basis in evidence"—regarding the effect of COVID-19 on "socially disadvantaged" farmers and ranchers. More fundamentally, responding to a disease or pandemic has never been recognized as a permissible basis for government discrimination on the basis of race.

### B.   Section 1005 Is Not Narrowly Tailored

Even if there were a compelling interest that could justify a race-based loan assistance program, any such program must be narrowly tailored to

---

[12] The SBA program only applied a *presumption* that racial minorities are "socially disadvantaged." *See* 13 C.F.R. § 124.103. In contrast, under Section 1005, race is conclusive.

ensure that the use of racial preferences is a "last resort." *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cty.*, 122 F.3d 895, 926 (11th Cir. 1997). The narrow tailoring inquiry "must be intrusive, and focused very closely and in a very precise way on the specific terms of the regulation or policy under review, because only with that kind of searching examination can a court ensure that the defendant's use of race is truly as narrow as the Constitution requires." *Johnson*, 263 F.3d at 1251. A "searching examination" shows that Section 1005's race-based restriction is not narrowly tailored, in at least three ways.

### 1. Section 1005 uses a rigid race-based remedy

The rigid and categorical nature of Section 1005's loan assistance program shows that it is not narrowly tailored. *See Johnson*, 263 F.3d at 1255 (finding no narrow tailoring where the government used a "rigid, mechanical approach to considering race"). Under Section 1005, every farmer or rancher who is a racial minority qualifies for loan forgiveness—regardless of evidence of need or past discrimination. Indeed, a minority farmer who acknowledges that he has *never* been discriminated against in farm loans, farming, or elsewhere would still unquestionably qualify for loan assistance under Section 1005. Likewise, minority farmers who have already obtained redress for past discrimination would still qualify for loan assistance under Section 1005.[13]

---

[13]  *See American Rescue Plan Debt Payments FAQ*, https://www.farmers.gov/americanrescueplan/arp-faq (last updated May 21, 2021) ("Question 3: I was a successful

Thus, the relief provided for in Section 1005 has "no logical stopping point." *Croson*, 488 U.S. at 498 (quotation omitted). By contrast, a white farmer cannot qualify for loan assistance under Section 1005 no matter how significant his need or how dire his individual circumstances. This rigid and categorical race-based classification cannot satisfy narrow tailoring.[14]

### 2. Section 1005 arbitrarily benefits members of certain racial groups

Section 1005 "gives an arbitrary or disproportionate benefit to members of the favored racial groups." *Johnson*, 263 F.3d at 1253. The evidence cited in SB 278 suggests at most that some minority farmers and ranchers have historically been discriminated against in applying and qualifying for farm loans. But Section 1005 does not directly address this problem by targeting relief to those who were discriminated against. Indeed, by definition, its loan assistance program can only apply to those who have *successfully acquired* farm loans, not those who were *unable* to obtain farm loans due to

---

claimant in a class action settlement (e.g., Pigford, Keepseagle), and received debt forgiveness. I have secured one of the eligible loans, do I still qualify? [Answer:] Yes, if you have eligible indebtedness as of January 1, 2021.").

[14] The rigid racial classification here contrasts with the federal contracting preference for "disadvantaged business entities" (DBEs), which some courts have found narrowly tailored because "[t]hough the minority groups in question are given presumptive DBE status across the board, the federal regulations ultimately require individualized determinations." *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 945 (7th Cir. 2016). In the Seventh Circuit's view, this ensures that the program "requires states to extend benefits only to those who are actually disadvantaged." *Id.* at 946. Section 1005 contains no such safeguard.

discrimination.[15] That blunderbuss approach necessarily and arbitrarily excludes those who would have suffered most from lending discrimination, making it an exceedingly poor fit for remedying the problem alleged in SB 278.

Furthermore, the "random inclusion of racial groups" for which there is no evidence of past discrimination demonstrates that a program is not narrowly tailored. *See Croson*, 488 U.S. at 506. Although proposed findings in SB 278 refer to alleged instances of lending discrimination against Black and Hispanic farmers, Section 1005 provides loan assistance for *every* minority race—including Asian Americans and Pacific Islanders, for whom SB 278 provides no particularized evidence of discrimination. Farmers and ranchers who are members of any racial group recognized by USDA other than "White" qualify for loan assistance under Section 1005, regardless of whether there is evidence that group members have suffered racial discrimination in farm loan administration. This "suggests that perhaps [Congress's] purpose [in enacting Section 1005] was not in fact to remedy past discrimination." *Croson*, 488 U.S. at 506.

