IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SCOTT WYNN, an individual,

       *Plaintiff*,

v.

TOM VILSACK, in his official capacity
as Secretary of the U.S. Department of
Agriculture, *et al.*,

       *Defendants.*

No. 3:21–cv–00514–MMH–JRK

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Congress enacted Section 1005 of the American Rescue Plan Act (ARPA) to provide debt relief to socially disadvantaged farmers who it determined needed such relief due to decades of discrimination against them in U.S. Department of Agriculture (USDA) programs, the disproportionate impact of COVID-19 on them, and the failure of prior funding to reach them. Plaintiff, a white farmer who has been the recipient of thousands of dollars in USDA benefits—not the victim of USDA discrimination—seeks to enjoin USDA from providing debt relief to minority farmers because he alleges they will then gain an unfair advantage over him. Plaintiff's motion should be denied.

Plaintiff does not satisfy any of the requirements for such extraordinary relief. First, he cannot establish irreparable harm because he provides no evidentiary support for his conclusory allegation that he will suffer competitive disadvantage if USDA implements § 1005. He admits circuit precedent forecloses his ability to establish irreparable harm on the basis of his equal protection allegation. And he cannot rely on the irreparable nature of his alleged harm where he has not shown a harm in the first place.

Second, Plaintiff has not shown a likelihood of success on the merits of his equal protection claim. The Supreme Court has recognized that both of Congress's interests in enacting § 1005—remedying prior discrimination against minority farmers in USDA programs and ensuring that its funding does not serve to perpetuate the effects of that discrimination—are compelling. Congress had strong evidence, including testimony and reports spanning decades and up to the enactment of § 1005, documenting discrimination against minority farmers in USDA programs and its lingering effects,

thereby necessitating the remedial action in § 1005.  And Congress narrowly tailored its remedy by directing one-time payments to the groups it found to have suffered such discrimination, only after trying race-neutral alternatives for decades.

Third, the balance of interests tilts decisively in favor of Defendants.  Congress sought in § 1005 to provide debt relief to minority farmers disadvantaged by decades of discrimination in USDA programs and to ensure that, unlike prior funding—which went overwhelmingly to white farmers like Plaintiff—this funding did not perpetuate the effects of that discrimination at a time when minority farmers needed relief most. Those interests dwarf any alleged competitive disadvantage this single Plaintiff could possibly suffer due to implementation of § 1005.

## BACKGROUND

### I.    USDA'S FARM SERVICE AGENCY AND FARM LOAN PROGRAMS

USDA's Farm Service Agency (FSA) administers a variety of farm credit and benefit programs.  *See* Consol. Farm and Rural Dev. Act, 7 USC §§ 1921, *et seq.*; 7 CFR § 2.42(a)(28).  Like its predecessor the Farmers Home Administration (FmHA), FSA makes credit available to farmers who cannot obtain it from commercial institutions, 7 USC §§ 6932(b), including by making loans directly to farmers, *see id.*, and guaranteeing loans of commercial lenders up to 95%, 7 CFR § 762.129, to expand opportunities for farmers and ranchers, *id.* § 762.101.[1]  These loans assist farmers with buying or improving farm property, *id.* § 764.151 ("farm ownership" loans), provide

---

[1] For ease of reference, Defendants use "farmers" to include "farmers and ranchers."

credit and management assistance to help farmers run their farms, *id.* § 764.251 ("operating" loans), or help farmers resume operations after a disaster, *id.* § 764.351 ("emergency" loans).  *See* 7 USC §§ 1923, 1942, 1963.

Local committees have been key to the administration of USDA loan programs, *see* 16 USC § 590h(b)(5), though their structure and role in those programs have changed, *see* Congressional Research Service (CRS), FSA Comms.: In Brief (Jan. 29, 2021) (FSA Comms.).[2]  In 2002 and 2008, Congress adopted measures to ensure minority representation on the committees.  *Id* at 2-3.  And though county committees used to work with individuals to complete loan applications, make decisions about borrower eligibility and status, and determine loan amounts, *Garcia v. Johanns*, 444 F.3d 625, 628–29 (D.C. Cir. 2006), today they are uninvolved in the loan approval process, *see* FSA Comms. 3.  Now, they generally advise USDA loan officers on regional issues, conduct outreach to farmers, provide education and training, and ensure Socially Disadvantaged Farmers and Ranchers (SDFRs) are fairly represented.  *See id.*[3]

## II.  THE HISTORY OF DISCRIMINATION AGAINST SOCIALLY DISADVANTAGED FARMERS IN USDA PROGRAMS

Although USDA aims to serve all farmers equitably,[4] decades of evidence shows that not all USDA stakeholders have benefitted equally from its services—particularly its farm loan services.  *See infra* Argument (Arg.) II.B.  In fact, the evidence

---

[2] *Available at* https://perma.cc/HA3L-PDPG.
[3] As explained below, USDA defines SDFRs to include certain racial and ethnics minorities; herein, Defendants refer to SDFRs and minority farmers interchangeably.
[4] *History and Mission*, FARM SERVICE AGENCY, https://perma.cc/B47X-MTCL.

indicates just the opposite: that throughout USDA's history and up to present day, minority farmers have been "hurt" more than helped due to discrimination in USDA's farm loan programs.  Civil Rights at the [USDA]—A Report by the Civil Rights Action Team (CRAT) 6 (1997) (CRAT Rep.)[5]; *see also* Arg. II.B.

Minority farmers have long experienced inequities in FSA's administration of farm loans, including with respect to loan approval rates, amounts, and terms.  *See* U.S. Commission on Civil Rights (USCCR), *The Decline of Black Farming in America* 84-85(1982) (1982 Rep.)[6] (discussing complaints of loan amounts being reduced or repayment schedules "accelerated without explanation"); *see also* CRAT Rep. 16 (discussing complaints of loans being "arbitrarily reduced" or not arriving as promised); Hr'g on the USDA's Civil Rights Prog. for Farm Prog. Participants before House Subcomm., Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Ag., 107th Cong. 23, 16-21, 33-35 (2002) (2002 Civil Rights Hr'g) (discussing disparities in loan processing times and approval rates for Hispanic farmers and discrimination complaints by "black, American Indian, [and] Hispanic" farmers).  These experiences are recounted in numerous reports and the many administrative civil rights complaints filed by minority farmers.  *See* Arg. II.B.  But those complaints have failed to remedy individual experiences of discrimination in FSA's loan programs, because too often they languished in a growing backlog or went unanswered altogether.  *See id.*

---

[5] *Available at* https://perma.cc/5DNF-PFJY.
[6] *Available at* https://perma.cc/CFE9-ANJ3.

These problems spawned a series of lawsuits against USDA by groups of minority farmers.[7]   From 1997 and over the next decade, African-American, Native American, Hispanic, and female farmers alleged that USDA systematically discriminated against them in the administration of farm loans and other benefits and failed to investigate discrimination complaints.  *See Pigford II*, 856 F. Supp. 2d at 8; Arg. II.B. Although USDA settled the lawsuits and has paid more than $2.4 billion to claimants, *see* Arg. II.B., State taxes eroded recoveries, debt relief was incomplete, and reports before Congress showed that the settlements have not cured the problems faced by minority farmers.  *See* 167 Cong. Rec. S1264 (Mar. 5, 2021) (Stabenow).

Even after the lawsuits, investigations revealed that Socially Disadvantaged Groups ("SDGs") continued to experience discrimination with respect to the requirements, availability, and timing of FSA loans.  *See* Arg. II.B (discussing Jackson Lewis LLP, "Civil Rights Assessment" (Mar. 31, 2011) (JL Report)).[8]   Just this year, the Government Accountability Office (GAO) noted that "[c]oncerns about discrimination in credit markets … have long existed" and that, as a result, minority farmers continue to "ha[ve] less access to credit."   GAO-21-399T, Fin. Servs.: Fair Lending, Access, and Retirement Sec. 1 (2021).[9]   As these and other reports have documented,

---

[7] *Pigford v. Glickman* ("*Pigford I*"), No. 97-1978 (D.D.C.); *Keepseagle v. Veneman*, No. 99-03119 (D.D.C.); *Garcia*, No. 00-2445 (D.D.C.); *Love v. Glickman*, No. 00-2502 (D.D.C.); *In re Black Farmers Discrimination Litigation* ("*Pigford II*"), No. 08-mc-0511 (D.D.C.).
[8] *Available at* https://perma.cc/8X6Q-GZ5V.
[9] *Available at* https://perma.cc/3CWQ-B959.

discrimination in USDA's loan programs has contributed to a dramatic loss of minority-owned farmland.  *See* Arg. II.B; *see, e.g.*, 1982 Rep. 176 (reporting that from 1920 to 1992, the number of all minority-owned farms fell from 925,000 to around 60,000).

