# Exhibit B

Agric Hum Values (2017) 34:631–643
DOI 10.1007/s10460-016-9756-6



# A new era of civil rights? Latino immigrant farmers and exclusion at the United States Department of Agriculture

Laura-Anne Minkoff-Zern[1] · Sea Sloat[2]

Accepted: 4 November 2016 / Published online: 10 November 2016
© Springer Science+Business Media Dordrecht 2016

**Abstract** In this article we investigate how Latino immigrant farmers in the Mid-Atlantic region of the United States navigate United States Department of Agriculture (USDA) programs, which necessitate standardizing farming practices and an acceptance of bureaucracy for participation. We show how Latino immigrant farmers' agrarian norms and practices are at odds with the state's requirement for agrarian standardization. This interview-based study builds on existing historical analyses of farmers of color in the United States, and the ways in which their farming practices and racialized identities are often unseen by and illegible to the state. This disjuncture leads to the increased racial exclusion of immigrant farmers from USDA opportunities. Such exclusions impede the transition to a ''new era of civil rights,'' as has been proclaimed by USDA leadership. Although efforts to address institutionalized racism on a national level may be genuine, they have failed to acknowledge this schism between rural Latino immigrants and the state, thereby inhibiting a meaningful transition in the

fields, and con- tinuing a legacy of unequal access to agrarian opportunities for non-white immigrant farmers.

**Keywords** Immigrant farming · Race in agriculture · Latino farmers · United States Department of Agriculture (USDA)

## Introduction

Following a United States Department of Agriculture (USDA) staff member in her white sedan with government plates, we drove our own unmarked rental car through a winding country highway. We passed corn and soybean fields, farmhouses, and a small downtown with a few local businesses. We drove up a gravel driveway and parked behind the USDA car. Trailing the staff member, a white female soil conservationist, we walked unannounced onto a farm with a few acres of diverse vegetables, a farmhouse, a shed, and a hoop house. The hoop house had been financed through a grant from the USDA's National Resource Conservation Service (NRCS), giving the staff member rights to visit the property and inspect the structure and property randomly for the first 3 years, to validate that it is up to code and being used properly.

USDA staff in the Northern Neck of Virginia promotes the hoop house, or ''high tunnel'' installation program to local vegetable farmers. These tunnel-shaped greenhouses allow farmers to start their seeds and get their crops to market earlier in the season. The USDA covers the entire cost of the hoop house. In exchange, the farmer must agree to keep it in production for a minimum of three years, maintain meticulous records of their growing practices and finances, and allow USDA officials onto their property unannounced. This program is one of a variety of financial assistance opportunities for small and medium scale fruit and vegetable farmers through the USDA's NRCS and Farm Service Agency (FSA). These agencies offer a

& Laura-Anne Minkoff-Zern
  lminkoff@syr.edu

Sea Sloat
ssloat@gmail.com

[1] Department of Public Health, Food Studies, and Nutrition, David B. Falk College of Sport and Human Dynamics, Syracuse University, 544 White Hall, Syracuse, NY 13244, USA

[2] 3009 Abell Ave, Baltimore, MD 21218, USA

variety of loans, grants, and crop insurance programs, which vary year to year. Although the USDA targets his- torically discriminated against populations, including Latinos, as part of their Socially Disadvantaged Applicant Program for guaranteed, direct operating, and direct farm loans, not many Latino farmers take advantage of them.[1]

The farm we visited is owned and operated by a Mexican immigrant farmer, one of a small number of Latino farmers in Virginia who directly participates in a USDA funded program. Latino farmers have a low rate of inclusion in USDA programs nationally. In 2012, the census recorded 79,807 farm operators of Hispanic/Latino origin. One hundred and sixty-five Commodity Credit Corporation loans, 3244 Conservation Reserve, Wetland Reserve, Farmable Wetlands, or Conservation Reserve Enhancement program payments, and 13,276 other federal farm program payments were awarded to Latino operators. Respectively, that indicates a 0.2, 4, and 17% inclusion rate for each program. Comparatively, the census recorded 2,034,439 white farm operators in 2012. They participated in the same loan programs at a rate of 0.6, 14, and 34% (USDA 2014). From these numbers, Latino farmers utilized USDA loans and other direct assistance programs at about one-third to a half of the rate of white farmers. This is regardless of the fact that they are a growing presence among new farmers in the United States.

According to official USDA agricultural census data, the number of farms with principal operators of ''Spanish, Hispanic, or Latino origin,'' grew from 50,592 in 2002 to 55,570 in 2007. In 2012, the number increased again, to 67,000 farms, a twenty-one percent increase over 5 years, Latinos making up three percent of all principle operators.[2] Of those 67,000 Latino farm operators, the vast majority (64,439), were the primary farm business owners as well. Comparatively, Asian principle operators also grew 21% in that period, although they make up less than 1% of all farmers overall. Black principle operators grew 12%, still making up only one point four percent of all farmers nationally. In contrast, during the same period the population of white principle operators fell 5% and overall the number of farmers dropped four percent (USDA 2014). As many Latino farmers transition from working as laborers in others' fields to positions as farm owners and operators, they, along with other farmers of color, represent the new face of a flourishing generation of farmers.

In response to a number of civil rights lawsuits against the USDA on behalf of African American, Hispanic, Native American, and female farmers, US Secretary of Agriculture Tomas Vilsack (2009) has proclaimed a ''new era of civil rights,'' for the agency.[3] Despite this procla- mation and the fact that their numbers are growing, immigrant farmers are still not extended the same oppor- tunities as other farmers, due to the fact that their practices are often incompatible with the standardization and bureaucracy required to be properly acknowledged and supervised by the USDA. Their direct market approach, planting of diverse crops, reliance on family labor, and lack of record keeping stand in contrast to the dominant model of US industrial agriculture.[4]

It is not simply the size or scale of their farms that bars them from accessing USDA resources, although that certainly limits what is available to them. The farmers in this study have limited formal education, literacy, and English language skills, and are therefore exceptionally daunted by the paperwork necessary for government grant, loan, and insurance applications. Additionally, it is not routine for Latino immigrant farmers to record and track their own farming progress and decisions in writing. In contrast, their farming knowledge tends to be documented and dissemi- nated through word of mouth. As has been the case for other farmers who do not replicate state-sanctioned or dominant forms of farming, these practices and forms of agrarian knowledge sharing may be interpreted as unsci- entific, or ''illegible'' to the state, and therefore not deemed worthy of acknowledgement (Scott 1998), or in this case,

---

[1] For more information on the Socially Disadvantaged Applicant Program, see http://www.fsa.usda.gov/FSA/webapp?area=home&subject=prod&topic=sfl.

[2] These numbers do not tell us how many are first generation immigrants. The number of operators that were also owners before 2012 is not available. We would argue Latino immigrants are generally being undercounted in these numbers. Almost none of the farmers we interviewed had heard of the Agricultural Census. Many farm on rented land, often under informal agreements. Even those that own their land rarely live on the farm. Given their histories of immigration, many are resistant to filling out government paperwork. Additionally, Hispanic/Latino is considered an ethnicity, not a race, by the Census, and if they check this box they must also choose a race, such as White, Black, or Native American, none of which are representative of the farmers we interviewed. In discussions with Census of Agriculture Staff who outreach to Hispanic/Latino populations, it was confirmed that although they have increased outreach to all groups deemed socially disadvantaged farmers in recent years, they also agreed that the farmers discussed in this study are still underrepresented in the census. Despite these issues, the census is still the best comprehensive national agricultural data we have to date and provides context for racial and ethnic shifts occurring in US agriculture.