The Eleventh Circuit decision in *Howard v. McLucas*, 871 F.2d 1000 (11th Cir. 1989), provides a valuable contrast. There, the court found a plan to

---

[15] *See American Rescue Plan Debt Payments FAQ*, https://www.farmers.gov/americanrescueplan/arp-faq ("If you do not have a current farm loan, you are not eligible for debt relief under Section 1005 . . . .").

consider race in the promotion of employees who had suffered from discrimination to be narrowly tailored because (1) the plan was "directed only to the wage grades where discrimination had occurred" and (2) the company promoted precisely the same number of employees that could be shown to have been adversely impacted by past discriminatory promotion practices. *Id.* at 1008–09. Here, Section 1005's loan forgiveness program applies to *every* minority farmer with a farm loan, regardless of the value of the loan, when the loan was acquired (as long as it had an outstanding balance on January 1, 2021), or whether there is any concrete evidence of racial discrimination. This arbitrary and disproportionate benefit does not satisfy narrow tailoring.

### 3.    Section 1005 ignores available race-neutral alternatives

The narrow tailoring analysis requires Defendants to engage in "serious, good faith consideration of workable race-neutral alternatives" that would allow them to achieve the interest they believe to be compelling. *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). This will ordinarily involve proof "that Congress had carefully examined and rejected race-neutral alternatives." *Croson*, 488 U.S. at 507. Yet here, there is no indication that Congress considered race-neutral alternatives before selecting a blanket policy of loan repayment for all farmers and ranchers who are racial minorities. *See Virdi v. DeKalb Cty. Sch. Dist.*, 135 F. App'x 262, 268 (11th Cir. 2005) (finding no

narrow tailoring where "there is no evidence that the District considered race-neutral alternative means of tracking its activities"); *Johnson*, 263 F.3d at 1259 (concluding that the defendant "fails to show on this record that it meaningfully considered, let alone rejected as insufficient, any wholly race-neutral alternatives to the [challenged] race-conscious admissions policy").

That omission is especially devastating because such alternatives appear readily available. For example, if Congress believed that there was ongoing lending discrimination that disproportionately affected minority farmers, it could have tailored a remedy to meet that problem, such as by ramping up enforcement of antidiscrimination laws or enhancing its oversight of USDA's lending practices. It could also have allocated additional settlement funds or eliminated statutes of limitations or other legal obstacles for those who could show concrete evidence of discrimination. Or, if there was ongoing concern about the ability of minority farmers to access farm loans in the first place, Congress could have increased outreach or funding for such loans.

Similarly, if Congress's intent was to help individually disadvantaged farmers and ranchers (including those impacted by COVID-19), there are several obvious race-neutral alternatives. It could have directed Defendants to extend loan forgiveness based on a showing of severe economic need. Or it could have relied on income-to-debt ratios or similar metrics to identify farmers and ranchers who could most benefit from loan assistance. Even if these

alternatives would have required additional investigation or the dedication of additional administrative resources, an "interest in avoiding the bureaucratic effort necessary to tailor remedial relief . . . cannot justify a rigid line drawn on the basis of a suspect classification." *Croson*, 488 U.S. at 508. Congress's failure to consider available alternatives is convincing proof that Section 1005's loan assistance program is not narrowly tailored. Instead, the text and history of Section 1005 are a clear indication that Congress is "committed . . . to using race" until "it is precluded from doing so." *Johnson*, 263 F.3d at 1259. That approach cannot survive the narrow tailoring inquiry.

## II.   Mr. Wynn Will Suffer Irreparable Harm Without a Preliminary Injunction

An injury is irreparable when it "cannot be undone through monetary remedies." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983); *see also United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1358 (11th Cir. 2019) (explaining that when it is unlikely that a plaintiff will be able to recover money damages, his injury is irreparable). That is true here. Farmers or ranchers who have their farm loans forgiven under Section 1005 will gain an unfair competitive advantage over those, like Mr. Wynn, who are required to continue to pay their farm loans and are therefore unable to use that capital for other investments or improvements. Even if Section 1005 is eventually

invalidated, that would not reinstitute any loans that were forgiven during the pendency of the litigation and therefore cannot restore the status quo.[16]

Moreover, Mr. Wynn cannot seek monetary relief due to sovereign immunity. *See Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) ("In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."); Order, *Greer's Ranch Café*, ECF No. 11 at 16 (holding that plaintiffs' "injuries are . . . irreparable in light of Defendants' sovereign immunity"). Thus, allowing Defendants to implement the "socially disadvantaged" portions of Section 1005 during the pendency of this litigation would "impair the implementation and effectiveness of any remedy provided by the Court." *Lathers, Local 251-L v. Jones*, No. 89-0063-CIV-ORL-19, 1989 WL 224950, at *2 (M.D. Fla. Mar. 17, 1989). A preliminary injunction is necessary to preserve the status quo and ensure that Mr. Wynn is able to secure full relief. *See Burgos v. Univ. of Cent. Fla. Bd. of Trs.*, 283 F. Supp. 2d 1268, 1271 (M.D. Fla. 2003) ("The primary purpose of a preliminary injunction is to preserve the