## III.  CONGRESSIONAL RECOGNITION OF DISCRIMINATION AGAINST SOCIALLY DISADVANTAGED FARMERS IN USDA PROGRAMS AND PAST FAILURES TO REMEDY ITS LINGERING EFFECTS

The history of discrimination against minority farmers in USDA programs has not gone unnoticed by Congress.  For decades, Congress has heard testimony and acknowledged such discrimination, during numerous hearings to understand and remedy its ongoing effects.[10]  And in passing § 1005, Congress did so again.

The predecessor to § 1005 included findings highlighting the pattern of discrimination in USDA programs and its consequences for minority farmers.  *See* S.278, "Emergency Relief for Farmers of Color Act of 2021," (intr'd Feb. 8, 2021).  The bill noted that over the last century, Black farmers dwindled from 14 to two percent of all

---

[10] *See, e.g.,* Hr'g on USDA's Civil Rights Progs. and Responsibilities before The House Subcomm. on Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Ag., 106th Cong. 37 (1999) (Goodlatte) (recognizing that "[c]ivil rights at the [USDA] has long been a problem"); 2002 Civil Rights Hr'g 16, 18, 26 (hearing testimony about the disparities in loan processing times and approval rates for Hispanic farmers; underrepresentation of minorities in USDA; and continuing delays in the resolution of civil rights complaints); Hr'g to Review the USDA's Farm Loan Progs. before the Senate Comm. on Ag., Nutrition, and Forestry, 109th Cong. 800 (2006) (Karen Krub, Farmers' Legal Action Group, Inc.) ("[T]here is still no meaningful process for investigation and resolution of allegations of discrimination [against] FSA decision-makers."); Hr'g to Review Availability of Credit in Rural America before the House Subcomm. on Conserv., Credit, Energy, and Research, Comm. on Ag., 110th Cong. 8 (2007); Hr'g on Mgmt. of Civil Rights at the USDA before the House Subcomm. on Gov't Mgmt., Org., and Procurement, Comm. on Oversight and Gov't Reform, 110th Cong. 137 (2008) (hearing testimony about, and recognizing, the continued problem of USDA discrimination against minority farmers, including the inability of Native American and Hispanic farmers to receive loans; underrepresentation of minorities on county committees; and delayed processing of civil rights complaints, including allegations that complaints were shredded and not processed, all despite creation in 2002 of the Assistant Secretary of Civil Rights); House Ag. Comm. Hr'g on U.S. Ag. Policy and the 2012 Farm Bill (Apr. 21, 2010); House Ag. Comm. Hr'g on USDA Oversight 45, 50 (July 22, 2015).

farmers and lost about 80% of their land. *Id.* § 2, ¶ 5(A)-(C). The findings attributed the losses to minority farmers to various "civil rights violations by the Federal Government," *id.* ¶ 1(B), including persistent discrimination at USDA, *id.* ¶¶ 2-15.

Floor statements leading to the passage of § 1005 echoed those findings. As Chairman of the House Agriculture Committee, David Scott, put it, "[t]he systemic discrimination against … farmers of color by USDA is longstanding and well-documented and continues to present barriers for these producers to participate in the agricultural economy." 167 Cong. Rec. H765 (Feb. 26, 2021). He recounted "this history and the continuing challenges for these farmers" by summarizing over a dozen reports between 1965 and 2019, which showed how discrimination against them manifested at all levels of USDA—from lacking representation on county committees, to receiving disproportionately fewer farm loans, to being denied an adequate process for resolving civil rights complaints. *Id.* H765-66. Senator Cory Booker cited some of the same evidence in attributing the massive loss of Black-owned farmland to the "brutal legacy of discrimination by [USDA]." *Id.* S1265; *see also id.* S1262 (Stabenow) (citing studies estimating losses "at more than $120 billion in lost opportunities").[11]

### A. Congress Concludes that Its Previous Efforts Failed To Address—and Indeed Perpetuated—the Disparities Caused By the Longstanding Discrimination Against Socially Disadvantaged Farmers.

At the same time, Congress acknowledged that its previous efforts to remedy

---

[11] M. Gordon, "Revolution is Based on Land: Wealth Denied via Black Farmland Ownership Loss" (Dec. 17, 2018) (Tufts University), https://perma.cc/YJ9U-KC7E; USDA, *Who Owns the Land? Agricultural Land Ownership by Race/Ethnicity, Rural Amer.* at 55-57 (2002), https://perma.cc/FG7J-YJEQ.

the lingering effects of discrimination against minority farmers in USDA programs "ha[d] fallen short." *Id.* S1262 (Stabenow).  As Senator Stabenow explained, Congress began targeting USDA assistance to SDFRs during the agriculture credit crisis in the 1980s, created a program to provide outreach and technical assistance to SDFRs in 1990 (the "2501 Program"), and permanently funded the 2501 Program in 2018.  *See id.* S1263-64.  In response to the lawsuits brought by groups of farmers against USDA, Congress suspended statutes of limitations for Equal Credit Opportunity Claims in 1998, and in 2010, it provided $1.25 billion to ensure that those claimant groups received payments under their respective settlements.  *See id.* S1264.  Also in 2002, Congress created the Office of the Assistant Secretary for Civil Rights at USDA to ensure better compliance with civil rights laws.  *See id.*  And in 2014, it created a permanent Office of Tribal Relations under the Secretary of Agriculture.  *See id.*

Despite these efforts, Congress found that minority farmers continued to suffer the effects of discrimination in USDA programs.  Two GAO reports mandated by Congress in 2018 illuminated the extent of the problem, *see* GAO-19-539, Ag'l Lending: Info. on Credit & Outreach to [SDFRs] Is Limited 2 (2019)[12]; GAO-19-464, Indian Issues: Ag'l Credit Needs and Barriers to Lending on Tribal Lands (2019),[13] revealing that SDFRs still had "more difficulty getting loans and credit from USDA … [that] can help beginning farmers break into the business and help existing farmers

---

[12] *Available at* https://perma.cc/5RD6-24VH.
[13] *Available at* https://www.gao.gov/assets/gao-19-464.pdf.

continue running their operations," S1264 (Stabenow) (citing Nat'l Young Farmers Coal., Cal. Young Farmers Rep. 32 (Apr. 2019)).[14]

Congress also found that, due to the lingering effects of the longstanding discrimination against minority farmers, "Black farmers and other farmers of color were in a far more precarious financial situation before the COVID–19 pandemic hit"—and a year into the pandemic, some "ha[d] simply not been able to weather the storm." *Id.* S1265-66 (Booker). For instance, Congress observed that a disproportionate number of Black, Hispanic, Asian-American, and Indigenous farmers were in default on their direct loans, putting farmers of color at risk of "facing yet another wave of foreclosures and potential land loss." *Id.* (citing statistics that 13% of borrowers with FSA direct loans were currently delinquent but that number increased to 35% for Black farmers and 24% for Hispanic, Asian-American, and Indigenous farmers); *see also id.* at S1264 (Stabenow explaining that SDFRs are more likely to have loans in default because they "are less likely to have the same access to adequate loan servicing … as their White counterparts" due to discrimination in USDA loan programs); Review of the Off. of the Assistant Sec'y for Civil Rights, Hr'g before the House Subcomm. On Nutrition, Oversight, and Dep't Ops., Comm. on Ag., 116th Cong. 25, 9 (2019) (2019 Civil Rights Hr'g) (Adams) (citing reports that Black farmers were subject to 13% of USDA foreclosures despite being less than 3 percent of direct loan recipients).