[3] Lawsuits include the *Pigford v. Glickman* and *Brewington v. Glickman* class action lawsuits for African American farmers, The *Keepseagle v. Vilsack* settlement for Native American farmers, and The Hispanic Farmers and Ranchers and Female Farmers and Ranchers claims processes. More information can be found at http://www.outreach.usda.gov/settlements.htm.

[4] We are not claiming that family labor is inherently a better system or more equitable, only that it is evidence of a particular form of farming. Hiring family labor by no means ensures labor justice on the farm. In particular, family labor can reinforce patriarchal agrarian relations and patterns (See Feldman and Welsh 1995; Reed et al. 1999; Riley 2009).

Case 3:21-cv-00514-MMH-JRK   Document 22-2   Filed 06/04/21   Page 5 of 16 PageID 165

A new era of civil rights? Latino immigrant farmers and exclusion at the United States… 633

acceptable for funding. Many small scale diversified crop and vegetable farmers run up against the same challenges when looking for government resources, yet for the immigrant farmers in this study, the expectation for standardized practices are compounded with the above mentioned lack of formal education, literacy, and English abilities. These barriers are made worse by their distrust of US government agencies, as related to their immigration experiences.

The dominant industrial model promoted by the USDA has long been problematic for smallholding farmers as well as more diversified growers, regardless of race, ethnicity, or citizenship status. As Earl Butz, the secretary of agri- culture under US President Richard Nixon, infamously told the country, farmers should ''Get big or get out.'' Butz's policies, and those of USDA leadership since, have focused on supporting the large-scale production of commodity crops, corn and soy in particular, mainly through commodity price supports and crop insurance programs.[5] These decisions are not just made at the agency level. US agricultural policy is largely set by the United States Farm Bill, which is voted on by Congress every five years. By setting priorities and outlining fiscal parameters, the Farm Bill contributes to the prioritization of large-scale industrial production, and deprioritizes the needs of smallholders, ''specialty'' crop growers (mainly fruit and vegetable producers), and other diversified growers (Ahearn et al. 2005; Clapp and Fuchs 2012; Dimitri et al. 2005; DuPuis 2002; among others).

Conversely, scholars have argued that the USDA has a history of democratic planning and resource distribution, including many agency leaders and other individuals who have worked explicitly with farmers of color, African-American farmers in particular (Couto 1991; Gilbert 2015). These arguments directly contend with Scott's monolithic description of the state. As such a large government agency, there is no one consistent way staff or leadership interacts with the public. Despite the generally industrial focus of USDA funds, there are USDA opportunities for small-scale farmers, as well as for those that have been deemed sustainable, or socially disadvantaged by the agency. The Sustainable Agriculture and Research (SARE) program offers USDA sponsored grants and outreach in each state. Additionally, the USDA conducts research and development related to local food initiatives, such as farmers' markets, which are the primary markets for the Latino immigrant farmers included in this study. In this way, the farmer participants of this research have indirectly benefitted from the support of local and direct market ini- tiatives funded by the agency. Finally, in recent years, and as a result of the lawsuits mentioned above, the USDA has devoted new funding to support farmers identified as socially disadvantaged, such as minority farmers, Latino farmers included. This support may also reach Latino immigrant farmers indirectly through new programs and funding available to nonprofits outreaching and providing agricultural assistance in their communities.

In our research, we have encountered USDA staff who are actively engaged with farming communities of color and some who specifically focus on Latino farmers. Unfortunately, these practices were not the norm, and the staff who actively pursue opportunities to work with Latino immigrant or socially disadvantaged farmers expressed that there was a lack of structural support from the agency in that pursuit. Although there are USDA programs targeted to sustainable or diverse growers, this information cannot reach the farmers if they are not on the radar of the state in the first place. It is also notable that in The Mid-Atlantic, the region that is the focus of this article, neither the farmers nor the NRDC staff we interviewed ever men- tioned opportunities available to farmers that might be a better fit for them given their diverse growing practices, such as SARE programs.

The existence of Latino immigrant farmers is often unknown or overlooked in day-to-day on the ground USDA operations. In beginning research with Latino farmers, the first author made cold phone calls to USDA regional headquarters in five states across the United States, including Virginia, New York, California, Minnesota, and Washington. In each case, when the author first called and asked to speak someone who works with ''Latino farmers,'' the person on the end of the line responded as if the caller had asked about Latino *farmworkers,* not farm business owners. The author consistently had to explain, ''I am looking to speak with someone in your office that might work with immigrant *farmers*, as in farm business owners, not laborers.'' Even in regions where Latino farmers exist in significant numbers, it took substantial explanation to start a conversation where USDA staff understood the specific group of farmers the author was interested in dis- cussing. They were either unaware that Latino farmers existed in their region or were so accustomed to thinking of Latino immigrants as agricultural workers that they disre- garded their encounters with Latino farmers until probed directly.

The lacking awareness of Latino immigrant farmers among USDA staff is also reflected in the scholarly liter- ature on Latinos in agriculture in the United States. There is a growing body of geographical, anthropological, and sociological research on farm labor, which critically engages with the politically produced vulnerability and exploitation of the immigrant body. This literature contributes to our understanding of historical and modern-day

---

[5] For more information on practice support programs see: http://www.fsa.usda.gov/programs-and-services/price-support/Index.

labor conditions in the agri-food system, necessary for gaining a comprehensive picture of the political economy of food production and advocating for workers' rights throughout the food system. In particular, this work investigates the relationship between the Latino immigrant worker and the state, providing nuanced analysis of how US national policy and immigration agencies reinforce unjust working conditions and a racialized work force (See Allen 2008; Brown and Getz 2008; Guthman and Brown 2015; Gray 2013; Holmes 2013; Mitchell 1996; Sbicca 2015; and many others). Yet, critical analysis of Latino workers thus far does not include the possibility that some immigrant workers are in fact advancing in this agrarian class system. Further, there has been almost no compre- hensive inquiry of how Latino immigrant farm owners are experiencing state apparatuses.[6] This research makes this needed intervention, exploring how Latino farmers interact with the state through their engagement, or lack thereof, with the USDA.

This article addresses why Latino farmers are so unlikely to participate in USDA direct financial assistance programs, despite their growth as a new group of farmers, and particularly as a group that the USDA declares they want to support. We contend that the standardization of practices and bureaucracy inherent in receiving USDA assistance stand in stark opposition to the agrarian norms and practices of Latino immigrant farmers in the Mid-At- lantic, and act to hinder their participation in USDA opportunities. The requirements of standardization help to maintain a racialized class boundary in US agriculture today, and play a large role in preventing Latino immigrant farmers from moving up the agricultural ladder.[7] While monitoring and recording farmer activities is necessary at some level for the USDA to assure that funds are used appropriately, the extent to which farmers are asked to track activities and comply with standardization is impos- sible for most immigrant farmers. If their differential practices and limited literacy and linguistic abilities are not considered, these farmers will never be able to take full advantage of the programs they so desperately need.