---

[16] The USDA has indicated that it will begin processing payments in June. *See* https://www.farmers.gov/sites/default/files/2021-05/arp-timeline-pdf.pdf (last visited May 24, 2021). Once the USDA has begun forgiving loans, any court order which merely restrains future loan forgiveness will no longer provide Plaintiff with full relief. Not granting a preliminary injunction will therefore irreversibly alter the status quo and limit Plaintiff's ability to secure full relief.

status quo until the merits of the controversy can be fully and fairly adjudicated" (internal quotation marks omitted)).[17]

## III. The Balance of Equities Tips in Mr. Wynn's Favor and an Injunction Is in the Public Interest

The irreparable harm that Mr. Wynn will suffer without a preliminary injunction outweighs any harm that the preliminary injunction would cause Defendants. When a constitutional right hangs in the balance, that usually trumps the harm to defendants. *See Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1272 (11th Cir. 2020) (loss of the right to vote outweighed the government's asserted harms); *Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 3041326, at *21 (S.D. Fla. June 6, 2020) ("irreparable harm to [plaintiffs'] constitutional rights and health" outweighs asserted government interests). Moreover, Defendants cannot show that an injunction would cause them any direct harm, since it would simply prevent them from providing loan assistance

---

[17] Although Mr. Wynn's primary irreparable harm argument is that monetary relief is barred by sovereign immunity, his denial of equal protection is also an irreparable harm. The Eleventh Circuit held several decades ago that an equal protection injury does not in and of itself constitute irreparable harm. *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285–86 (11th Cir. 1990). But that is contrary to the "well-settled" conclusion that many other courts subsequently reached in equal protection cases. *See, e.g.*, *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019) ("[W]ell-settled law supports the constitutional-violation-as-irreparable-injury principle . . . ."); *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000) (rejecting the argument that the presumption of irreparable harm in constitutional cases only applies to First Amendment injuries). In light of the "well-settled" consensus that "the deprivation of constitutional rights unquestionably constitutes irreparable injury," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), the continued viability of *Northeast Florida Chapter* is in doubt, especially since an equal protection injury almost always carries with it non-monetary harm, such as shame or stigma, that is hard to quantify.

in a race-based fashion. By contrast, Mr. Wynn would suffer an irreparable violation of his constitutional rights absent a preliminary injunction.

A preliminary injunction would also serve the public interest because "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). Indeed, "the public . . . has no interest in enforcing an unconstitutional law." *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); *see also Vigue v. Shoar*, 494 F. Supp. 3d 1204, 1231 (M.D. Fla. 2020) (similar). Because Mr. Wynn has shown a strong likelihood of success, the public interest factor weighs in his favor.

## IV.    No Security Should Be Required

This Court has discretion to determine the amount of security required under Rule 65(c) and it is "well-established" that it "may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005). This is particularly appropriate in "[p]ublic interest litigation" such as this case. *Booher v. Marion Cty.*, No. 5:07-CV-00282, 2007 WL 9684182, at *4 (M.D. Fla. Sept. 21, 2007). Vindicating Mr. Wynn's equal protection rights is strongly in the public interest, and there is no need for a bond or other security.

## CONCLUSION

The Motion for a Preliminary Injunction should be granted.

Dated: May 25, 2021.

Respectfully submitted,

PACIFIC LEGAL FOUNDATION

                                                 s/ Wencong Fa
Christina M. Martin                      Wencong Fa*
Fla. Bar No. 100760                      Cal. Bar No. 301679
4440 PGA Blvd., Suite 307                Lead Counsel
Palm Beach Gardens, FL 33410             Daniel M. Ortner*
Telephone: (561) 619-5000                Cal. Bar No. 329866
Facsimile: (561) 619-5006                930 G Street
Email: CMartin@pacificlegal.org          Sacramento CA 95814
                                         Email: WFa@pacificlegal.org
                                         Email: DOrtner@pacificlegal.org

                                         Glenn E. Roper*
                                         Colo. Bar No. 38723
                                         1745 Shea Center Dr., Suite 400
                                         Highlands Ranch CO 80129
                                         Telephone: (916) 419-7111
                                         Facsimile: (916) 419-7747
                                         Email: GERoper@pacificlegal.org

                                         *Attorneys for Plaintiff*
                                         * Special admission

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2021, I caused the foregoing to be served

via U.S. Mail (certified) on the following parties:

Thomas J. Vilsack, Secretary
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Washington, DC 20250

Zach Ducheneaux, Administrator
Farm Service Agency
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Washington, DC 20250

Additionally, I certify that the foregoing was sent via U.S. Mail (certified)

to the United States Attorney General at the following address:

Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

s/ Wencong Fa
Wencong Fa*
Cal. Bar No. 301679
Lead Counsel
* Special Admission