Despite the particularly vulnerable position of minority farmers, lawmakers

---

[14] *Available at* https://perma.cc/PEY5-Z253.

cited reporting that the overwhelming majority of recent agricultural subsidies and pandemic relief prior to ARPA went to non-minority farmers—again, in part due to the lingering effects of discrimination.  Specifically, the reporting indicated that 99.4 percent of USDA's Market Facilitation Program (MFP) payments went to white farmers, *see* S1264-65; *see also id.* H766,[15] and nearly 97 percent of the $9.2 billion provided through USDA's first Coronavirus Food Assistance Program (CFAP) in 2020 likewise went to non-minority farmers, *see id.* S1264-65; H766.[16]  Senator Stabenow explained that "[t]he diminished relationships between [SDFRs] and USDA as a result of both latent barriers and historic discrimination limit[ed]" SDFRs' access to, and participation in, USDA programs, such that "73 percent of Black farmers … were not even aware of the agricultural aid provisions of the[se] coronavirus rescue programs."  *Id.* S1264.[17]  A letter introduced into the record from 13 full-time professors who specialize in agricultural issues explained that federal farm programs "have perpetuated and exacerbated the problem," by preferring certain crops (those produced by white farmers) and "reward[ing] the largest farms the most" (those owned by white farmers),

---

[15] Citing N. Rosenberg, *USDA Gave Almost 100 Percent of Trump's Trade War Bailout to White Farmers*, Farm Bill Law Enterprise, https://perma.cc/T7SY-TZQM.  In 2018 and 2019, FSA was authorized to distribute up to $25.1 billion through the MFP to assist producers directly affected by retaliatory tariffs by China.  The MFP is reportedly the single largest subsidy to farmers and "has almost exclusively benefitted white men and their families."  *Id.*

[16] Citing J. Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, Envir'l Working Group (EWG) (Feb. 18, 2021), https://perma.cc/PVZ7-QMFD.  CFAP was created in 2020 pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to assist producers who faced market disruptions due to COVID-19.  It consisted of $16 billion in direct support to producers and $3 billion to buy agricultural products and re-distribute them to Americans in need.  *See USDA Announces [CFAP]*, USDA (Apr. 17, 2021), https://perma.cc/B7N9-PTRE.

[17] Citing Fed'n of S. Coops/Land Assist. Fund, Ann. Rep. 4 (2020), https://perma.cc/94PY-HSM6.

thereby "distort[ing] credit, land, input costs, and markets" to the disadvantage of minority farmers.  *Id.*[18]

## B.    Congress Enacts Section 1005 To Remedy Discrimination in USDA Programs and Avoid Perpetuating Its Effects.

On March 10, 2021, Congress passed ARPA, which provides widespread pandemic relief to the American people, including farmers.  *See* Pub. L. No. 117-2 (2021).  ARPA "takes a multipronged approach to tackle the public health and economic crises resulting from the COVID-19 pandemic."  H.R. Rep. No. 117-7, 3 (2021).  The House Report accompanying the bill shows that Congress was focused on the "most vulnerable communities … forced to bear the brunt of" the pandemic and resultant economic crisis "as underlying health and economic inequities grow worse."  *Id.* at 2.  Among those communities were minority farmers who had "received a disproportionately small share of the farm loans and payments administered by USDA as a result of … longstanding and widespread discrimination."  *Id.* at 23.

As part of ARPA, Congress passed § 1005, which was designed to "provide targeted and tailored support for … farmers," CR H765 (Scott), who "have for many decades suffered discrimination by [USDA]," *id.* S1265 (Booker), and who had not benefited from prior pandemic relief efforts, *see id.* H1273 (Rep. Neal) (explaining

---

[18] In addition to most of the reports cited herein, the letter also attached and summarized the following sources documenting USDA discrimination:  Hr'g on the Decline of Minority Farming in the United States, Comm. on Gov't Ops., U.S. House of Reps. (1990); D.J. Miller Disparity Study: Producer Participation and EEO Compl. Process Study), D.J. Miller & Associates report prepared for the USDA FSA (1996); USDA: Problems in Processing Discrim. Compls., GAO (2002); USDA: Recomms. and Options to Address Mgmt. Deficiencies in the Off. of the Assistant Secretary for Civil Rights, GAO (2008), https://perma.cc/YW73-83WE.  *See* S1266-67.

Black farmers were not targeted by other Covid-19 legislation); *see also id.* S1264-65 ("Congress includes these measures to address the longstanding and widespread systemic discrimination within the USDA, particularly within the loan programs, against [SDFRs].") (Stabenow); S.278, Sec. 4, ¶ (a)(1)-(2) (stating that its purpose was "to address the historical discrimination against [SDFRs] and … issues relating to … COVID–19 … in the farm loan programs[] and across the [USDA]").

Section 1005 provides funds to pay up to 120 percent of certain direct or guaranteed USDA farm loans held by a "socially disadvantaged farmer or rancher" and outstanding as of January 1, 2021.[19]  *See* § 1005.  For purposes of § 1005, Congress gave the term "socially disadvantaged farmer or rancher" the same meaning as in Section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990, codified at 7 USC § 2279(a).  *See id.* § 1005(b)(3).  That provision defines a "socially disadvantaged farmer or rancher" as "a farmer or rancher who is a member of a socially disadvantaged group," 7 USC 2279(a)(5), which is further defined as "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities," *id.* § 2279(a)(6).

USDA has long interpreted "socially disadvantaged group[s]" to include the following five groups: American Indians or Alaskan Natives; Asians; Blacks or Afri-

---

[19] Congress provided 20% over and above outstanding loan balances because State taxes eroded previous settlement payments to minority farmers.  *See* S1264 (Stabenow); David Zucchino, *Sowing Hope, Harvesting Bitterness*, LA Times (Mar. 23, 2012), https://perma.cc/V8TZ-C6RZ.

can Americans; Hispanics or Latinos; and Native Hawaiians or other Pacific Is-
landers. *See* 66 FR 21617-01 (Apr. 30, 2001) (interpreting 7 USC § 2279 to include
those groups for purposes of Outreach and Assistance for SDFRs Program); 74 FR
31571 (July 2, 2009) (same for Conservation Reserve Program); 75 FR 27615 (May
14, 2010) (same for Risk Management Purchase Waiver). USDA confirmed in a No-
tice of Funds Availability (NOFA) that SDGs would continue to "include, but are not
limited to," those same five groups, while others could be considered for inclusion on
a case-by-case basis by the Secretary in response to a written request. *See* NOFA.[20]

## IV.  PROCEDURAL HISTORY

On May 18, 2021, Plaintiff filed suit challenging USDA's implementation of §
1005. Doc. 1. Plaintiff, a farmer who identifies as white, alleges that he holds USDA
loans and would qualify for debt relief under § 1005 but for the fact that he is white.
*Id.* ¶ 4. He claims that USDA's interpretation of "socially disadvantaged farmer or
rancher" in § 1005 to include farmers who identify as falling within one of the five
aforementioned racial or ethnic groups, and not automatically white farmers like him,
violates equal protection, *see id.* ¶¶ 19, 52-53. On May 25, 2021, Plaintiff filed a motion
for preliminary injunction to enjoin USDA from enforcing § 1005. Doc. 11.

---

[20] *Available at* https://perma.cc/A35E-UANV.

## ARGUMENT

### I.   Plaintiff Has Not Shown That He Is Entitled To A Preliminary Injunction.

A preliminary injunction is a "drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion" on all four elements." *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001).[21]  Namely, that (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury absent an injunction; (3) the threatened injury to him outweighs the damage an injunction would cause to the opposing party; and (4) the injunction would not be adverse to the public interest.  *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020).  The latter two factors merge when the Government is the opposing party.  *Id.* at 1293.  "To carry [his] burden," the movant "must offer proof beyond unverified allegations in the pleadings"; "vague or conclusory affidavits" will not suffice.  *Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001).  Plaintiff has not carried his burden here.

### A.  Plaintiff Has Not Shown Irreparable Harm.

"A showing of irreparable harm is the *sine qua non* of injunctive relief."  *N.E. Fla. Ch. of the Ass'n of Gen. Contractors of Am. v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).  Even where a plaintiff can establish a substantial likelihood of success on the merits—Plaintiff cannot, *see* Arg. I.B—injunctive relief is inappropriate without showing irreparable harm.  *See Snook v. Tr. Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 486 (11th Cir. 1990).

---

[21] Herein, all internal alterations, citations, omissions, quotations, and subsequent history are omitted unless otherwise indicated.