These farmers, despite the avowed support to help them from the state, struggle with the same types of racialized boundaries in US agriculture as previous generations of farmers of color (Daniel 2013; Gilbert et al. 2002). Notwithstanding these challenges, many Latino immigrant farmers are prevailing against the odds. We contextualize this work in the historical roots of the relationship between farmers of color and the USDA and subsequent discord between their farming practices and those supported by government agencies. We show this discord through stories told by immigrant farmers themselves, highlighting the ways in which they express discomfort with and suspicion of state requirements. In particular, we underline the ways that Latino immigrant farmers' language and literacy limit their ability to directly take part in USDA programs and how those barriers interact with existing categories and requirements for assistance. Lastly, we propose recommendations for increasing institutional support for Latino immigrant farmers in US agriculture. We hope this work contributes to academic and policy discussions concerning immigration, identity, and improvement of government support programs for farmers of color.

Citizenship, race, and legibility

The US has a long history of constituting citizenship, and related rights to land and resources, through whiteness. Previous groups of immigrants and farmers of color have been excluded from full citizenship rights in the US due to state sanctioned policies, which are reinforced through daily experiences of racial exclusion. Non-white immigrant farmers have been explicitly dispossessed of land and capital, in many cases due to their racial and citizenship status (Chan 1989, Foley 1997; Matsumoto 1993; Minkoff-Zern et al. 2011; Wells 1991, 1996). The Alien Land Laws in the early twentieth century excluded Japanese immigrants from holding land and forced practicing farmers off property they were already cultivating (Matsumoto 1993). Southeast Asian farmers in California are currently being disproportionately punished and discriminated against through the enforcement of labor laws, which do not recognize their family labor practices (Minkoff-Zern et al. 2011; Sowerwine et al. 2015). These processes have succeeded in creating agricultural racial formations, resulting in the ownership and operation of US farms remaining in primarily white hands.

The unjust and uneven consequences of agricultural racial formations are not limited to immigrants of color; there is a long and well-recorded history of discrimination against US-born farmers of color in the United States, particularly African American and Native American farmers (See Clearfield 1994; Daniel 2013; Gilbert et al. 2002; Grim 1996; Payne 1991; Ponder 1971; Simon 1993; and many others). This discrimination has ranged from overtly racist treatment at local and federal USDA offices

---

[6] This is with the exception of the work of Miriam Wells (1996), whose groundbreaking research in the 1970 s and 80 s shed light on the class and race-based struggles of Mexican and Japanese immi- grants in California agriculture.

[7] We do not mean to imply that USDA practices or requirements are the only factors limiting the advancement of Latino immigrant farmers. There are many other barriers, including lack of access to capital, land, and markets, which are also related to their educational, linguistic, and citizenship limitations. These barriers are compounded by the standardization and bureaucracy required by the state in order to access programs and assistance.

Case 3:21-cv-00514-MMH-JRK   Document 22-2   Filed 06/04/21   Page 7 of 16 PageID 167

A new era of civil rights? Latino immigrant farmers and exclusion at the United States… 635

to deficient literacy assistance, legal counsel, and advertisement of available opportunities to help non-white farmers access and maintain their land and markets (Gilbert et al. 2002).

Historian Pete Daniel (2013) draws on Scott's legibility argument to explain USDA discrimination against black farmers in the civil rights era, providing historical context within which to understand USDA policy and practice today. African American farmers in the United States, like Latino and other immigrant farmers of color, have been displaced from their livelihoods many times over. For many, this displacement occurred historically through the capture and enslavement of their ancestors from their homelands, and more recently, as landowners and tenant farmers, whose systematic discrimination by the USDA contributed to black farmers' ninety-three percent decline from 1940 to 1974. Daniel argues that black farmers' cultivation techniques were seen as adversarial to the modernist vision of agriculture in the 1930s. They gener- ally operated small subsistence-based farms, and agricul- tural knowledge was passed through the generations by word of mouth. The New Deal's Agricultural Adjustment Administration worked to make the ''rural countryside legible'' by compiling information and statistics on farms across the nation (9). Large farms and grid-like orderly homesteads were idealized as the form to spread modern agricultural technologies. The USDA proceeded to map, structure, and make rural America visible in order to ensure a transition to agrarian efficiency. Black farming operations did not fit this model of efficiency and modernism and therefore were not considered for subsidies and grants. Due to competition from industrial farmers with government support, thousands of black farmers were dispossessed from their land over the following decades. This prefer- ential treatment functioned in conjunction with explicit racist conduct (Daniel 2013).

Alternately, many scholars have critiqued Scott's argument concerning the state as an overly homogenous account, and lacking in nuance. Contrasting with Daniels, Gilbert (2015) specifically addresses the ways that various arms of the USDA have historically engaged people of color in land-use planning and for resource distribution. Similarly, Couto (1991) has shown the ways the FSA worked with Black farmers during the New Deal era, to help them transition from tenant to owner. Both of these studies point to the importance of recognizing variation among USDA actors and branches. Unfortunately, our research shows that these historical moments in the USDA have been brief and have not sustained a comprehensive approach to democratizing land access and ownership across racial lines in the US.

A set of lawsuits targeting the USDA over the past fifteen years have documented the ways that farmers of color have been structurally discriminated against by the agency. In 1999, a class action lawsuit was settled by black farmers, alleging racial discrimination by the USDA between 1981 and 1996, while applying for farm loans and assistance. In 2000, another class action suit was filed against the USDA on behalf of Hispanic Farmers and Ranchers that were discriminated against from 1981 to 2000, also while applying for USDA loans. The USDA admitted to discrimination and this case is currently being settled via a claims process, where farmers are eligible to receive from $50,000 to $250,000 (Hispanic and Women Farmers and Ranchers Claims and Resolution Process 2012; Martinez and Gomez 2011). According to our contact with the Office of General Counsel at the USDA, the Claims Administrator received over 50,000 claims. As of July 2015, the USDA approved 14.4% of the claims, while the rest were rejected. They provided a one-line explanation to farmers whose claims were not accepted: ''You failed to provide sufficient documentation, or the documentation that you provided was not sufficient to meet the requirements under the Framework'' (Zippert 2015). As we will discuss below, this statement reflects many Latino farmers' general lack of standardization and documentation practices, which we argue, are necessary in order to be deemed legible in the eyes of the USDA.

As is evidenced by the growing numbers of Latino immigrant farmers, those under pressure to conform often continue to create alternative agrarian spaces. Wells' (1996) research on the struggle of Mexican immigrants in California agriculture in the 1970s and 1980s illustrates the ways Latino farmers' practices have been persisting in this context. Her work confirms historical commonalities between African American and Latino immigrant farmers in terms of how their farming practices contrast with more standardized state farming models. Wells' study also reflects our own findings, described below, that Mexican and other Latino immigrants prefer to make their farming decisions independently and find technical advice from governmental outsiders unsuitable to their own experiences and practices. Additionally, Wells observes that immi- grants' lack of material resources and formal education to invest in their farm businesses leads them to be more dependent on particular ''knowledge systems,'' which dif- ferentiate them from white farmers (138). Our research builds on her work in demonstrating the disjuncture between immigrants' agrarian practices and those rewarded by state authorities.