Here, Plaintiff alleges that he will be irreparably harmed by the "unfair competitive [dis]advantage" he will suffer if USDA relieves the debt of minority farmers while he must continue to pay his USDA loans. PI Mot. 20. Plaintiff's unsupported allegation of competitive disadvantage—made only in his motion—is insufficient to carry his burden to establish irreparable harm. "Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support … a motion for a preliminary injunction." *Dragon Jade Int'l, Ltd. v. Ultroid, LLC*, 2018 WL 1833160, at *3 (M.D. Fla. Jan. 30, 2018) (quoting Charles Alan Wright, et al., 11A Fed. Practice and Proc. § 2949 (3d ed. 2017)). Plaintiff presents no such evidence.

Plaintiff's motion baldly alleges that he will suffer competitive disadvantage because, unlike minority farmers, he will be "required to continue to pay [his] farm loans." PI Mot. 20. But his declaration in support of his motion—the only support he provides—does not even allege that Plaintiff would suffer competitive disadvantage. *See* Wynn Decl., Doc. 12. A conclusory and unsupported allegation of competitive disadvantage in Plaintiff's motion simply does not suffice to establish irreparable harm for purposes of a preliminary injunction. *See Ne. Fla.*, 896 F.2d at 1285–86 (reversing lower court's finding of irreparable harm where movant presented nothing more than "[c]onjecture about a possibility of difficulties with damage computations," "a conclusory allegation of irreparable harm," and an assertion of speculative economic injury by his counsel; *Nivel Parts & Mfg. Co., LLC v. Textron, Inc.*, 2017 WL 1552034, at *2 (M.D. Fla. May 1, 2017) (movant failed to establish irreparable

harm "due to lost market share" where his declaration "consist[ed] mainly of conclusory statements and lack[ed] evidentiary support" and failed to "demonstrate that Nivel ha[d] lost market share ... or quantify Nivel's expected loss of market share").[22]

Rather than provide evidence to support his claim of harm, Plaintiff hangs his hat on the argument that his harm is irreparable because it "'cannot be undone through monetary remedies.'"  PI Mot. 20 (quoting *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983); *see also id.* at 21 ("Mr. Wynn cannot seek monetary relief due to sovereign immunity.") (citing *Odebrecht Const., Inc. v. Sec'y, Fla. DOT.*, 715 F.3d 1268, 1289 (11th Cir. 2013)).  But even if Plaintiff could show that his alleged harm were irreparable, he still must establish an actual or imminent harm "in the first place."  *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 38 F. Supp. 3d 1365, 1379 (N.D. Ga. 2014).  Holding otherwise would mean that a plaintiff who cannot obtain monetary relief from a governmental entity due to sovereign immunity would suffer irreparable harm no matter how unsupported and speculative his allegations of economic harm.  That is not the law.  *See  GeorgiaCarry.Org*, 38 F. Supp. 3d at 1379 ("It is the showing" of a likely deprivation, "not merely the allegation of [it], that amounts to irreparable harm"); *see also Odebrecht*, 715 F.3d at 1288 (in addition to finding harm irreparable because of

---

[22] Plaintiff also has not shown that any alleged competitive disadvantage he might suffer is "imminent."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).  USDA is currently identifying borrowers eligible to receive debt relief under § 1005 and intends to notify SDFRs with eligible direct loans of their eligibility by July 10, 2021.  *See* NOFA.  The required parties must then respond to USDA, certifying the information in the offer notice and accepting the offer before USDA will distribute any funds.  *See id.*  Only then could Plaintiff possibly even begin to suffer any competitive disadvantage.

sovereign immunity, finding three harms that were "actual and imminent").[23]

**B.  Plaintiff Has Not Shown That He Is Likely To Succeed On His Facial Challenge To Section 1005.**

Plaintiff likewise cannot show that he is likely to succeed on the merits of his facial challenge to § 1005 on equal protection grounds.  "The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it."  *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995).  Thus, "[a]lthough all governmental uses of race are subject to strict scrutiny, not all are invalidated by it."  *Grutter v. Bollinger*, 539 U.S. 306, 326-27 (2003).  "When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied."  *Id.* at 327.

Once the government shows that it had "a strong basis in evidence for its conclusion that remedial action was necessary," the plaintiff bears "[t]he ultimate burden … to demonstrate the unconstitutionality of an affirmative-action program."  *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277–78 (1986).  To prevail on a facial challenge to a regulation, a plaintiff must establish "that no set of circumstances exists under which [it] would be valid."  *GeorgiaCarry.Org, Inc. v. Ga.*, 687 F.3d 1244, 1255, n.19 (11th Cir. 2012).

---

[23] Plaintiff argues secondarily in a footnote that his alleged "denial of equal protection is also an irreparable harm."  PI Mot. 22 n.17.  But, as Plaintiff admits, that basis for irreparable harm is foreclosed by Circuit precedent.  *See id.* (acknowledging as much) (citing *Ne. Fla.*, 896 F.2d at 1285–86).

Plaintiff claims that USDA's use of racial classifications violates equal protection. *See* Compl. ¶¶ 52-53.  But the Supreme Court has recognized the government's compelling interests in remedying discrimination in agency programs and in ensuring that public funds are not allocated in a manner that perpetuates the effects of discrimination.  Congress relied on strong evidence showing the unfortunate, but well-documented, history of discrimination against minority farmers in USDA programs, including its loan programs, and recent gaps in funding to those same minority groups. And the remedy the government adopted is time-limited, necessary to meet an acute need in this historic moment, and tailored to the groups that Congress observed had suffered discrimination in USDA programs and had not received prior funds, while allowing for the inclusion of other groups determined to be socially disadvantaged. USDA's use of racial classifications to relieve the debts of SDFRs is thus a permissible means to further the government's compelling interests.

## 1. Section 1005 Serves Compelling Government Interests.

The government's compelling interest in relieving debt of SDFRs is two-fold: to remedy the well-documented history of discrimination against minority farmers in USDA loan (and other) programs and prevent public funds from being allocated in a way that perpetuates the effects of discrimination.  Its reliance on these interests did not break new ground.  "The Government unquestionably has a compelling interest in remedying past and present discrimination by a state actor." *United States v. Paradise*, 480 U.S. 149, 167 (1987).  And "[i]t is beyond dispute that any public entity ... has a compelling interest in assuring that public dollars drawn from the tax contributions of

all citizens do not serve to finance the evil of private prejudice." *City of Richmond v.*

*J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (O'Connor, J., plurality op.); *see also Hershell*

*Gill Consulting Eng'rs v. Mia.-Dade Cty*, 333 F. Supp. 2d 1305, 1316 (S.D. Fla. 2004).

The congressional record elaborates both concerns at length. *See supra* Background ("BG") III. And USDA has reiterated them. Indeed, Plaintiff acknowledges that USDA's stated goal in providing debt relief to minority farmers is to "address longstanding racial equity issues within [USDA]" and "respond to the cumulative impacts of systemic discrimination and barriers to access that have created a cycle of debt." Compl. ¶ 28 (quoting Opening Stmt. of Thomas J. Vilsack before House Comm. on Ag. (Vilsack Stmt.)).[24] Congress and USDA also expressed their interest in ensuring that funds are not allocated in a manner that perpetuates discrimination against minority farmers. *See* BG III. Members of Congress explained that minority farmers had been largely left out of prior agricultural funding (such as the MFP) and the pandemic relief in CFAP, *see id.*, and Secretary Vilsack stressed that the debt relief will help SDFRs "dealing with a disproportionate share of COVID infection rates, hospitalizations, death and economic hurt," Vilsack Stmt.

Thus, the government had compelling interests in adopting its "tailored approach" in § 1005 "to address these longstanding inequities" in USDA programs and congressional funding, made acute by a pandemic that disproportionately affected minority farmers. H.R. Rep. 117-7, 23.

---

[24] *Available at* https://perma.cc/3LWV-4SMF.

### 2. The Government Had Strong Evidence that Remedial Action Was Necessary To Further Its Compelling Interests.

The government need not make a "formal finding[] of discrimination" before adopting an affirmative action program, *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1565 (11th Cir. 1994), but it must have "a strong basis in evidence for its conclusion that such action was necessary" to further it compelling interests, *Croson*, 488 U.S. at 500, which it may establish through persuasive statistical data and anecdotal evidence, *Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cty.*, 122 F.3d 895, 907 (11th Cir. 1997).