This article advances literature on immigration and racial discrimination in agriculture, shedding light on the ways that the USDA's processes are promoted as univer- sally accessible or color-blind, while they in fact maintain racial and ethnic divides in agriculture. Applying the notion of illegibility to the practices of Latino farmers, we

explore how government expectations of modernization largely function as gatekeepers to agricultural development and growth, despite individual and structural efforts to create inclusivity. In the case of Latino immigrants, farmers marginalized by state authorities are still rising in numbers and drawing on their own agrarian knowledge and norms to preserve their agrifood traditions and lifestyles. These farmers are cultivating in a way that contributes to local economies and ecosystems, as well as creating more a culturally diverse populace of US farm owners. Although they are currently making their businesses work, many function on the edge of economic stability. Without government support and acknowledgement of these differences in agrarian practice, their livelihoods and farm businesses may not survive in the long-term.

## Methods and procedures

This article is based on semi-structured interviews with 18 immigrant farmers and 20 interviews with staff of programs that advocate for and work with low resource and ''socially disadvantaged'' farmers, as well as participant observation of farms and at farmers markets in the Mid-Atlantic region. Fieldwork took place June 2013–July 2014. This study is part of a larger comparative project, including interviews with over seventy Latino immigrant farmers, as well as twenty-seven interviews with actors in non-state programs, six extension agents, and fourteen United States Department of Agriculture (USDA) staff/ agents in Virginia, California, New York, Minnesota, and Washington states from 2011 to 2016.

The first author conducted all research with the assistance of five student research assistants, in Spanish and English. The second author was a research assistant. Research assistants translated interviews conducted in Spanish to English. Although neither of the authors are native Spanish speakers, both speak Spanish fluently. Farmer interviews took place at their farms, homes, and farmers' markets. We also conducted participant observation at farms and farmers' markets. To meet farmers, we attended conferences and markets where immigrant farmers sell. We also met farmers through other immigrant farmers, farmer training/incubator organizations, extension agents, USDA staff, farmers' market managers, and other groups that outreach to immigrant farmers. Specific locations and names will remain anonymous.

The interviews with outreach and advocacy workers were done in English and include staff from three regional farmers' markets with a high percentages of Latino farmers, The Latino Farmers and Ranchers Association, the Rural Coalition, Telemon Foundation, Virginia Cooperative Extension, and the USDA. At the USDA, we interviewed staff that work in the office of Advocacy and Outreach and the Socially Disadvantaged Farmers and Ranchers Program in Washington DC and the NRCS and FSA local offices in Virginia. Additionally, we interviewed staff that work at the federal level on the Hispanic and Women Farmers and Ranchers discrimination suit and claims process at the USDA. All nonprofit outreach workers at the nonprofits spoke Spanish, most as native speakers. Only one person we spoke with at the USDA federal offices spoke Spanish. There was no one working in the local offices in this region that spoke Spanish.[8]

Interviews with farmers were conducted in Spanish and took place at their farms, homes, and markets where they sell. Fifteen of the eighteen farmers we interviewed live in the Northern Neck of Virginia, an agricultural region located three hours south of Washington DC. There are approximately 30 Latino immigrant families farming in the region. All but two interviewed in the Northern Neck are part of an extended family living in the region, originally from Jalisco, Mexico. These immigrants represent one half to two-thirds of the fruit and vegetable farmers in this region, almost all with farmworker backgrounds, according to estimates by farmers themselves and local United States Department of Agriculture (USDA) and extension staff. The other two farmers live and farm in Prince George's County, Maryland, a suburb of Washington DC, where their farms are surrounded by residential homes.

Farmers we interviewed emigrated from Mexico (16), El Salvador (1), and Guatemala (1). In a few instances we interviewed adult children of immigrant farmers who work on the family farm, when their parents were not available. All identify as Latino or Hispanic. In this article we use the term Latino, although participants in interviews used Latino/Hispanic interchangeably. They are almost all resident aliens or naturalized citizens, and have been in the United States for approximately twenty years. Some came before the Immigration Reform and Control Act of 1986, which provided many undocumented immigrants who had arrived before 1982 with legal status. Participants were never asked directly about their documentation status, although some participants alluded to crossing the border illegally. All except for one adult spoke Spanish as their first language and minimal English. Many have children who are teenaged or young adults and speak English.

Farmers interviewed have been operating their own farms for a range of 2–20 years. They all farm on a relatively small-scale (ranging from three to eighty acres, with most between 2 and 20), practice integrated pest management (low chemical input), grow diverse cropping systems,

---

[8] Nationally, there are USDA staff in local office that speak Spanish. For the larger project, we were able to interview two in Washington State.

Case 3:21-cv-00514-MMH-JRK   Document 22-2   Filed 06/04/21   Page 9 of 16 PageID 169

A new era of civil rights? Latino immigrant farmers and exclusion at the United States…                                637

and use primarily family labor. They sell the majority of their produce through direct sales at farmers' markets, although two farms also sell portions of their product to a wholesaler or a packinghouse.

We define a farmer foremost as someone that identifies him or herself as a farmer (*campesino*, *agricultor*, or *ranchero* in Spanish). More specifically, one who currently owns their farm business, so as to differentiate them from a farm laborer, who works for an employer. They must also perform at least some of the manual labor on the farm. They do not need to own the land they farm, or the machinery they use. While most in this region own the land they are farming, they all started by renting originally. We did not include a sales minimum for inclusion in this study, only that they must be selling at least some of their crops and self-identify as a farmer.[9] Five of the farmers interviewed have off-farm jobs in farm work, construction, and other industries, which they balance by soliciting help from nuclear and extended family members to support the farm. They all make at least some, if not all, of their income from their own farming business.

## Time, labor, and spatial control

If a visitor knows where to look, they might be able to tell an immigrants' field from their neighbors'. In contrast to the monocropped, uniform rows of wheat and corn, which line most of the side of country highways in this region, the Latino immigrants' fields include huge varieties of produce, each row different from the next. Among the cultivated crops, plants such as *purselane* (also known as *verdolaga* or pigweed), seen as a common weed by US-born farmers, is left to grow between the rows. Farmers harvest it for their Latino customers and themselves to consume in soups and stews. Juxtaposing the perfectly managed rows of grain, grown by mid-scale white farmers, and kept meticulously free of wild plants by regular doses of pesticides and pest resistant genetically modified seeds, the immigrant farmer's fields show signs of agroecological variety. These growing practices are harder to quantify and monitor by existing standards, and ultimately make it more difficult for Latino farmers to fit into the boxes created by USDA's programs.

All farmers interviewed saw starting their own farm as a way to regain independence over their daily lives and labor, in the face of their limited material wealth and political standing. In contrast to their experience as farm-workers, they have the ability to choose when to rise, what to plant, and how to pick their crops, as long as they operate a productive farm. Cultivating using practices that reflect their own experience reasserts immigrant farmers' control over their own labor. To protect this autonomy, many of the farmers we spoke with shied away from interactions with the state where they may be subjected to standardizing their practices to match a particular form of farming.