Here, the decades of investigations, testimony, and reports on which Congress relied when it enacted § 1005 provide a strong basis in evidence to support its conclusion that targeted debt relief was necessary to address the lingering effects of historic discrimination against minority farmers in USDA programs, which was exacerbated by COVID-19 and the relative failure of prior funding to reach those farmers.

a. *The Government's Persuasive Evidence of Longstanding Discrimination Against SDFRs in USDA Programs.* As set forth below, in enacting § 1005, Congress relied on a vast body of statistical and anecdotal evidence recounting discrimination against SDFRs in USDA programs.

Reports by USCCR in 1965 and 1982 shed light on inequities in USDA's farm loan programs, which "actively contributed to the [alarming] decline in the Black ownership of farmland." 1982 Rep. 176. USCCR reported that between 1970 and 1980, Black-operated farms had declined "57 percent—a rate of loss 2 1/2 times that for white-operated farms"—and that "almost 94 percent of the farms operated by blacks

ha[d] been lost since 1920." *Id.* FSA (through its predecessor FmHA) was largely to blame. 1982 Rep. 176-79.

For instance, FmHA consistently provided inferior loans—in terms of amounts and repayment terms—to Black farmers as compared to their white counterparts, which was consistent with its overall pattern of "follow[ing] local patterns of racial segregation and discrimination in providing assistance" to farmers. Equal Opportunity in Farm Progs., An Appraisal of Servs. Rendered by Agencies of the USDA, USCCR (1965) (1965 Rep.) 100.[25] Data "revealed that in terms of the size of loans, purposes for which loans were to be used, and technical assistance, FmHA did not provide services to black farmers comparable to those provided to similarly situated whites." 1982 Rep. at 9. What's more, USDA's civil rights complaints process—an otherwise "important tool to ensure that FmHA provide[d] equal opportunities for minority farmers," *id.* at 134—was too "ineffective" and "untimely" to provide adequate recourse, *id.* at 169. Investigation into the large number of civil rights complaints showed they were often stalled or not acted on at all. *Id.* at 166-70. The cost of this discrimination was often "the season's crop, and ultimately the[] farm[]." *Id.* at 173.

That is exactly what such discrimination cost many farmers, according to another civil rights report issued over a decade later. When a team of USDA leaders appointed by the Secretary of Agriculture—the Civil Rights Action Team ("CRAT")—reviewed USDA's civil rights problems in 1997, it heard Black, Hispanic,

---

[25] *Available at* https://perma.cc/34HP-5V9P.

Asian-American, and American Indian farmers tell of unexplained delays in processing their loan applications, arbitrary reductions in farm loans by county officials, and failures to receive promised loans at all, often leaving them "without enough money to repay suppliers and any mortgage or equipment debts." *Id.* at 3, 6-7, 15-16. Many minority farmers lost "significant amounts of land and potential farm income" as a result of these practices. *Id.* at 30; *id.* at 14 (reporting that "the number of all minority farms ha[d] fallen" significantly''—"from 950,000 in 1920 to around 60,000 in 1992"); *see also* 1982 Rep. 176 (reporting similar findings). Like the USCCR, the CRAT found that USDA's civil rights complaints process was an ineffective "system without accountability," where complaints often languished for years in a growing backlog or were left unanswered altogether. *Id.* at 24-25.[26]

Lack of administrative recourse for discrimination led to a series of lawsuits over the next decade by African-American, Native American, Hispanic, and female farmers, alleging that USDA had systematically discriminated against them on the basis of race, ethnicity, and gender in the administration of farm loans and other benefits and routinely failed to investigate administrative complaints about such discrimination. *See Pigford II*, 856 F. Supp. 2d at 8 (describing allegations by African-American farmers that USDA had "deprived countless farmers of desperately needed credit and payments under various aid programs," causing "severe financial losses and even, in

---

[26] *See also* USDA OIG, *Rep. for Secretary on Civil Rights Issues – Phase I*, (1997), https://perma.cc/NK6B-W2CL.

many cases, los[t] … land"); *Cantu v. United States*, 565 Fed. App'x 7 (D.C. Cir. May 27, 2014) (summarizing similar allegations in the other suits).

Though the cases settled, the court in *Pigford I* stressed that the claims, "though broad in scope, were no exaggeration"—it was clear by then that USDA had failed to "provide equal opportunity for all as the law requires." *Pigford II*, 856 F. Supp. 2d at 8 (quoting CRAT Rep. 6). Farmers in that case recounted not only being denied loans but also receiving them after "planting season was over, [when] the loans w[ere] virtually useless," or receiving supervised loans requiring a county supervisor's co-signature before funds could be withdrawn. *Pigford I*, 185 F.R.D. 82, 87 (D.D.C. 1999). To receive payments under the settlements, claimants had to substantiate these claims of discrimination with some level of evidence. *Pigford II*, 856 F. Supp. 2d at 9-10 (explaining the settlement's two-track system that awarded differing amounts depending on a "substantial evidence" or "preponderance of the evidence" showing); *see also Cantu*, 565 Fed. App'x at 8-9 (explaining processes in other cases). In the *Pigford* litigation alone, so many African-American farmers sought relief that Congress enacted special legislation extending the statute of limitations for administrative civil rights complaints, *see* Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 14012 (2008), and then appropriated $1.25 billion to fund awards to successful claimants, *see* Claims Resolution Act of 2010, Pub. L. No. 111-291 (2010). To date, the government has paid more than $2.4 billion under settlement agreements with minority and female farmers who sufficiently substantiated their claims. *See Pigford I*, 97-cv-

1978, Doc. 1812, at 7; *Pigford II*, 08-mc-511, Doc. 378-1, at 4; *Keepseagle*, 99-cv-3119, Doc. 646, at 2; *Love*, 00-cv-2502, Doc. 248-1, at 4.

Even after the settlements, problems with discrimination in USDA programs lingered.  In 2011, the firm Jackson Lewis LLP ("JL") was commissioned by Secretary Vilsack to assess the "effectiveness" of USDA agencies "in reaching America's diverse population in a non-discriminatory manner."  JL Rep. i.  After a thorough 18-month investigation and analysis, JL issued a 569-page report setting forth its findings and 234 recommendations.  *See id.* at iv, viii.  The report compiled substantial anecdotal evidence, depicting "a system where the deck was always stacked, not only against access to USDA programs, but also against [customers'] ultimate success" due to their status as minorities.  *Id.* at viii.[27]  It found that the evidence "substantiated claims of denial of equal program access and continuing institutional discrimination," *id.* at viii, which resulted in "a broad and longstanding negative impact on … SDGs—including the loss of scarce or irreplaceable farm lands," *id.* at 64.[28]

Like preceding reports, the JL Report again recounted persistent complaints that African-Americans, Hispanics, and Asians were discriminated against with re-spect to the availability, timing, and requirements for obtaining FSA loans.  *See id.* at

---

[27] Relatedly, JL cited substantial statistical evidence that, in the every-day operations of each USDA agency reviewed, SDGs were under-represented to their detriment, *see id.* xxiii, including with respect to the FSA specifically, *id.* at 131; *see also id.* at 69-72.  This contributed to "serious concerns as to both inequitable service delivery … and employment discrimination."  *Id.* at 63.

[28] The JL Report included women in its groups of SDGs, along with Hispanics/Latinos; Blacks/Afri-can Americans; Asians; American Indians/Alaskan Natives; and Native Hawaiians/Pacific Islanders. *See id.* 66 n.33.  Although USDA's interpretation of SDGs, consistent with the statutory definition, includes only racial and ethnic groups, Defendants rely herein on JL Report's many findings specific to the aforementioned racial and ethnic groups.