Each farmer interviewed has a unique story, but they all share the common experience of previously working as farm laborers. One farmer recounted his journey of starting his own business, which provides insight into why immigrant farmers place such importance on maintaining independence,

When I decided to work for myself, I was working for someone else. I saw that after I worked for him for about five years, and he was becoming successful, making a lot of money. And I stayed the same, earning six dollars an hour… One day I said to him, 'To start, this is good. But now I see that you're just there doing nothing, and I don't make anything. I don't make money, I'm the only one working.' Because I was the only employee he had… He had at least two-hundred, five-hundred thousand dollars in earnings that I had made for him. And I said, 'No, I'm killing myself for you. It's over. I'm going to start my own business.' And that's how it happened.

This farmer, without access to standard bank loans due to his lack of well documented income history and related low credit score, started a farm by saving his small earnings, as did all other farmers in this study whose access to loans was scant. Beginning by renting a small plot, and slowly saving enough to buy land, he started with almost nothing in terms of capital investment and depended on his experience, knowledge, self-exploitation, and family labor to advance his business.

Their personal histories of exploitation as workers motivate immigrant farmers to seek more control over their daily activities and decision-making power concerning their land. All of the farmers we spoke with relayed the physical and emotional challenges of farming, as it requires consecutive months of intensive labor, oftentimes 12 h a day, seven days a week. They expressed that not being ensured a paycheck at the end of the week is a precarious way to live. One farmer explained, ''Here we live just from

---

[9] The National Agricultural Statistics Service defines a farm as any business ''from which $1000 or more of agricultural products were sold or would normally be sold during the year'' (USDA 2014). Since the Census only requires a $1000 sales minimum, and all the farmers we interviewed are selling regularly at farmers' markets and other informal venues, we assume they are all selling at least that much in the year, so there should not be a discrepancy in definitions. To be considered an ''actively engaged farmer,'' according to the Farm Service Agency of the USDA, and therefore benefit from their farm programs, one must significantly contribute to agriculture in the form of, ''capital, land, and/or equipment, as well as active personal labor and/or active personal management.'' Individual contributions to the farm operations must be ''identifiable and documentable; as well as separate and distinct from the contributions made by any other partner, stockholder or member'' (Farm Service Agency 2015).

the land. There's no one paying us $8 an hour. There's no one paying us.'' As independent business owners, they are subject to the unpredictability of the market. As farmers, they are additionally vulnerable to uncertain weather and climate conditions. Overwhelmingly, though, the satisfaction that comes with making their own decisions keeps them farming, regardless of the struggles. As one farmer shared, ''I feel happy that it's *my* business, that we can make our own decisions.'' Even in the most difficult times, the desire to maintain control over one's labor and growing practices transcends the daily obstacles of small-scale farming.

On their farms and in their businesses, farmers avoid cultivation systems imposed upon them by outsiders, be they wholesalers who would tell them what to plant and how much (in order to secure a market), or government officials whose programs require particular crops and techniques to qualify for assistance, as described in the cover crop and hoop house program below. All the farmers interviewed plant diverse fruits and vegetables, an impor- tant strategy for selling directly to customers at farmers' markets, their primary outlet for sales. Some noted they sold to their extended community as well, as part of a more informal market. Rarely did we hear of them selling to restaurants or local stores, as luxury crop buyers usually go with more socially connected and better-marketed white farmers, and contracts with large grocery chains go through a wholesale purchaser, requiring larger quantities than they grow. Generally, they are able to avoid selling through a middleman or outlets that would require reducing their diversity or standardizing their practices. Growing diverse crops is also often reflective of their previous farming experience in Mexico and Central America, although climates, markets, crop varieties, and other resource availability differs greatly.

One farmer, who grows a diversity of crops, from standard farmers' market produce like kale and heirloom tomatoes to less common products for the region, like peanuts and purple potatoes, told us that growing a variety of crops is an important strategy for attracting customers at the market,

> When you bring more to the market, more people come to buy… Because if I just bring melon, or I don't bring squash, people are only going to buy that, and that's it. But if I bring a little bit of everything, people will come buy one thing and then another… The more varieties you plant, the better. That's why we have a little bit of white potatoes, red, yellow, purple, and then white, purple, and red sweet potato. And then when they go to market and there are all the different colors, everything looks pretty. Red peppers, black peppers, purple peppers, green peppers, white, orange—all the colors.

Like many of the other farmers we interviewed, he also planted Latin American crop varieties, in addition to ones well known to American customers. They grow and sell herbs like *pápalo* and *chipilin*, *pipián* (a squash variety), *tomatillos*, and hot *chiles*, which are hard to find in many parts of the United States. They produce these for their own consumption, as well as for Latino customers, and the occasional US-born or white customers who know how to cook Latin American food or are adventurous chefs.

Yet their choice to cultivate diverse cropping systems, which work well for direct markets and reflect their own experience as farmers pre-immigration, are not supported by the USDA programs made available to them in their local offices. For example, the local office in the Northern Neck region offers a cover crop assistance program, sub- sidized through state funds. But as the staff from the local NRCS office told us, this program is not tailored to their needs as diversified fruit and vegetable farmers,

> I also offer this cover crop program for them. That program is through… it's a state program. But most of them- the cover crop has to stay on the land, between certain planting dates and certain dates that you have to destroy. And that date, the destroyer date is after. Because they start planting around February first: the beginning of February they start discing their land, preparing their land. And that cover crop has to stay on there until the middle of March. And that's not good for vegetable farmers at all because they need that time, they need that land. When it's ready to go, they're ready to go.

> So the cover crops work better for the grain farmers?

> Yes. I have offered several times. I go out there and just try to push the program. And they say no, it's just not good for them because of the rules and regulations of the cover crop program.

This example of poor seasonal fit with available NRCS programs could be equally true for any fruit or veg- etable farmer in the region. Yet for Latino immigrant farmers, who have fewer farming options, due to their limited access to capital investment, land, and markets, this misalignment reinforces an existing inequality for already disenfranchised farmers.

In another example, in order to participate in the hoop house program, in addition to being subject to random visits, providing a detailed log of what is planted, how much was spent, and how much profit was made; farmers must also plant particular crops according to USDA

Case 3:21-cv-00514-MMH-JRK   Document 22-2   Filed 06/04/21   Page 11 of 16 PageID 171

A new era of civil rights? Latino immigrant farmers and exclusion at the United States… 639

guidelines. Farmers must prepare and adhere to an operation and maintenance plan, which includes particular instructions as to proper irrigation and planting practices and erosion control. This plan has to be reviewed and approved by a NRCS official. While the few farmers who participate in the program did not express frustration at these requirements, others stayed away from government offices because they did not want to have to answer to outside authorities. One farmer who chose to participate in the hoop house program conveyed both gratitude and frustration,

> We were planting tomatoes, because they're very particular. They [the USDA] want certain stuff. You can't go ahead and do anything you want with them [the hoop houses]… And it's good help. I'm not saying it doesn't help, but we've managed to come so far on our own.

While the farmer expressed gratitude for the financial assistance, she also questioned if the planting restrictions are worth the support. The requirement for standardization feels like a relinquishment of some part of her agrarian autonomy, or the ability to make all farming decisions as she wishes. Even for those that succeed in securing state resources, they seem unsure about the decision to work within certain rules and regulations. However, most farmers never looked into USDA programs due to their suspicion of the government and government officials. This discomfort was compounded by their inability to navigate state bureaucracy. In the section below, we discuss the challenges they face as immigrants with limited English abilities and minimal formal education, contending with the paperwork of state-sponsored programs.