83-87.  African-American farmers, for instance, complained of their loans being "doled out in small amounts by FSA or subject to dual signature" requirements, or having other supervision requirements not imposed on white farmers.  *Id.* at 85-86 ("When loans are approved for African Americans, FSA tends to 'control the purse strings' (uses supervised accounts), and the same is not true for Whites who receive loans[.]").[29]  Hispanic and Asian farmers similarly reported unfair treatment and being "stereotyped as … farm workers, rather than farm owners."  *Id.* at 86-87.  Additionally, the report found that USDA's discrimination complaints processing resulted in "what appear[ed] to be an almost foregone conclusion: in 97%+ of the claims, there [wa]s no finding of discrimination."  *Id.* at xxv.  It stressed that "most FSA employees" believed "that inequitable treatment of customers and potential customers is, at worst, a series of isolated and independent incidents."  *Id.* at 66.  That was incorrect, according to JL—in reality, "the inequities faced by SDGs have, over time, been systemic and ingrained in every-day FSA operations."  *Id.*

b. *The Government's Persuasive Evidence of Lingering Discrimination in USDA Programs.*  The inequalities described in the JL Report are reflected in recent reports that "continue to document the challenges and barriers faced by farmers of color due to race or ethnic discrimination or the legacy of such discrimination."  CR S1263 (Stabenow).  For instance, a 2017 study, cited by Chairman Scott before § 1005's enactment,

---

[29] In recent congressional testimony, Congress heard of black farmers receiving "'supervised' bank accounts which required white loan officers to co-sign every transaction."  Comm. Hr'g on State of Black Farmers, 2021 WL 1154123 (2021) (John Boyd, Nat'l Black Farmers Ass'n) (March 25, 2021).

focused on "the challenges faced by Latinx farmers," including the "failure of agricultural agencies to engage in appropriate outreach or account for language barriers" with respect to them.  H766 (citing L. Minkoff-Zern & S. Sloat, *A New Era of Civil Rights? Latino Immigrant Farmers and Exclusion at [USDA]*, AG. & HUMAN VALUES 34 (2017)) (attached as Ex. B).  The study's conclusion: "These processes have succeeded in creating agricultural racial formations, resulting in the ownership and operation of US farms remaining in primarily white hands."  Minkoff-Zern & Sloat, *A New* Era at 634.

Two additional GAO reports, generated at Congress's request, looked at the "challenges SDFRs reportedly face in obtaining agricultural credit[.]"  GAO-19-539, 2.  In the first report, GAO concluded that the "long-standing and well-documented" "allegations of unlawful discrimination against SDFRs in the management of USDA programs" were substantiated by the data and were continuing to affect SDFRs' ability to access credit.  *Id.* at 28-29.[30]  In the second report, specific to Native Americans, GAO noted that some Native American stakeholders believed "discrimination ... contribute[d] to the lack of commercial lending on tribal lands," which may also have "deter[ed] them from applying for credit" at all.  GAO-19-464, 19-20.

That same year, Congress held a hearing on civil rights compliance at USDA "to ensure the Department ... functions equally for everyone it serves and employs,

---

[30] Specifically, SDFRs accounted for an estimated 17% of primary producers in USDA's 2015-2017 Agricultural Resource Management Surveys but only 13% of farms with loans and 8 percent of total outstanding farm debt.  SDFR debt represented an estimated 9 percent of total farm ownership debt and 7 percent of total farm operating debt.  Therefore, even though farm ownership debt comprised most outstanding SDFR farm debt (67%), SDFR primary producers were still less likely to have outstanding farm ownership debt than all other farmers and ranchers.  GAO-19-539, 16.

regardless of race, gender, ethnicity, or any other protected class." 2019 Civil Rights Hr'g 1 (Fudge). By that time, the "controversial history on civil rights at USDA" was "no secret." *Id.* Congress repeated some of the same concerns about discrimination that motivated its, and USDA's, prior efforts to revise the Department's programing, including the higher foreclosure rates for black farmland, *id.* at 9, and the faster decline of farm ownership "for black farmers than for other farmers." *Id.* at 8.

In 2021, GAO released another report summarizing "more than a decade of [its] work" on issues related to income security and underscoring the "racial and income disparities in access to financial services and availability of credit," including among "minority farmers and ranchers." GAO-21-399T, 1. Drawing from previous reports and incorporating updated data, GAO concluded that minority farmers, including tribal members, "had less access to credit than other agricultural businesses." *Id.* at 1, 2-3 (statistics illustrating that they "received a disproportionately small share of farm loans and agricultural credit"). This evidence—and more—that Congress relied on in passing § 1005 was more than sufficient to justify its conclusion that there has been discrimination against minority farmers in USDA loan (and other) programs.

*c. The Government's Persuasive Evidence That Allocation of Prior USDA Funds Exacerbated the Effects of Longstanding Discrimination in USDA Programs.* Congress also had a strong basis in evidence to conclude that, while COVID-19 was hitting minority farmers the hardest, recent agricultural funding and pandemic relief was unfortunately perpetuating historic inequalities, creating a need for targeted relief. Numerous sources have reported the pandemic's disproportionate impact on the health and welfare of

minorities in the United States.  *See, e.g.*, COVID-19 Racial and Ethnic Health Disparities, CDC (Dec. 10, 2020), https://perma.cc/DJ3J-22DU.  Congress recognized this, *see* H.R. Rep. No. 117-7, 2-3 (noting that the "most vulnerable communities" had been "forced to bear the brunt of" the pandemic and economic crisis), and that like other minority groups, minority farmers were particularly vulnerable, *see* CR S1265 ("[F]armers of color were in a far more precarious financial situation" than their white counterparts "before the COVID-19 pandemic hit.") (Booker).  For instance, while "[a]pproximately 13 percent of borrowers with FSA direct loans [we]re currently delinquent on their loans," that number increased to 35% for Black farmers and 24% for Hispanic, Asian-American, and Indigenous farmers, meaning that minority farmers were on the precipice of "yet another wave of foreclosures and potential land loss." *Id.* S1266.

Despite their disproportionate need, Congress noted that although "[t]he USDA spends billions of dollars annually to provide crucial support to American agricultural producers," "agricultural producers belonging to racial or ethnic minority groups have received a disproportionately small share of the farm loans and payments administered by USDA as a result of the longstanding and widespread discrimination against these groups."  H.R. Rep. No. 117-7, 23; *see also id.* at 12 (noting that such programs "continue to disproportionately benefit farmers who are not racial or ethnic minorities").  Indeed, as discussed, Congress cited reporting that the overwhelming majority of recent agricultural funding and pandemic relief had gone to white farmers. *See* BG III.A.  The academic letter introduced into the record explained that these were

just the most recent examples of farm programs that "have perpetuated and exacer-bated the problem" of discrimination against minority farmers by favoring large, non-minority landowners.  CR S1266.  Congress thus had a strong basis in evidence to conclude that its "tailored approach" in § 1005 was necessary "to address these longstanding inequities."  H.R. Rep. 117-7, 23.

*d. Plaintiff Does Not Undermine the Government's Persuasive Evidence.*  In light of the above, Plaintiff's assertion that Defendants cannot show that minority farmers have suffered racial discrimination in the general farming market or with respect to farm loans specifically, *see* PI Mot. 11-12, is simply unfounded.  The evidence relied upon by Congress laid out the "well-documented" discrimination against minority farmers, who historically have received disproportionately fewer loans from FSA, in lower amounts, with less favorable terms, and with less access to loan servicing than their white counterparts; whose discrimination complaints languished or went unanswered; and who had been largely left out of prior COVID-19 relief efforts and other agricul-tural programs.  *See* Arg. I.B.2.a-c.  All of this evidence provides more than "good reason to believe" that the present effects of historical discrimination in USDA ser-vices, but especially in FSA's loan programs, necessitated targeted relief for minority farmers.  *Ensley*, 31 F.3d at 1566.  The evidence that Congress relied upon was specific and did not turn on "amorphous" concepts of "societal discrimination," as in other cases on which Plaintiff relies.  *Regents of U. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978).

Similarly contradicted by the record is Plaintiff's assertion that Congress failed to credit previous efforts to remedy historical lending discrimination.  PI Mot. 11-12.

Congress pointed to the shortcomings of previous settlements, and explained why other "case-by[-]case measures" had fallen short of remedying past discrimination and its cumulative effects.  *See, e.g.,* CR S1264 (Stabenow).  It further emphasized the present-day statistics showing continued disparities between minority and white farmers when it comes to farm ownership, the number of loans in default, rates of foreclosure, and access to credit and other USDA benefits.  *See* BG III, Arg. I.B.  Thus, Congress's prior actions do not undermine the strong basis in evidence that the lingering effects of historical discrimination warranted remedial relief today.

Finally, Plaintiff asserts that although Congress purported to address issues related to COVID-19, Congress did not consider any evidence related to the effect of COVID-19 on SDFRs.  PI Mot. 14.  Again, that assertion is belied by the record.  Congress noted that due to discrimination in USDA programs, SDFRs were in a far worse position, facing the possibility of foreclosure at higher rates than before COVID-19 hit.  *See* BG III.A.  And Congress pointed to various statistics showing that minority farmers did not benefit from recent agricultural funding and prior pandemic relief, *see id.*, which only exacerbated the pre-existing disadvantages they faced and further necessitated the targeted debt relief in § 1005.