## Paperwork and standardization

As can be expected from any government institution, the USDA requires extensive paperwork before, during, and after taking advantage of their loans, grants, or insurance options. When farmers were asked what they think the greatest challenge is for Latino farmers accessing USDA programs, most mentioned the paperwork. This discomfort stems from their general distrust of the US government, coupled with the fact that most Latino immigrant farmers have limited English skills, as well as reading and writing abilities, even in their native language. Although white farmers may also be resistant to paperwork and general bureaucracy, the fact that most farmers we interviewed did not have an education past middle school, means they are lacking the literacy skills necessary to fill out the required paperwork in any language. For many, this means they may never enter the door of the USDA to inquire about opportunities due to intimidation. For others, it may be the ultimate reason they stall in the process and fail to obtain the grant, loan, or insurance package.

Of all the farmers interviewed, only three had successfully used USDA programs- two had grants for hoop houses from the NRCS and one had crop insurance, secured through his local USDA Risk Management Agency office. One farmer also applied for a hoop house and been accepted into the program, but had yet to receive the funds. Local staff are aware of the Latino farmer presence in the area and lacking participation in programs. They discussed with us the ways they tried to conduct outreach, yet were very clear that without a Spanish speaker in the office, their abilities were limited. The local extension agent speaks minimal Spanish and helps Latino farmers access educational materials, but was unable to entice them to apply for USDA funds or programs. A local USDA staff member told us that there must be 10% participation in USDA programs in the region for bilingual forms to be made available. However, it is unlikely there will ever be more than 10% participation if the paperwork is not made available in Spanish in the first place. This catch-22 represents a structural problem within the USDA, which aggravates the already tenuous history of USDA discrimination.

Although some forms are available in Spanish online, finding them is difficult and availability is inconsistent. For example, selected forms for the FSA are available in Spanish on the USDA national site, but not on the Virginia or Maryland state sites specifically (although other states, such as Texas and New York have them on their state sites). For the FSA national site, one must go through an exhaustive search to find the translated forms. To find them, the user must go to the FSA main site, find the link to FSA ''Fact Sheets'' under the ''Newsroom'' link, which is listened under the ''FSA Home'' site. The whole search must be done in English. Then you have to choose from a drop down menu in English to get the translated links. Even then, only a small fraction of all available English forms are available translated. The NRCS national site is somewhat more user friendly for Spanish speakers, with a page specifically dedicated to the forms in Spanish, including Spanish instructions to access the forms.

Without Spanish-speaking outreach abilities, most farmers never hear about the programs available. When asked about the USDA, most farmers interviewed were unaware of opportunities accessible to them. USDA FSA loans are designed for farmers who struggle with traditional bank loans and are meant to be a farmers' first line of credit. Although many farmers interviewed told us they were unable to get access to credit from regular banks, they were unaware that USDA loan programs existed for these

13

reasons specifically. One farmer relayed this lack of awareness,

> The truth is that I don't know what they [the USDA] have… We were told that in Warsaw [Virginia], in the department of environment, where the applica- tions are, that one can fill something out so that they can give you a big greenhouse. However, I only learned about this year. I just didn't know.

Even those who speak nearly perfect English still find the forms intimidating. One immigrant farmer, who has obtained US citizenship, told us,

> I tried in the past to get a small operating loan. And I didn't feel confident enough to fill out the application by myself because there were a lot of questions I didn't know.

Since attempting to apply for her first USDA loan, as described above, she has since applied for another loan that she successfully secured with the assistance of the local FSA staff. Yet, the level of confidence needed to walk into a government office where a huge stack of paperwork awaits is unrealistic for most, especially when understood in context of the tense relationship between most rural Latino immigrants and the state, given their histories of immigration. As noted in the methods section, although most of the farmer participants in this study are docu- mented, many of them got their legal paperwork after crossing the border illegally in the early 1980s. They are all part of a local immigrant community, which includes both documented and undocumented individuals.

Another farmer, who has 60 acres in production, a large vegetable farm for the region, was the only farmer inter- viewed who had crop insurance. He told us that it took three trips to the offices to get the proper paperwork filled out. He does not read nor write in English or Spanish and found the process intimidating and frustrating, as well as time consuming, beyond what he felt he could afford as the owner and manager of a family-run farm.

The fact that paperwork, and the related language bar- rier, is the greatest impediment to aid for immigrant farmers is well understood by USDA staff in these coun- ties. One local USDA staff member explains,

> Most of our [Latino] producers- used to have some come in the office. They don't come in anymore. I think it's English. Because we had one that couldn't speak English, and he would always bring his son in here. And then the forms. We have some forms that are in Spanish, but most of our forms aren't. I think it's…where they're used to dealing with more cash than a lot of paperwork. I think they find the paper- work a little overwhelming.

In addition to noting that the written forms them- selves are a technical challenge, she highlights that immigrant farmers are not accustomed to operating in bureaucratic environments. Even if the forms were in Spanish, their limited formal education makes the pro- cess of filling out paperwork extremely daunting. They are not accustomed to excessive paperwork from their experience as farmers in Mexico, or as farmworkers in the United States.

Even after the initial application for participation in a program is filed, there can be a large amount of follow up paperwork over a long period of time. For example, to participate in the hoop house program, one farmer told us, ''What you have to do is keep a log of how much you spent, what you're getting out of it, and your profit out of it. So that's something that we had to do.'' Another farmer who participated in the program said, ''They were very strict and limited to certain stuff [we could plant]… It's very complicated paperwork.'' They were both grateful for the program support, but expressed that the paperwork was an extra burden on top of their already busy schedules. Those that did use USDA programs also noted that their children, who are often born and educated in the US, were typically responsible for filing this paperwork. They were most comfortable with the language and the formalities of crop documentation, which their parents struggle to navi- gate. For those farmers without grown or teenaged children to help with the paperwork, participation in such programs was an even greater barrier.

A former staff member at the USDA's Socially Disad- vantaged Farmer and Rancher Program at the federal level expressed that although the administration was making attempts to be more inclusive of immigrants and other farmers of color, the changes being made are equivalent to offering ''coffee and donuts,'' rather than addressing uneven access at the local level. She stated that the out- reach to socially disadvantaged farmers such as Latino and Black farmers, as a result of the discrimination claims, does not provide the technical assistance that farmers really need,

> 'Here have a cookie and some coffee, honest we'll give you a loan.' But then they leave. And actually, 'No honest, we won't give you a loan,' because nobody actually stopped eating the donut and the coffee and figured out how to get financed, because that would be hard work…'Here's information about the USDA. Hey, by the way, the USDA doesn't discriminate anymore. And we really hope that when you come to our office you'll meet someone that looks like you and treats you with respect, and if they don't, here's your civil rights.' But not, 'So let's sit down with your tax return now.'