### 3. The Provision of Debt Relief to Minority Farmers Is Narrowly Tailored To Serve the Government's Compelling Interests.

That targeted relief is narrowly tailored to further the government's compelling interests.  Narrow tailoring requires that "the means chosen to accomplish the government's asserted purpose must be specifically and narrowly framed to accomplish that

purpose." *Grutter*, 539 U.S. at 333.  To assess narrow tailoring, courts look to: "[i] the necessity for the relief and the efficacy of alternative remedies; [ii] the flexibility and duration of the relief, including the availability of waiver provisions; [iii] the relationship of the numerical goals to the relevant labor market; and [iv] the impact of the relief on the rights of third parties," *Paradise*, 480 U.S. at 171, as well as over- or under-inclusiveness, *see Croson*, 488 U.S. at 506.  All of the pertinent factors show that USDA's provision of debt relief to minority farmers is narrowly tailored.

First, the necessity for USDA's remedial action is firmly rooted in the evidence set forth above, showing longstanding discrimination against minority farmers in USDA programs.  *See* Arg. I.B.2.  That discrimination contributed to a situation where minority farmers were hit hardest by COVID-19, such that they were on the brink of foreclosure at higher rates than white farmers, and yet, got short-changed *again*, reportedly receiving a tiny fraction of CFAP funds less than a year after white farmers received the vast majority of the single largest U.S. agricultural subsidy.  *See* BG III.A. Targeted relief to minority farmers was thus necessary to remedy the discriminatory effects on minority farmers, made even more acute by a pandemic that disproportionately affected them, *see* Vilsack Stmt. (explaining disproportionate impacts on SDFRs), and to ensure that, unlike prior agricultural funding and pandemic relief, public funds were not allocated in a manner that perpetuated existing inequities.

The necessity of the debt relief in § 1005 is underscored by the inefficacy of the race-neutral alternatives that Congress used before enacting § 1005.  As explained, Congress changed the role of county committees in USDA loan programs and enacted

measures to achieve greater minority representation on those committees in 2002 and 2008, *see* BG I, and yet testimony and reporting, as recent as one month before Congress passed § 1005, shows continuing disparities in the number, amounts, and servicing of USDA loans for minority farmers as compared to non-minority farmers.  *See id.* III.A.  Also in 2002, Congress created an Assistant Secretary of Civil Rights at USDA to attempt to address the agency's poor civil rights record, and yet, subsequent testimony and reports showed continuing issues in processing civil rights complaints, *see* Arg. I.B.2, including "inconsistencies and missing information in [USDA] data" and a dearth of findings of wrongdoing as recently as 2019, 2019 Civil Rights Hr'g (Fudge). Congress created the 2501 Program in 1990 to increase minority farmers' awareness of, and access to, USDA resources, and permanently funded the program in 2018, and yet, recent reporting indicated that minority farmers were still not aware of USDA resources, including recent pandemic relief, *see* BG III.A.  And most recently, Congress created CFAP to help farmers who had been adversely impacted by the pandemic, and yet, the vast majority of the billions in CFAP funding did not reach minority farmers due to structural biases in federal farm programs.  *See id.*  Where Congress has tried for decades to use race-neutral means to remedy the effects of discrimination against minority farmers, the relative failure of those race-neutral efforts shows the necessity for this race-conscious one.  *See Fisher v. U. of Tex.*, 136 S. Ct. 2198, 2213 (2016) (race-conscious admissions program was narrowly tailored where university failed to achieve compelling interest after trying to for seven years via race-neutral means).

Second, in addition to being necessary, the debt relief for minority farmers is

both flexible and time-limited.  Although five minority groups are included in USDA's definition of "socially disadvantaged groups," USDA's definition is "not limited to" those groups.  NOFA, 6.  Rather, the Secretary will consider written requests on a case-by-case basis to determine whether other groups should be eligible for debt relief. *See id.*  The debt relief under § 1005 is also "a one-time occurrence," extended to SDFRs with qualified loans as of January 1, 2021.  USDA's implementation of § 1005 is thus "flexib[le] in administration," *Fullilove v. Klutznick*, 448 U.S. 448, 460 (1980), and "temporary in application," *Paradise*, 480 U.S. at 178, thereby ensuring that the race-conscious measure endures no longer than necessary to serve its purposes.

Third, USDA's provision of debt relief to minority farmers does not impose an unacceptable burden on innocent third parties, namely white farmers.  Plaintiff points to no evidence that white farmers were historically denied equal treatment by USDA—indeed, he himself has benefited from such programs, receiving  over $180,000 in agricultural subsidies between 1995 and 2020, *see* https://perma.cc/3U5P-T6XD, including $9,590 in CFAP funding, *see* https://perma.cc/WU66-HUPZ.  And Plaintiff does not address reports showing that the overwhelming and disproportionate majority of recent agricultural subsidies and pandemic relief before ARPA went to white farmers—and *not* minority farmers.  *See* BG III.A.  The temporary and comparatively small debt relief under § 1005[31] to relieve the sizeable burden minority farmers have long borne does not impose an impermissible one on white farmers, who have received

---

[31] The MFP alone is a $25.1 billion program, while USDA estimates that payments under § 1005 will be roughly over $4 billion.  *See* https://perma.cc/R69N-AL5K.

and continue to receive the vast majority of agricultural funding.  *See* BG III.A; *Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 481 (1986) (finding 29.3% nonwhite union membership goal to remedy past discrimination had "only a marginal impact on the interests of white workers" where whites were "denied certain benefits available to their nonwhite counterparts" but still constituted "a majority of those entering the union").

Fourth and finally, USDA's provision of loan payments to minority farmers is neither over- nor under-inclusive.  As explained, there is a large body of evidence that the minority groups included in USDA's definition of "socially disadvantaged groups" for purposes of § 1005 have suffered from discrimination in USDA programs with nation-wide scope.  USDA has defined SDGs to include those same racial and ethnic groups since at least 2001.  *See* BG III.B.  And reporting before and since then has recounted discrimination in federal programs against *those* SDGs, including by addressing a particular SDG, *see, e.g.,* GAO 19-464 (addressing Native Americans); *see also* JL Rep., or SDGs as a whole as defined by the USDA, *see, e.g.,* GAO 19-539 at 1. Reporting also shows that recent agricultural funding has gone disproportionately to those who do not fall within USDA's definition of SDGs.  *See* Jared Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, EWG (Feb. 18, 2021), https://perma.cc/PVZ7-QMFD.  Where particular racial and ethnic groups have suffered discrimination in USDA programs and been largely left out of relief efforts, debt relief to those particular groups to ameliorate the effects of that discrimination and unequal funding is not over-inclusive.  *See, Paradise*, 480 U.S. 149.  Nor is the definition

underinclusive because it does not include white farmers.  As noted, the evidence simply does not show (and Plaintiff does not argue) that white farmers have suffered the same history of discrimination as minority farmers or failed to receive recent funding.[32]  Where Congress sought to remedy discrimination and funding inequities unique to minority farmers, § 1005 is not under-inclusive because it does not include white farmers who generally have not suffered the same discrimination and unequal treatment.  *See Croson*, 488 U.S. at 506 (noting that if relief program was meant to compensate contractors for past discrimination, one might legitimately ask why they are forced to share the relief with those who were not shown to have been discriminated against).

None of Plaintiff's arguments undermine this showing.  Plaintiff first argues that § 1005 is a "rigid race-based remedy" because "every farmer ... who is a racial minority qualifies for loan forgiveness—regardless of evidence of need or past discrimination," while "a white farmer cannot qualify … no matter how significant his need or how dire his individual circumstances."  PI Mot. 15-16.  But Congress enacted § 1005, in part, because its previous efforts, "taken mostly on a case-by case basis," "ha[d] still not remedied the discrimination" against minority farmers in USDA programs.  S1264 (Stabenow).  Due to that discrimination, the disproportionate impact of COVID-19, and being largely left out of previous funding, Congress determined that those minority farmers were *acutely* in need of the debt relief in § 1005.[33]  Moreover, the Supreme

---

[32] Indeed, as noted, Plaintiff has received very recent CFAP funding, on top of prior subsidies.
[33] And while the definition of SDG does not explicitly refer to economic disadvantage, the qualified loans being paid off are typically loans to farmers who cannot obtain credit through private industry.