Case 3:21-cv-00514-MMH-JRK   Document 22-2   Filed 06/04/21   Page 13 of 16 PageID 173

A new era of civil rights? Latino immigrant farmers and exclusion at the United States… 641

In her view, despite the genuine intention of creating more inclusive programs at the federal level, in effect, the USDA's claims of making institutional change to combat historic discrimination are merely rhetoric. She argues that to improve opportunities for disadvantaged farmers, they need technical assistance. In our research, we found that sufficient technical assistance would include linguistic training for local staff and outreach and continued support for farmers with discrepancies in language and literacy.

Lengthy paperwork, required initially when a farmer applies for USDA assistance and throughout the process of utilizing the loan or program, proves to be a barrier to Latino immigrant farmers in accessing state support. Language barriers and uneven formal educational experience aggravate their general wariness of government authority even further. When immigrant farmers cannot speak the language and do not feel confident with the procedures required of them to access programs, this can be interpreted as a problem of legibility. Furthermore, their own agricultural practices and ways of sharing knowledge are not easily recorded in USDA forms. Their planting schedules and cultivation cycles tend to not fit the standardized format the state paperwork requires. It is a lack of translation, both linguistic and cultural, that function to keep Latino immigrant farmers away from USDA offices. It is only by recognizing these disjunctures that the USDA can truly move forward and into a new more inclusive era.

Towards a new era of inclusion

Under Vilsack's guidance, the USDA has taken several steps working towards a new vision of equality at the federal level. Since 2009, they have provided civil rights trainings to employees, established the Office of Advocacy and Outreach to aid beginning and socially disadvantaged farmers, and claim to be working towards resolving civil rights lawsuits inherited from previous administrations. The department has also vowed to be an equal opportunity employer and create a workforce, which ''represents the full diversity of America'' (USDA 2015).

Unfortunately, in our work we have found that despite claims of increased racial equality from the federal offices of the USDA, little on the ground change is being made in local and regional offices to directly help Latino immigrants overcome obstacles in order to transition from the role of farmworker to farmer in the United States. The processes of monitoring and standardization, as currently required by USDA programs, exacerbate the racial exclusion of immigrant farmers from state programs, and ultimately, from the advantages other farmers receive. This uneven rural development must be understood in context of the historical relationship between Latino immigrants and the state as well as through the lived experiences of those struggling within a system where their practices are not deemed readable. Today's Latino immigrant farmers follow this pattern of racialized others being left out of system where some practices are deemed legible, and therefore legitimate, and others are not.

As previously mentioned, programs that are developed for the specific needs of diversified fruit and vegetable, or specialty crop growers, already exist within the USDA. There are also microloan programs available through the FSA, which are also designed for ''nontraditional'' farmers and require less paperwork, and could be greatly helpful for Latino immigrants as they transition to farm ownership. Additionally, an office of Minority and Socially Disadvantaged Farmers Assistance (MSDA) has been established within the FSA with the express purpose of assisting farmers such as those who participated in this study. These programs are a great start to making government-supported programs available to immigrant growers. Regrettably, due to social divides and language and educational barriers, these programs are unknown to those most in need of assistance.

Of course, some paperwork and state monitoring are necessary for programs to function and for farmers to be held accountable. We do not suggest that these procedures can or should be simply abolished. Rather, these processes must be streamlined to take account of differences in growing practices, linguistic and literacy capabilities, and the need for farmers to maintain autonomy on multiple levels, if they are to build the trust that is so sorely lacking. Programs should be amended to account for differential growing seasons for diverse crops. Technologies such as camera phones could be better utilized for documentation purposes, in contrast to lengthy written paperwork; an idea suggested to us by an extension worker in New York. In all our discussions with USDA and other outreach staff there was an interest in these changes being made to accommodate ''non-traditional'' farmers in the US.

We do not claim that the USDA is the only institutional boundary for Latino immigrant farmers, nor the only place improvements can and should be made. Immigrant farmers struggle with access to capital, outreach and access to markets, general business skills, and many other management practices. But the USDA is the only state institution that claims to provide economic opportunities for rural communities and agricultural producers of the United States. While there are many entrepreneurial and non-profit ventures that focus on advancement for and training of small farmers, farmers of color, and immigrant farmers, they are often working on shoestring budgets, with varying levels of accountability to their clients, and have limited access to resources and markets themselves. The USDA

does support many of these projects through grants, but making access to direct services from the USDA to farmers more equitable must also be a focus of improvement if services are going to reach farmers of all racial and ethnic backgrounds.

Latino immigrant farmers are challenging historical racial legacies in farming in the United States despite the odds, and persisting in new markets and climates that are seemingly unattainable. The USDA has the opportunity to support their growth as farmers, but in order for programs and funding to reach the most financially disadvantaged beginning farmers, the agency must do more to recognize the challenges immigrant farmers experience in the current system. A productive first step in addressing the long-standing fear of state authority is certainly the recognition of its existence, yet more must be done to truly make services and financial support available. To start, USDA staff in local offices need better support for linguistic and cultural translations, and outreach must focus on making farmers feel safe and included. This support must be available consistently throughout the United States, and not just in offices where farmers are already participating. For this to happen, awareness must improve more broadly at the national level where decisions are made, such as in the debating of the US Farm Bill. Individuals at the local level are powerless if federal leadership does not make concrete changes to procedures and funding steams to support these changes. To truly transition to a new age of civil rights, elected officials and leadership at the United States Department of Agriculture must look closely at local conditions and challenges that individual groups of socially disadvantaged farmers face and make clear and grounded changes to include them.

To create a more racially diverse agricultural system in the United States, there is work to be done by scholars and practitioners alike. This paper asks researchers and critical theorists to better recognize the persistence of non-white farmers in order build on our understanding of agricultural transitions and racial formations. Using the lens of legibility, we have investigated how Latino immigrant farmers are commonly excluded from state supported opportunities, further marginalizing them from agricultural success and stability. The state and civil society are by no means separate entities, and many within the USDA are actively working on creating reforms with regards to their history of racism. Yet until these institutional norms are challenged, many farmers of color, and immigrant farmers in particular, will continue to struggle with agrarian class mobility and land and food producing industries with remain in primarily white hands.

Acknowledgements The authors are grateful to the Goucher College Environmental Studies Department for the opportunity to work together and conduct this research as well as the David B. Falk College of Sport and Human Dynamics at Syracuse University and the Association of American Geographers (AAG) for continued financial support for this project. They would also like to thank the organizers and participants of the ''Race and Rurality in the Global Economy'' Workshop at Duke University, where this paper was first presented, as well as Lindsey Dillon and Clare Gupta for comments on earlier versions and feedback from Evan Weissman on the workshop presentation. Most importantly, the authors would like to thank all participants in this study for their time and willingness to discuss their lives and livelihoods with us.

# References

Ahearn, M.C., J. Yee, and P. Korb. 2005. Effects of differing farm policies on farm structure and dynamics. *American Journal of Agricultural Economics* 87(5): 1182–1189.

Allen, P. 2008. Mining for justice in the food system: Perceptions, practices, and possibilities. *Agriculture and Human Values* 25(2): 157–161.

Brown, S., and C. Getz. 2008. Privatizing farm worker justice: Regulating labor through voluntary certification and labeling. *Geoforum* 39(3): 1184–1196.

Chan, S. 1989. *This bittersweet soil: The Chinese in California agriculture, 1860–1910*. Berkeley: University of California Press.