Court has confirmed that Congress need not have limited that debt relief to identifiable victims of discrimination, as Plaintiff suggests.  *See Loc. No. 93, Int'l Ass'n of Firefighters v. Cleveland*, 478 U.S. 501, 516 (1986) ("[T]he voluntary action available to employers and unions seeking to eradicate race discrimination may include reasonable race-conscious relief that benefits individuals who were not actual victims of discrimination.").  And other groups *can* qualify for debt relief under § 1005.  *See* NOFA.  There is thus no merit to Plaintiff's first argument.  Plaintiff next argues that § 1005 is not narrowly tailored because it does not "target[] relief to those who were discriminated against" because it applies "to those who have *successfully acquired* farm loans, not those who were *unable* to obtain farm loans due to discrimination" and to racial groups "for which there is no evidence of past discrimination."  PI Mot. 16-17.  But the record of discrimination against minority farmers was not limited to their inability to obtain USDA loans.  It shows that they have also received smaller loan amounts, had those amounts arbitrarily reduced, were subject to inordinate approval wait times that adversely affected their ability to repay the loans, were denied opportunities to avoid foreclosure, and were often assigned "supervised" loans that required white loan officers to approve and co-sign every transaction.  *See* BG III, Arg. I.B.2.  What's more, many minority farmers who have received loans in recent decades may not have been able to at all had it not been for *Pigford I*'s settlement condition that a successful claimant receive priority consideration for loan approval.  *See Pigford I*, 185 F.R.D. at 96.

Moreover, Congress reasonably concluded that repaying existing loans was the most effective and efficient way to provide timely relief to minority farmers in the

midst of a pandemic that has disproportionately affected them.  Thus, far from a "blunderbuss approach," PI Mot. 17, Congress targeted assistance to those acutely in need of it and in a manner designed to provide timely relief.  It is also not the case that § 1005 provides relief to groups "for which there is no evidence of past discrimination." *Id.* at 17.  As noted, Congress had before it numerous reports and testimony recounting discrimination in USDA programs against specific SDGs, *see, e.g.,* JL Rep. (reporting discrimination in USDA programs against each SDG group specifically, including Asians, Hawaiians, and Pacific Islanders), and SDGs as a whole, as defined by USDA.

Plaintiff also argues that Congress failed to consider race-neutral alternatives before it enacted § 1005 and suggests several Congress should have used.  *See* PI Mot. 18-19.  That is incorrect:  Congress not only considered, but used for decades, race-neutral means to attempt to remedy discrimination in USDA programs against minority farmers.  And while Congress need not have "exhaust[ed] … every conceivable race-neutral alternative" before employing a race-conscious one, *Grutter*, 539 U.S. at 309, Congress in fact tried alternatives similar to those Plaintiff suggests.  For example, Plaintiff suggests that Congress could have "ramp[ed] up enforcement of antidiscrimination laws or enhance[ed] its oversight of USDA's lending practices."  PI Mot. 19.  But in 2002, Congress created an entire office at the Assistant Secretary level within USDA dedicated to enforcing civil rights, *see* https://www.usda.gov/oascr, and it has held numerous oversight hearings focused on civil rights issues at USDA, including in FSA and its loan programs, *see supra* n.6.  Plaintiff suggests that Congress could have "allocated additional settlement funds or eliminated statutes of limitations

... for those who could show concrete evidence of discrimination." PI Mot. 19. But as Plaintiff's argument recognizes, Congress did just that, *see* S1264 (Stabenow), and it passed § 1005 because it found that such measures "did not adequately remedy the discrimination," *id.* Plaintiff also suggests that "if there was ongoing concern about the ability of minority farmers to access farm loans in the first place, Congress could have increased outreach or funding for such loans." PI Mot. 19. But Congress created, and permanently funded, the 2501 Program expressly for such types of outreach. *See* BG III.A. In sum, Plaintiff's arguments show that Congress in fact tried numerous race-neutral alternatives before providing the debt relief in § 1005, further illustrating that § 1005 is narrowly tailored. *See Fisher*, 136 S. Ct. at 2213.

### C. The Injunction Plaintiff Seeks Is Contrary to the Public Interest.

Finally, the balance of the harms overwhelmingly favors Defendants, as the injunction Plaintiff seeks is manifestly contrary to the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (pointing out that "[t]hese factors merge when the Government is the opposing party"); PI Mot. 1 (seeking to prevent USDA "from enforcing the 'socially disadvantaged' provisions of Section 1005 of [ARPA]"). Congress passed § 1005 based on its determination that debt relief for minority farmers was necessary to remedy the lingering effects of the well-documented history of USDA discrimination against them and to ensure that, unlike prior funding, pandemic relief actually reached them. *See* BG III.A-B. And it did so based on evidence that minorities, and

minority farmers in particular, were especially in need due to the disproportionate impact of COVID-19 on those communities and their lack of access to prior rounds of agricultural funding and pandemic relief.  *See id.*

As noted, Congress has a compelling interest in remedying prior discrimination and in ensuring that its funds are not allocated in a manner that perpetuates that discrimination.  *See* Arg. I.B.1.  Minority farmers, who, Congress noted, sat disproportionately on the brink of foreclosure when COVID-19 hit, plainly have a strong interest in receiving those funds.  And the Government and the public have a strong interest in the implementation of the laws enacted by the duly elected representatives in Congress.  *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").  All of those interests would be harmed if Plaintiff were to obtain the preliminary relief he seeks.

Plaintiff, on the other hand, is acting in his individual economic interest.  He has not shown that his interests will be irreparably harmed by one-time payments to minority farmers.  And even if he had, the government and the public's interests in remedying prior discrimination, ensuring the equitable and timely distribution of much-needed pandemic relief, and seeing the implementation of duly enacted federal law, easily outweigh any individual competitive disadvantage Plaintiff could possibly suffer as a result of the implementation of § 1005—a direct response to a national economic and public-health emergency of historic proportions.

## II.    Any Injunctive Relief Should Be Limited To Plaintiff.

If the Court were to enjoin any aspect of § 1005 (and the Court should not), any such injunction should be limited to Plaintiff.  *See* PI Mot. 1 (requesting in the alternative that the Court enjoin Defendants "from limiting loan assistance to only [SDFRs] under Section 1005").  "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."  *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018).  Thus, the "plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Id.* at 1934.  Principles of equity independently require that injunctions be no broader than "necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  Thus, where Plaintiff brings this lawsuit only on his own behalf, and on the basis of his alleged injury, any injunction should apply only to him.  This is especially so where § 1005 is being challenged in three other federal courts, *Miller v. Vilsack*, No. 21-595 (N.D. Tex.); *Faust v. Vilsack*, No. 21-548 (E.D. Wis.); *Carpenter v. Vilsack*, No. 21-104 (D. Wyo.).  *See Trump. v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (explaining that nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch") (Thomas, J., concurring).

## CONCLUSION

For the aforementioned reasons, the Court should deny Plaintiff's motion for a preliminary injunction.

DATED: June 4, 2021                    Respectfully submitted,


                                       BRIAN M. BOYNTON
                                       Acting Assistant Attorney General

                                       LESLEY FARBY
                                       Assistant Branch Director
                                       Civil Division, Federal Programs Branch

                                       */s/ Emily Sue Newton*
                                       EMILY SUE NEWTON (VA Bar No.
                                       80745)
                                       Senior Trial Counsel
                                       KYLA M. SNOW (Ohio Bar No. 96662)
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, NW
                                       Washington, D.C. 20005
                                       Tel: (202) 305-8356 / Fax: (202) 616-8460
                                       emily.s.newton@usdoj.gov

                                       *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 4, 2021, I filed with the Court and served on opposing counsel through the CM/ECF system the foregoing document.


DATED: June 4, 2021          */s/ Emily Sue Newton*
                             EMILY SUE NEWTON
                             (Va. Bar No. 80745)
                             Senior Trial Counsel
                             Civil Division, Federal Programs Branch
                             U.S. Department of Justice
                             1100 L Street, NW
                             Phone:  (202) 305-8356
                             Fax:     (202) 616-8470
                             E-mail:      emily.s.newton@usdoj.gov

                             *Counsel for Defendants*