Clapp, J., and D. Fuchs. 2012. *Food*. Cambridge: Polity.

Clearfield, F. 1994. Reaching out to socially disadvantaged farmers. rural development and a changing USDA. In *Proceedings of the 51st annual professional agricultural workers conference*, ed. N. Baharanyi, R. Zabawa, W. Hill, and A. Parks, 135–142. Tuskegee: Tuskegee University.

Couto, R.A. 1991. Heroic bureaucracies. *Administration & Society* 23(1): 123–147.

Daniel, P. 2013. *Dispossession: Discrimination against African American farmers in the age of civil rights*. Chapel Hill: UNC Press Books.

Dimitri, C., A.B. Effland, and N.C. Conklin. 2005. *The 20th century transformation of US agriculture and farm policy*, vol. 3. Washington, DC: US Department of Agriculture, Economic Research Service.

DuPuis, E.M. 2002. *Nature's perfect food: How milk became America's drink*. New York: NYU Press.

Farm Service Agency. 2015. *Actively engaged in farming*. www.fsa.usda.gov/programs-and-services/payment-eligibility/actively_engaged/index. Farm Service Agency Programs and Services. Accessed September 5, 2015.

Feldman, S., and R. Welsh. 1995. Feminist knowledge claims, local knowledge, and gender divisions of agricultural labor: Constructing a successor science. *Rural Sociology* 60: 23–43.

Foley, N. 1997. *The white scourge: Mexicans, Blacks, and poor Whites in Texas cotton culture*. Berkeley: University of Califor- nia Press.

Guthman, J. and S. Brown. 2015. I will never eat another strawberry again: The biopolitics of consumer-citizenship in the fight against methyl iodide in California. *Agriculture and Human Values* 1–11.

Gilbert, J. 2015. *Planning democracy: Agrarian intellectuals and the intended New Deal*. New Haven, CT: Yale University Press.

Gilbert, J., G. Sharp, and M. Sindy Felin. 2002. The loss and persistence of black-owned farmland: A review of the research literature and its implications. *Southern Rural Sociology.* 18(2): 1–30.

Case 3:21-cv-00514-MMH-JRK   Document 22-2   Filed 06/04/21   Page 15 of 16 PageID 175

A new era of civil rights? Latino immigrant farmers and exclusion at the United States… 643

Gray, M. 2013. *Labor and the locavore: The making of a comprehensive food ethic*. Berkeley: University of California Press.

Grim, V. 1996. Black participation in the farmers home administration and agricultural stabilization and conservation service, 1964–1990. *Agricultural History* 70(2): 321–336.

Hispanic and Women Farmers and Ranchers Claims and Resolution Process. 2012. https://www.farmerclaims.gov. *Informational website for the hispanic and women farmers and ranchers claims resolution process*. Accessed 19 Dec 2015.

Holmes, S. 2013. *Fresh fruit, broken bodies: Migrant farmworkers in the United States*. Berkeley: University of California Press.

Martinez, J., and R. E. Gomez. 2011. *Identifying barriers that prevent hispanic/latino farmers & ranchers in Washington State from Participating in USDA Programs and Services*. Rural Community Development Resources (RCDR) Center for Latino Farmers. Yakima.

Matsumoto, V.J. 1993. *Farming the home place: A Japanese American community in California, 1919–1982*. Ithaca: Cornell University Press.

Minkoff-Zern, L.A., N. Peluso, J. Sowerwine, and C. Getz. 2011. Race and regulation: Asian immigrants in California Agriculture. In *Cultivating food justice: Race, class and sustainability*, ed. A. Alkon, and J. Agyeman, 65–85. Cambridge: MIT Press.

Mitchell, D. 1996. *The lie of the land: Migrant workers and the California landscape*. Minneapolis: The University of Minnesota Press.

Payne Jr., W.C. 1991. Institutional discrimination in agriculture programs. *Rural Sociologist* 11(1): 16–18.

Ponder, H. 1971. Prospects for black farmers in the years ahead. *American Journal of Agricultural Economics* 53(2): 297–301.

Reed, D.B., S.C. Westneat, S.R. Browning, and L. Skarke. 1999. The hidden work of the farm homemaker. *Journal of Agricultural Safety and Health* 5(3): 317.

Riley, M. 2009. Bringing the 'invisible farmer' into sharper focus: Gender relations and agricultural practices in the Peak District (UK). *Gender, Place and Culture* 16(6): 665–682.

Sbicca, J. 2015. Food labor, economic inequality, and the imperfect politics of process in the alternative food movement. *Agriculture and Human Values* 32(4): 1–13.

Scott, J.C. 1998. *Seeing like a state: How certain schemes to improve the human condition have failed*. New Haven: Yale University Press.

Simon, M. F. 1993. Addressing the Problems of Agency Utilization by Kentucky's Black Limited Resource Farmers: Case Studies. In *Challenges in agriculture and rural development. Proceedings of the 50th annual professional agricultural workers conference*, ed R. Zabawa, N. Baharanyi, and W. Hill. Tuskegee, 129–134. Tuskegee University.

Sowerwine, J., C. Getz, and N. Peluso. 2015. The Myth of the Protected Worker: Southeast Asian Micro-Farmers in California Agriculture. *Agriculture and Human Values* 32(4): 1–17.

United States Department of Agriculture. 2014. *Census of agriculture*. www.agcensus.usda.gov. Accessed 2 Nov 2015.

United States Department of Agriculture. 2015. *Secretary Vilsack's Efforts to Address Discrimination at USDA (OASCR, Vilsack's Efforts to Address Discrimination at USDA)* http://www.ascr.usda.gov/cr_at_usda.html. Accessed Online 6 Jan 2015.

Vilsack, T. J. 2009. *Memo to all USDA employees: A new civil rights era for USDA*. USDA Department of the Secretary. http://www.usda.gov/documents/NewCivilRightsEra.pdf. Accessed Online 15 Nov 2015.

Wells, M.J. 1991. Ethnic groups and knowledge systems in agriculture. *Economic Development and Cultural Change* 39(4): 739–771.

Wells, M.J. 1996. *Strawberry fields: Politics, class, and work in California agriculture*. Ithaca: Cornell University Press.

Zippert, J. 2015. USDA approves only 14% of completed claims in the Hispanic and Women Farmers and Ranchers Discrimination Settlement. *Greene County Democrat*. http://greenecountydemocrat.com/?p=14384. Accessed Online 15 Nov 2015.

Laura-Anne Minkoff-Zern, PhD is an assistant professor of Food Studies at Syracuse University. Dr. Minkoff-Zern's research and teaching broadly explore the intersections between food and racial justice, rural development, and transnational agricultural and immigration policy. Her forthcoming book is titled *The New American Farmer: Race, Immigration, and the Struggle for Sustainability*.

Sea Sloat completed her undergraduate degree at Goucher College, where she majored in International Relations with a focus on food politics. While in school, Sea founded Goucher's food recovery program and gained a practical understanding of the US food system by working on several farms across the country. Most recently, Sea worked for Bon Appetit Management Company as East Coast Fellow where she engaged college students around issues in the industrial food system.

Agriculture & Human Values is a copyright of Springer, 2017. All Rights Reserved.