```
 1                IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                      JACKSONVILLE DIVISION

 3               CASE NO:  3:21-cv-00514-MMH-JRK

 4
     SCOTT WYNN, an individual,        Jacksonville, Florida
 5
                     Plaintiff,
 6        -vs-                         Date: June 16, 2021

 7   TOM VILSACK in his
     official capacity as U.S.         Time: 10:00 a.m. - 11:52 a.m.
 8   Secretary of Agriculture;
     ZACH DUCHENEAUX, in his           Courtroom:  10B
 9   official capacity as
     administrator, Farm Service Agency,
10
                     Defendants.
11   _____

12

13                  PRELIMINARY INJUNCTION HEARING
               BEFORE THE HONORABLE MARCIA MORALES HOWARD
14                   UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20   OFFICIAL COURT REPORTER:

21   Cindy Packevicz Jarriel, RPR, FCRR
     221 N. Hogan Street, #128
22   Jacksonville, FL  32202
     Telephone:  904.301.6843
23   e-mail:  cindyrprfcrr@gmail.com

24        (Proceedings reported by stenography; transcript
     produced by computer.)
25
```

2

1              A P P E A R A N C E S

2

3    COUNSEL FOR PLAINTIFF:

4    **WENCONG M. FA, ESQ.**
     **GLENN EVANS ROPER, ESQ.**
5    Pacific Legal Foundation
     930 G Street
6    Sacramento, CA 95814

7

8    COUNSEL FOR DEFENDANTS:

9    **EMILY NEWTON, ESQ.**
     U.S. Department of Justice
10   20 Massachusetts Avenue NW
     Washington, DC  20530
11

12   **KYLA SNOW, ESQ.**
     DOJ-Civ
13   Federal Programs Branch
     1100 L Street NW
14   Washington, DC  20005

15

16                    -   -   -

17

18

19

20

21

22

23

24

25

```
 1                     P R O C E E D I N G S

 2     June 16, 2021                              10:01 a.m.

 3                           -  -  -

 4               COURT SECURITY OFFICER:  All rise.

 5               The United States District Court, in and for the

 6     Middle District of Florida, is now in session.  The Honorable

 7     Marcia Morales Howard presiding.

 8               Please be seated.

 9               THE COURT:  Give me one moment to get my computer

10     back up.

11               All right.  This is Case No. 3:21-cv-514-MMH-JRK.

12     It's Scott Wynn versus Thomas Vilsack and Zach Ducheneaux.

13               And counsel for the plaintiff, if you would please

14     make your appearances.

15               MR. FA:  Good morning, Your Honor.  Wen Fa for

16     plaintiff.

17               MR. ROPER:  And also Glenn Roper on behalf of the

18     plaintiff.

19               THE COURT:  And for the defense?

20               MS. NEWTON:  Good morning, Your Honor.  Emily Newton

21     from the U.S. Department of Justice representing the U.S.

22     Department of Agriculture, and with me is my colleague, Kyla

23     Snow, also from the Department of Justice.

24               THE COURT:  Okay.  Good morning, everyone.

25               First of all, you might be wondering why you're so
```

1  popular.  There are a number of observers here.  This hearing
2  time had been set aside for a civil hearing that's part of the
3  court's summer education series for interns and law clerks.
4  And so we had to -- given that this matter had to be expedited,
5  we moved the subject matter of the hearing that was supposed to
6  be today to another day, but the time for the summer series
7  couldn't be changed.
8        So no pressure, but your performances today will
9  influence the next generation of lawyers, so we expect great
10  things from you.
11       For those students that were interested in the
12  subject matter of the hearing that you were supposed to be
13  hearing, that has now been moved to July 19th at 3:30.  So if
14  any of you-all had read the materials of that and you want to
15  come to that, that's when you should come.
16       All right.  Before turning to the merits of the
17  motion -- and just for purposes of the record, we're here on
18  the motion for preliminary injunction which is Document No. 11
19  filed by plaintiff, Mr. Wynn.
20       And the United States, the defendants, responded to
21  that, and the response in opposition to plaintiff's motion for
22  preliminary injunction, that's Document No. 22, and filed a
23  reply in accordance with the Court's briefing schedule, and
24  that's Document No. 23.
25       In addition to that, on June 10th, the National Black

1  Farmers Association and the Association of American Indian

2  Farmers filed an opposed motion for leave to file *amicus curiae*

3  brief in opposition to plaintiff's motion for preliminary

4  injunction, and that's Document No. 25.

5            There hasn't been a response to that.

6            So, Mr. Fa, do you want to -- I don't know which one

7  of -- you or your colleague, do you want to address the motion?

8  Are you still in opposition to the Court accepting the *amicus*

9  brief?

10            MR. FA:  We are, Your Honor.

11            THE COURT:  Do you wish to be heard as to that?

12            MR. FA:  We were not planning on making argument with

13  respect to that motion specifically.

14            The proposed *amici* also filed a motion to intervene,

15  and we plan on opposing -- we do oppose that and we plan on

16  responding to that, Your Honor.

17            THE COURT:  Okay.  And I understand that the defense

18  takes no position on these motions; is that right?

19            MS. NEWTON:  Yes, Your Honor.

20            THE COURT:  Okay.  So *The Rules of Civil Procedure*

21  don't actually have a specific rule regarding the filing of the

22  *amicus* brief.  There's nothing analogous to Rule 29 of *The*

23  *Federal Rules of Appellate Procedure*.  So it's discretionary.

24  And the Court has the inherent authority to allow *amicus*

25  briefs.

1    And the idea and one of the reasons to accept an

2 *amicus* brief is to aid the Court and to allow for the

3 presentation of voices that are not otherwise before the Court,

4 that is, the contentions of concerned bystanders.  And I think

5 that under the circumstances of the case that's currently

6 before the Court, and given the fact that the *amicus* brief is

7 filed on behalf of individuals who would receive relief under

8 the statute, at least according to the affidavit, that it's

9 appropriate to consider their arguments.

10    And so I'll grant the motion for leave to file the

11 *amicus* brief.  What that means is simply that I'm going to

12 accept the *amicus* brief and I'll consider the *amicus* -- the

13 arguments set forth in the *amicus* brief in ruling on the

14 current motion for preliminary injunction, but that's the

15 extent of relief that is granted on that motion.

16    There is, as Mr. Fa noted, another motion that was

17 filed a little after 5:00 last night, and that's the National

18 Black Farmers Association and the Association of American

19 Indian Farmers opposed conditional motion for leave to

20 intervene as defendants, and that's Document No. 33.

21    It was accompanied by a memorandum of law in support,

22 which should have been all in one motion, all in one document.

23 And there's also a proposed answer.

24    And in the motion, these organizations seek to -- to

25 intervene, but they seek to do so on a conditional basis in

1    that what they're asking is that the Court defer consideration

2    of the merits of the request for intervention until it becomes

3    apparent that the organization's interests diverge from those

4    of the government.

5            And so, Mr. Fa, I guess I want to clarify.  Would I

6    be correct in stating -- in understanding that you don't

7    necessarily oppose the filing of the motion, what you oppose is

8    the ultimate intervention in the case?

9            MR. FA:  Yes, Your Honor.

10           THE COURT:  Okay.  So with that being the case, what

11   I think I should do is accept the motion.  It's been filed on

12   the Court's docket, and, frankly, the Court has to file

13   anything that's submitted to the Court, but I am going to defer

14   consideration of it until, if ever, the interests of the

15   movant -- and in the movant's eyes, I guess, the interest of

16   the movant and the government diverge.

17           And so the way I think that has to work is that I'll

18   grant the motion to the extent that it's before the Court, but

19   I'm going to defer consideration of it until such time as the

20   movant -- and is Ms. Varnell here?  I don't see Ms. Varnell.

21           No, okay.

22           So, Madam Deputy, you'll have to put this in the

23   minutes.

24           I'll defer consideration of the motion until such

25   time as the movants file a notice advising the Court that in

1   their view the interests of the National Black Farmers

2   Association and the Association of American Indian Farmers have

3   diverged from those of the government.  Contemporaneous with

4   any such filing, the movant will have to file a supplemental

5   memorandum in support of intervention that addresses the

6   relevant factors based on the record as it actually stands

7   before the Court at that time.

8           Before doing so, the movant must confer with

9   plaintiff to determine if plaintiff still opposes that relief.

10  And if plaintiff opposes that relief, then plaintiff will have

11  to file any memorandum in opposition within 14 days after the

12  movants file their notice.  Also, if the government opposes it,

13  14 days after the memorandum.

14          MR. FA:  Since Your Honor -- just a point of

15  clarification.  Any proposed intervention, any motion would be

16  forthcoming, and then so we would not file a response 14 days

17  from yesterday as originally anticipated, we would wait to file

18  the reply?

19          THE COURT:  Correct.  So -- so as far as I'm

20  concerned, the motion is, sort of, as they suggest, it's a

21  placeholder.  It doesn't really have a basis for me to

22  determine intervention, because as they -- as they say, their

23  interests, at least as of this point, appear to be adequately

24  represented.

25          So what I'm -- what I'm requiring is I'm going to

1    defer the motion, so I'll take no action on it.

2         If and when the movants believe that their interests

3    are no longer aligned with the government such that they

4    actually seek to actively intervene, they'll have to confer

5    with you, they'll have to file a notice saying that they're

6    ready to proceed on the motion, and they'll have to file a

7    renewed memorandum that actually addresses the merits of

8    intervention.  And you'll respond 14 days from that memorandum.

9         All right.  So the conditional motion for

10   intervention is granted only to the extent that the Court

11   accepts it as properly filed and defers consideration of it

12   until a later date.

13        And that brings us to the arguments of what we are

14   actually here to address.

15            And, Mr. Fa, it's your motion, so I'll hear from you.

16            MR. FA:  Thank you, Your Honor.

17        And may it please the Court, Wen Fa for plaintiff

18   Scott Wynn.  The Farm Loan Assistance Program bases eligibility

19   on loan forgiveness solely on a farmer's race.

20        As this Court is aware, a federal district court in

21   Wisconsin recently issued a TRO which temporarily enjoined

22   defendants from distributing funds pursuant to the program.

23        As that court made clear, the merits of our claim are

24   extremely strong.  This program is broadly discriminatory,

25   lacks a compelling interest, and is not narrowly tailored.

1    So I'm happy to answer any questions that Your Honor

2  might have about the merits part plan, but absent any

3  questions, I'd like to begin with -- I'd like to focus on why

4  this Court ought to be the first court to grant a preliminary

5  injunction on this issue.

6    To begin, a preliminary injunction is necessary to

7  prevent the commission of irreparable harm.  As defendant's

8  declaration in the Wisconsin case, which we attached as an

9  exhibit to our reply brief makes clear, defendants are

10  committed to distributing these funds at the push of a button.

11    The program, as designed by Congress, provides a

12  limited pool of funds, and those funds can dry up in an

13  instant, especially given the fact that the Wisconsin TRO is

14  expressly narrow.  It does not enjoin defendants from

15  identifying eligible recipients.  It does not enjoin defendants

16  from reviewing and accepting applications.  And it does not

17  enjoin defendants from providing guidance pursuant to the

18  program.

19    THE COURT:  Mr. Fa, I know you -- you started out

20  with preventing irreparable harm, which is accurate, because

21  that's what a preliminary injunction is all about.

22    Talk to me about what harm your client, Mr. Wynn,

23  suffers specifically, because the affidavit doesn't really

24  explain much in that regard, the declaration that he provides.

25    How is he harmed by the fact that other people will

```
1   get loan forgiveness?
2               MR. FA:  Sure, Your Honor.
3               So I think Mr. Wynn alleges three different forms of
4   harm, and I think any of those forms are independently
5   sufficient to constitute irreparable harm in this case given
6   defendants' sovereign immunity.
7               First is the practical monetary harm.  So he does not
8   get the funds.  Other people get the funds he believes that he
9   would be entitled -- he deserves at least a chance to receive
10  some of the funds on a race-mutual basis.
11              So, you know, once defendants distribute this limited
12  pool of money, and they're committed to doing so at the
13  earliest opportunity, it's very -- it's going to be very hard
14  to put the toothpaste back in the tube, and that's why a
15  preliminary injunction is necessary to preserve the status quo.
16              THE COURT:  But if he doesn't have a right to loan
17  forgiveness, how is he harmed by not getting the loan
18  forgiveness?
19              MR. FA:  Well, the --
20              THE COURT:  He stands in the same position after this
21  money is distributed as he would today; right?
22              MR. FA:  Well, Your Honor, I think that's true of,
23  you know, I would say most if not every plaintiff in an equal
24  protection case.  One does not have a right to attend an elite
25  university or an elite law school.  One does not have the right
```

1   to obtain a contract.  The problem here is that his right to

2   loan forgiveness is determined solely on the basis of his race.

3          If he were a member of any minority group, he would

4   categorically be eligible for loan forgiveness regardless of

5   his circumstances.  But because he is white, he is

6   categorically excluded from this loan forgiveness program.  So

7   I think that would constitute irreparable harm, especially

8   given defendants' sovereign immunity.

9          THE COURT:  And the defendants raise the

10  Eleventh Circuit's *Northeast Florida Contractors* case as sort

11  of the -- as, I guess, addressing the idea that the violation

12  of his equal protection rights is sufficient.

13         Can you address that?

14         MR. FA:  Sure.  So one thing I just wanted to make

15  clear, the monetary harm is a separate independent bases from

16  the constitutional harm.  But I think the constitutional harm

17  also serves here as an irreparable harm when viewed in

18  conjunction with the defendants' sovereign immunity in this

19  case.

20         So in *Northeastern*, the Jacksonville case that

21  defendants mention, the Court noted that it believed that First

22  Amendment rights and the right to privacy were automatically

23  irreparable harm for purposes of a preliminary injunction.  And

24  that's because the intangible nature of those rights.

25         The reason that the Court ruled against the plaintiff

1   in that case was because they -- on that record, they

2   determined that, you know, plaintiffs could be made whole by,

3   say, if they were awarded loss contracts or in the form of

4   monetary damages.  There, of course, the defendant was a city,

5   and cities are not entitled to sovereign immunity.

6           But here, you know, I don't think anybody disputes,

7   one, that a constitutional violation, especially one that is as

8   fundamental as your right to be free from racial discrimination

9   on the part of the government constitutes a harm at all.

10          I think the parties would all agree that that

11  violation of an equal protection guarantee is a harm.  And what

12  makes the harm irreparable is the fact that defendants are

13  entitled to sovereign immunity.

14          Mr. Wynn would have no way to come into court, as the

15  plaintiff could have done in the Jacksonville case, to ask for

16  monetary damages.  And I think when you look at those

17  two factors in conjunction, the violation of his constitutional

18  rights in this case is an irreparable harm.

19          THE COURT:  And the -- when you -- the practical

20  monetary harm that you identified, the right -- well, not the

21  right -- not receiving loan forgiveness, the Eleventh Circuit

22  in the *Engineering Contractors* case talks about and recognizes

23  that affirmative action plans inherently always require

24  nonminorities to bear some burden in order to remedy prior

25  discrimination.

1     And the court -- the Supreme Court and the
2  Eleventh Circuit have recognized that efforts to remedy
3  specific prior discrimination are lawful, so why isn't the
4  monetary loss, that is just not getting loan forgiveness and
5  leaving plaintiff in the exact same position he's in, why
6  wouldn't that be the type of burden that is recognized and
7  permissible in order to remedy past discrimination?
8     MR. FA:  Because I think in this case we have a very
9  strong claim on the merits that this is not just some
10  affirmative, you know, run-of-the-mill affirmative action
11  program that would be endorsed by a court, this is something
12  that goes beyond the scope of anything that has been endorsed
13  in recent history by the Supreme Court, and frankly I think
14  this goes beyond the scope of the program that has been, you
15  know, viewed as either constitutional or unconstitutional by
16  the Supreme Court.
17     This is a very crude program and flexible program
18  that makes race -- while the Supreme Court said that race is
19  only permissible in very limited circumstances, and to be used
20  in a very limited manner, this uses -- this program uses race
21  as the only factor in all circumstances dealing with loan
22  forgiveness.
23     If you are a member of the five minority groups that
24  are listed as socially disadvantaged, you are categorically
25  eligible for loan forgiveness.  If you are a white farmer or

1  rancher, regardless of circumstances, you are categorically
2  ineligible.
3         I think that's quite different.  You know, I think
4  here we're getting a little bit to the merits and narrow
5  tailoring, but I would say it's quite different from the
6  contracting cases.
7         In those cases, the disadvantaged business enterprise
8  programs, they're composed primarily of minority businesses,
9  but they are more flexible -- much more flexible than this
10 program in at least two different ways.
11        First, a non-minority contractor could still show
12 that he is a disadvantaged business enterprise by meeting the
13 factors listed in Appendix E entitled 26 of The Code of Federal
14 Regulations.
15        Similarly, a -- although minority contractors are
16 generally entitled to a presumption of disadvantage, that
17 disadvantage can be overcome.  That's quite different from a
18 law like this where you're categorically excluded and you're
19 categorically included, and there's nothing a farmer can do
20 about that.
21        THE COURT:  Mr. Wynn, let me go back.  You said --
22 you said there were three forms of harm and you identified two,
23 monetary and the constitutional harm.  What's the third?
24        MR. FA:  So the third harm, as we point out in our
25 reply brief, is a competitive harm.  And there, I think it

1   would be -- you know, I do think that we have made allegations

2   in our declaration that are sufficient for purposes of a

3   preliminary injunction to prove up that competitive harm claim.

4           THE COURT:  Is the -- what Mr. Wynn has said in his

5   declaration is that a significant portion of his monthly income

6   is used to pay down his loan.  If he didn't have to use that to

7   pay down his loan, he could use it for other -- he could

8   repurpose that money, and then beyond that, it's entirely

9   speculative of whether he's competing with anybody who is

10  getting -- who is getting loan forgiveness.

11          There's no evidence of that; right?

12          MR. FA:  Well, Your Honor, I think in a -- in a

13  constitutional case like this, you know, a lot of the record is

14  established by the statute itself and also by the other record

15  evidence that's capable of judicial notice.

16          So, for example, you can take into account what the

17  statute actually says, and that's that minority farmers and

18  ranchers are automatically ineligible for loan forgiveness

19  regardless of the amount of loan.

20          And you -- I think you can also take into account the

21  argument that defendants made in their response brief which is

22  that this program is intended to sort of level the playing

23  field in a way to, you know, for what they perceive as

24  competitive disadvantages that, you know, on its term, socially

25  disadvantaged farmers, i.e., minority farmers and ranchers,

1    have -- have suffered.

2          So that's the reason that they're providing this loan

3    forgiveness to farmers and ranchers across the nation.

4          THE COURT:  So why isn't that a compelling government

5    interest?

6          MR. FA:  Well, I think it's not a compelling

7    government interest, Your Honor, because there is no -- there

8    is no finding of discrimination.  There's no specific --

9    defendants do not allege any specific episodes of past

10   discrimination by government entities that would constitute a

11   compelling interest.

12         And I think evidence of that is, you know, you look

13   at Secretary Vilsack's statement that we allege in our

14   complaint and I believe in our opening motion, that he wanted

15   to use this program to address what he believes is, you know, a

16   problem with systemic discrimination.

17         The problem with that, Your Honor, is systemic

18   discrimination, like societal discrimination that has been

19   rejected by the Supreme Court from cases like *Bakke* onward,

20   there is no precise defined scope to that.  So you don't -- you

21   don't really -- you wouldn't really know the actual scope of a

22   remedy that defendants are -- are enabled to dole out.

23         And I don't think they can provide evidence in this

24   case that every single minority farmer and rancher, regardless

25   of, you know, whether that person has been farming since the

1   '70s, regardless of whether that person -- farmer has just
2   been -- started farming two years ago, every single farmer and
3   rancher who is a minority has been subject to past episodes of
4   civic discrimination.  So I think that the Wisconsin court
5   correctly found there is no compelling interest in this case.
6           THE COURT:  The government argues that the four
7   statements in the Government Accountability Office report, the
8   letters from the law professors -- are they law professors? --
9   from the 13 professors, that all of those pieces of evidence
10  support the conclusion that the past remedies that Congress has
11  authorized to address what is undoubtedly a history of
12  discrimination by the government against minority farmers, that
13  those -- that that evidence supports a finding that those prior
14  efforts had been insufficient, and it's for that reason that
15  this additional remedy should be authorized.
16          What's your response to that?
17          MR. FA:  So I think -- I'd like to make two points in
18  my response.
19          First, I think, individual -- statements by
20  individual legislature that hearings on floors are very weak
21  probative evidence of congressional purpose.
22          And my second response, and I think it's even a more
23  important one, is that the -- even the statements themselves,
24  they do not point to anything that is specific enough to meet
25  what the precedent require as to compelling discrimination.

1    You know, in the contracting example -- in the
2 contracting cases, for example, you have finding by -- made
3 through studies that, for example, 15 percent of, say, black
4 contractors have been discriminated -- have alleged -- been
5 alleged to be discriminated in contracting in that particular
6 jurisdiction.  Here, there is nothing of the sort.  And I think
7 that is --
8    THE COURT:  What about the statistical disparities
9 that they identified?
10    MR. FA:  So I think those are the type of crude
11 statistical disparities that the court, in Justice O'Connor's
12 plurality opinion, rejected in *Croson*.
13    I mean, they talk about things like, you know, white
14 farmers, in general, plant different types of crop.  And then
15 comparted to minority farmers, white farmers are more likely to
16 have large farms compared to minority farmers.  But I think
17 that begets even another problem with their argument.  And
18 that's, you know, if they want to provide targeted relief on a
19 race-neutral basis, we have no issue with that, even if it
20 disproportionally goes to minority farm and ranchers.  And I
21 think such race-neutral alternatives are easily available to
22 defendants.
23    THE COURT:  So what are -- what are examples to
24 race-neutral alternatives?
25    MR. FA:  Well, I think that it would be tied -- any

1   race-neutral alternative would be tied with the defendants --

2   with the problems that defendants perceive.

3          So, for example, if they see a problem with, you

4   know, large farms are better able to weather the impact of the

5   COVID-19 pandemic.

6          I think defendants could very well implement a loan

7   forgiveness program that targets the farmers who work on small

8   farms.  Or, you know, if they see a problem with, you know,

9   particular crops being disproportionally affected by the

10  pandemic, they could target a program, a race-neutral program,

11  to provide for relief for farmers that plant those crops.

12         And I think that program would look a lot different

13  from this program.  Because in this program, the determination

14  that the -- the key determination of whether a farmer or a

15  rancher is eligible for loan forgiveness is not the type of --

16  not the type of crop he plants, not the size of his farm, not

17  any sort of interest rates that he received on any loan, it's

18  the fact that he is of a certain race.

19         And I think Supreme Court precedent over many years

20  from *Bakke* onward demonstrates that that is -- that is plainly

21  crude and not narrowly tailored, and violates the

22  constitutional guarantees of equal protection.

23         THE COURT:  One of the arguments that has been

24  presented is that 99 percent of the COVID farm relief went to

25  white farmers.  And I think that, at least as I understand it,

1   what the defendant appears to be arguing is that that is recent

2   evidence of the government's passive participation in a system

3   of racial exclusion and -- why wouldn't that evidence

4   support -- if the government is giving 99 percent of the COVID

5   farm relief to white farmers, why isn't that perpetuating the

6   effects of the previously recognized discrimination?

7          MR. FA:  Well, I'd like to make two points on that.

8   First, you know, with respect to statistical disparities of

9   cases like *Washington* and *Davis* have shown, even if you have

10  large statistical disparities, that is not necessarily

11  probative or conclusive evidence of discrimination.

12         And I think here, you know, defendants are entitled

13  to use race-neutral means, as we stated, to target, you know,

14  owners of small farms, for example, that might

15  disproportionally accrue to the benefit of minority farmers and

16  ranchers.

17         THE COURT:  But the -- the COVID aid was arguably

18  distributed on a race-neutral basis, but it ended up going

19  99 percent to white farmers; right?

20         MR. FA:  Right.  So I think the only way -- you know,

21  but, again, we don't accept that, obviously, as true for the

22  purposes of the merits.  You know, I anticipate we will still

23  be doing discovery on those numbers.  But for purposes of

24  preliminary injunction here, I don't think it is dispositive of

25  the case.

1    You know, you can have a race-neutral program that
2    accrue to the benefit of, you know, one race or another, but
3    here we're talking about a compelling interest for purposes of
4    government discrimination.

5    And the Supreme Court has said that the only type of
6    interest that is compelling enough to sustain a program that
7    might be viewed as government discrimination is one that undoes
8    the past discrimination on the part of a government entity.

9    I don't think you can prove past discrimination only
10   on the basis of statistical disparities alone.  And in any
11   event, you know, this program is not narrowly tailored because
12   even farmers and ranchers who might not have even been affected
13   by COVID, who might not have applied for any COVID relief, they
14   would be eligible for -- for the loan forgiveness if they were
15   a minority farmer and rancher.

16   It's also underinclusive because you could have a
17   white farmer or rancher who has actually been shut out of COVID
18   relief funds despite the negative impact of the pandemic on
19   that person's operation, and that person would be categorically
20   barred for no other reason than that person's race.

21   So I think we have a very strong chance of prevailing
22   on the merits.  We've shown irreparable harm.  The last
23   two factors are also met here.  Because as many courts,
24   including courts in the 11th Circuit have held, it is always in
25   the public interest to enjoin the enforcement of an

1   unconstitutional law, and that factor emerges with the balance

2   of harms factor in a case like this where the government is a

3   defendant.

4          THE COURT:  And what about the harm to the minority

5   farmers?  Like what is described in the National Black Farmers

6   and the Association of American Indian Farmers *amicus* brief.

7          MR. FA:  I don't think any one individual has a right

8   to obtain a windfall under the -- under an unconstitutional and

9   racially discriminatory program.  And I would add, you know, we

10  do not object to any race-neutral program that provides for

11  relief to farmers and ranchers on any race-neutral basis.

12         So I think it's possible, if not even likely, that

13  those same farmers would also be entitled to COVID relief down

14  the road under a race-neutral program.  But I am not aware of

15  any case that has found a constitutional violation but also

16  held that the injunction ordering the government to stop

17  violating the constitutional rights of individuals wouldn't

18  also serve the public interest.

19         THE COURT:  You describe the TRO that was entered in

20  Wisconsin as limited.

21         How -- I understand it's temporary and that it can

22  only last 14 days, but it stops the distribution of funds

23  entirely; right?

24         MR. FA:  Right.  It does stop the distribution of

25  funds.

1    What I meant to say by limited is that it doesn't
2  stop defendants.  In the opinion, it says defendants are still
3  able to identify eligible recipients.  They are still able to
4  accept -- review and accept applications.  And they're still
5  able to provide guidance to farmers and ranchers regarding the
6  program itself.
7    THE COURT:  And if an injunction were appropriate,
8  why wouldn't it be entirely appropriate for it to be limited in
9  that way?
10    MR. FA:  I have no -- no objection with an injunction
11  limited in that way.
12    THE COURT:  Oh, okay.  I perceived you saying
13  something different earlier and that's why I was --
14    MR. FA:  I'm sorry, Your Honor.  My point there was
15  just that, you know, as the defendant's declaration in the
16  Wisconsin case shows that we submitted as an exhibit to the
17  reply brief, I think paragraphs 28 to 30 shows the speed at
18  which they're able to distribute the funds.  And I was only
19  making the point that, you know, I think it's necessary for
20  this Court to issue a prompt preliminary injunction given that,
21  you know, once the defendants distribute the funds, it's going
22  to be very hard to undo that, as the Wisconsin court noted.
23    One last point I'd like to make is that, you know,
24  for reasons that we mentioned in our reply brief, I think the
25  injunction should be nationwide in scope, and that's exactly

1    the type of injunction that the Wisconsin court issued.  That's
2    because here we're dealing with a federal program and a limited
3    pool of funds.

4            You know, defendants ostensibly will distribute these
5    funds to farmers from Carolina to California, so I don't think
6    it's enough in this case.  You know, injunctions should be
7    tailored to the extent that they provide relief to the
8    plaintiff, and I don't think an injunction limited to, you
9    know, the Middle District of Florida would suffice here,
10   given --

11           THE COURT:  You propose that in your reply.

12           MR. FA:  We proposed -- so we proposed that as an
13   alternative, you know.  But we think that the best -- the
14   primary form of relief that we're asking for is a nationwide
15   injunction.

16           Because if defendants distribute these funds, a
17   majority of these funds to, say, farmers in California, you
18   know, I think that would dwindle the pool of limited funds
19   anticipated by Congress just as much as distributing the funds
20   in Florida.

21           THE COURT:  All right.  Let me hear from Ms. Newton.

22           MR. FA:  Thank you, Your Honor.

23           THE COURT:  So, Ms. Newton, there is one thing that
24   just factually I wondered about.  The statistics about the
25   number of qualifying loans and the number of people that are

1    behind in their payments seemed off.

2         And I guess my question in reading, I guess it was

3    Mr. Cobb's affidavit or declaration, it almost sounds like

4    these individuals are now being encouraged not to make payments

5    on their loans.  Because if they make payments, that will delay

6    them getting the relief, because the affidavit explained that

7    the processors will have to go back and sort of undo the ledger

8    entries.

9         And so is that causing the statistics to be off

10   kilter in terms of how many people are behind -- how many

11   minority farmers are behind in their loans?

12        MS. NEWTON:  No, I don't believe so, Your Honor.

13        I think those numbers are independent.  So

14   delinquency isn't counted as -- so the way that the program is

15   structured, minority farmers that had outstanding loans as of

16   January 1st, 2021, are entitled to the debt relief.

17        So if minority farmers -- so as of then, they didn't

18   owe any more money on their loan.  So if they didn't pay after

19   that, they wouldn't be counted in those delinquency numbers.

20   They didn't need to pay at all because those loans, under the

21   statute, will be paid off.

22        And so what Mr. Cobb was explaining in the

23   declaration was there were some farmers who have in fact made

24   payments since January 1st, and in order to determine the

25   amount that they will be owed under the statute, the USDA needs

1   to reverse those payments.  So it's not that they're delinquent

2   on payments, they've actually overpaid, because under the

3   statute, they're entitled to get relief as of what was

4   outstanding as of January 1st.

5              THE COURT:  And they're entitled to that relief

6   solely based on their race, nothing else?

7              MS. NEWTON:  So they are entitled to that relief

8   based on race.  It is presumed that if they fall within one of

9   those five racial categories, they will get that debt relief.

10             I would say it is not as inflexible as plaintiff's

11   counsel makes it out to be.  As was noted in the NOFA, there is

12   a case-by-case determination process that has been provided,

13   and if an individual can show that he or she is a member of a

14   group that has suffered racial or ethnic prejudice, the

15   secretary will, pursuant to that process, consider a written

16   request and supporting explanation.

17             THE COURT:  But that can never be a white person?

18   Because the definition, they have to be a member of a group

19   whose members have been subjected to racial or ethnic prejudice

20   because of their identity as a member of a group without regard

21   to individual qualities.

22             So that means anybody -- arguably, anybody but a

23   white person, male or female?

24             MS. NEWTON:  I don't think that's necessarily the

25   case.  We have another case in Texas where the plaintiff in

1    *Miller* are arguing that, for example, individuals who

2    self-identify as white, such as Jews, Irish -- people of Irish

3    heritage or Italian heritage, they have alleged that they too

4    have been subject to discrimination on account of their race or

5    ethnicity.

6          Now, whether or not they have shown that they have

7    suffered discrimination at the hands of the USDA like these

8    other groups, I don't know if that will be the case.  But the

9    point is is that there is this case-by-case determination.  And

10   I think more fundamentally on the merits, we have shown a

11   strong basis in evidence for Congress to have concluded that

12   these particular groups have suffered discrimination in USDA

13   loans programs, and as such, there is a compelling interest in

14   providing relief to those groups.

15         THE COURT:  I think that one of the things I struggle

16   with in looking at the evidence that's been presented is there

17   has been about $4 billion that's already been paid out to

18   address the past discrimination.

19         MS. NEWTON:  Are you referring to the payments made

20   under the settlement agreements?

21         THE COURT:  Yeah, *Pigford* and --

22         MS. NEWTON:  So approximately $2.4 billion.  4

23   billion was authorized, but approximately 2.4 billion has been

24   paid out.

25         THE COURT:  Okay.  Where is the evidence that that --

1    that those payments have actually not remedied the past
2    discriminations that was being sought to be addressed in
3    those --
4             MS. NEWTON:  Yes, Your Honor.
5             THE COURT:  -- in those, what I would say, much more
6    targeted programs?
7             MS. NEWTON:  Yes.  So I think there is strong
8    evidence in the record submitted by the government that
9    discrimination persisted such that the relief under Section
10   1005 was necessary.
11            That is plaintiff's primary argument as to compelling
12   interest.  He doesn't dispute that there is a compelling
13   interest here, that Section 1005 was enacted to serve those
14   compelling interests.  His argument is that once the
15   settlements were finalized --
16            THE COURT:  So what is it that -- point me to that
17   strong evidence.
18            MS. NEWTON:  Yes.  I think -- we cited 10 hearings
19   between 1999 and 2001 in which Congress heard testimony about
20   discrimination in USDA loan programs and its detrimental
21   effects on minorities, that there is disproportionally
22   foreclosed upon and delinquent on their loans.
23            THE COURT:  When was the *Pigford* settlement?
24            MS. NEWTON:  The *Pigford* settlement was 1999.  The
25   last settlement wasn't until 2010.

1        THE COURT:  Yeah, I --

2        MS. NEWTON:  I am happy to go through that evidence

3   we presented, and want to, Your Honor, but I think that is also

4   one thing -- I mean, plaintiff's argument presumes that -- he

5   says there is undeniable evidence that there was long-standing

6   discrimination in USDA programs against minority farmers for

7   decades.

8        And then the argument is that as of 2010, when that

9   last settlement agreement was entered into, that completely

10  remedied the problems, and that a mere ten years later there

11  are no lingering effects of that discrimination on minority

12  farmers.

13       I think that's unrealistic and it's belied by the

14  evidence in the record.  So to go back to that, there were ten

15  hearings that we cited to, they cited to the disproportionally

16  higher rates of foreclosure and delinquency on loans for

17  minority farmers, the backlog of civil rights complaints due to

18  the thousands filed by minority farmers, and the

19  underrepresentation of minorities within USDA, including on

20  county committees.

21       The records submitted by the government also cited to

22  over a dozen reports, including two GOA reports as late as 2019

23  and 2021, showing the adverse effects of discrimination against

24  minority farmers present today.

25       THE COURT:  Let's talk about those reports.

1    First of all, the 2021 report is the financial

2  services industry report, and it doesn't really contain any new

3  findings relevant to agriculture.  It just repeats the findings

4  from the 2019 report; right?

5    MS. NEWTON:  Yes.  But insofar as plaintiff is

6  alleging -- arguing that Congress didn't have a compelling --

7  strong basis for this compelling interest, he's saying that as

8  of the enactment of Section 1005.  And I think the 2021 report

9  acknowledges that the findings in the 2019 report persisted up

10  to that time.

11    THE COURT:  So the 2019 report with regard to -- it

12  says, quote:  Indian issues.

13    MS. NEWTON:  Uh-huh.

14    THE COURT:  This is GAO 19464 report.  It addresses

15  the barriers that Native Americans faced to obtaining

16  agriculture loans.  It talks about lane use restrictions and

17  administrative process delays and legal challenges,

18  creditworthiness, but I didn't see a finding in that report

19  that said any of this was the result of discrimination.

20    So how does that report --

21    MS. NEWTON:  I think that --

22    THE COURT:  -- report the need to address past

23  discrimination against Native Americans?

24    MS. NEWTON:  Yes, Your Honor.  I think it's actually

25  explained well by the 2019 -- the other 2019 GAO report that we

1    cited, and that explains how the historical discrimination in
2    USDA loan programs has affected socially disadvantaged farmers'
3    current ability to obtain credit in the private market, and
4    that also pertains to Native Americans.
5              So you just noted creditworthiness; it speaks
6    directly to that issue.  So it explains that because socially
7    disadvantaged farmers were, as plaintiff concedes, for decades,
8    denied loans and other program benefits through the USDA, they
9    haven't been able -- they not only had their farms depleted but
10   they haven't been able to develop them in a way that
11   non-minority farmers have.  As a result, they haven't been able
12   to purchase land and equipment that they could use as
13   collateral to obtain future and larger loans.  They also are
14   less familiar with lending standards.
15             So that report explains that they have a harder time
16   getting credit through the private market.  And all of this has
17   led to a situation where minority farms are disproportionately
18   smaller and bring in less revenue than non-minority farms, and
19   it's also led to a situation, as Your Honor acknowledged, where
20   Congress recognized that agricultural funding tends to go to
21   large farms.  And so as a result, minority farms that are
22   smaller and bring in less revenue are also missing out on the
23   large part of agricultural funding.
24             THE COURT:  Let me stop you there.
25             So GAO 19-539 report --

1    MS. NEWTON:  Yes.

2    THE COURT:  -- which is the one that addresses

3  agricultural lending.  And it addresses the effects on socially

4  disadvantaged farmers and ranchers, which in that report

5  actually includes women; and it's interesting to me that women

6  get left out of this funding despite the fact that all the

7  evidence that is relied on is equally applicable to women.  But

8  when, again, reading that report in full, what it -- what it

9  identifies is barriers that the socially disadvantaged farmers

10 face.

11    One of those barriers that's addressed is described

12 as actual or perceived discrimination.  But that's only one of

13 a number of the barriers that are identified.  The other

14 barriers are the things that you talked about like collateral,

15 like poor credit history, like farm size.

16    And I guess what -- what is interesting to me is that

17 that report included recommendations of how to remedy those

18 barriers, and none of those recommendations included blanket

19 loan relief.

20    The barriers that are identified can, for example, if

21 they don't have collateral, a targeted program that provides

22 guaranteed loans would address that.

23    If it's problems with credit history, then there are

24 programs that could address that.

25    If it has to do with farm size, then there could be

1    incentive to private lenders to lend to smaller farms.

2           The other thing that's addressed in this report is

3    the extent of outreach efforts.  The report says that they --

4    it's -- they're unable to calibrate the extent of their

5    outreach efforts because of record-keeping, but why -- why

6    doesn't the loan relief or why doesn't the program that -- that

7    Congress is authorizing actually address any of the challenges

8    that are identified in these reports that are relied on?

9    Because the -- Section 1005 gives loan relief only to the

10   people who successfully got loans, not -- it doesn't address

11   any of these challenges that are supposedly identified -- well,

12   not supposedly, but are clearly identified in these reports.

13          MS. NEWTON:  There's a lot to unpack in there, but if

14   I may.

15          THE COURT:  There was a lot to read.

16          MS. NEWTON:  Yeah, fair enough.

17          There are a few issues that I'd like to address.

18          So one thing is the legislation does address grants

19   and loans for socially disadvantaged farmers.  In Section 1006,

20   the very next provision, Congress authorized funding for grants

21   and loans to minority farmers I believe who were not able to

22   obtain loans.  It also provides for the funding of an equity

23   commission to address racial equity issues at the USDA, and

24   some further provision to address exactly what you were

25   referring to.

1       THE COURT:  Then what -- then what's -- what's the

2  point of the loan forgiveness?

3       MS. NEWTON:  Well, I think that goes to -- I mean,

4  it's essentially plaintiff's argument that the provision isn't

5  narrowly tailored because there are race-neutral alternatives

6  that could be used.

7       THE COURT:  That's what the Constitution requires;

8  right?

9       MS. NEWTON:  Exactly.  And I think it is telling that

10  Congress has tried each and every race-neutral alternative that

11  plaintiff proposed.  As we explained in our brief, he proposed

12  outreach to farmers.  There's a whole program, the 2501

13  program, that is set up to do that.

14       Congress -- he went through -- each and every

15  proposal he made, Congress has tried that for the last 30 years

16  and it found that it was unsuccessful.  Not only did it do

17  those things, but as you mentioned, it provided $35 billion in

18  recent agricultural subsidies and CFAP funding.  That's the

19  Coronavirus Food Assistance Program funding.  And it found that

20  that was not eliminating the problem, that, in fact, it was

21  exacerbating the problem because the overwhelming majority of

22  it did not reach socially disadvantaged farmers.

23       THE COURT:  Can I stop you and ask you --

24       MS. NEWTON:  Uh-huh.

25       THE COURT:  -- point me to the evidence in the record

1    that the past efforts that have been made have been

2    unsuccessful.

3              MS. NEWTON:  Uh-huh.

4              Yeah, I think it's at a couple places.  So we cite

5    numerous statistics.  I think, just to tick through what has

6    been submitted, you know, we cite to ten hearings, talking

7    about the persisting problems, over a dozen reports, the

8    articles and reports submitted or were cited by Congress, the

9    House report, accompanying ARBA, congressional findings in the

10   predecessor bill, the Section 1005, and the floor statements

11   made by multiple members of Congress.

12             THE COURT:  The floor statements, though, in terms

13   of -- they cite the history.  They very eloquently go through

14   the tortured, I think, history.  But in terms of their evidence

15   that past programs have been unsuccessful, I think both Senator

16   Booker and Senator Stabenow, they make the broad statements

17   that the past efforts have been unsuccessful, but they cite

18   mainly to -- there was, I think, like an *L.A. Times* article, I

19   think, is the basis for that.

20             It was pretty conclusory.  I didn't see where they

21   were -- what evidence was supporting that conclusion.

22             MS. NEWTON:  Yeah, I think there were a couple

23   things.  They spoke to the settlement agreements specifically

24   and said that those had not remedied the situation.  And

25   multiple Congress members, but also throughout hearings,

1    et cetera, there have been multiple references to the fact that
2    the settlement payments were eroded by state taxes.  There was
3    actually loan forgiveness under some of the settlements, and
4    that actually added to the tax debt that minority farmers faced
5    and they were not able to pay that off.  They also noted that
6    with respect to Native American farmers specifically, very few
7    applied through the settlement process because they tended to
8    be older in age and were difficult to reach.
9            And then there is the general evidence in the record
10   that we provided, all of those reports, et cetera, but I would
11   just cite -- cite a few statistics that are noted in all of
12   that -- those materials.
13           One, that black farmers were subject to 13 percent of
14   USDA foreclosures despite being less than 3 percent of direct
15   loan recipients.
16           That socially disadvantaged farmers accounted for an
17   estimated 17 percent of primary producers in USDA surveys
18   between 2015 and '17, but only 13 percent of farmers with
19   loans, and only 8 percent of total outstanding farm debt.
20           That approximately 13 percent of borrowers with FSA
21   direct loans were currently delinquent on their loans, but that
22   number increased to 35 percent for black farmers, and
23   24 percent for Hispanic, Asian, and indigenous farmers.  That
24   finding is reinforced by the Cobb declaration, which confirmed
25   similar disparities.

1    He averred that the ratio of white borrowers who are

2  delinquent on the eligible FSA loans was 11 percent.  That

3  compared to 37.9 percent of black borrowers, 14.6 percent of

4  Asian borrowers, 17.4 percent of American Indian/Alaskan Native

5  borrowers, and 68 percent of Hispanic borrowers.

6    So those are just some of the statistics.  And I

7  would note that the Eleventh Circuit has relied on that same

8  type of statistical data in equal protection cases.

9    So in *Home Corporations versus Hillsborough County*,

10  it found that statistical data over a six-year period, showing

11  that minorities were significantly underrepresented in

12  contracting, provided a *prima facie* case of discrimination.  It

13  also relied on discrimination complaints.

14    Here, there is compelling evidence in the record that

15  there have been thousands of discrimination complaints by

16  minority farmers against the USDA, and that was cited as a

17  continuing problem in a hearing in 2008 that's in the record

18  and in a hearing in 2019 that's in the record.

19    So there is -- there is definitely a strong basis in

20  evidence in the record that these issues persist, and I would

21  note that once we provided that strong basis in evidence,

22  plaintiff has the ultimate burden to show the

23  unconstitutionality of the program by rebutting that evidence.

24    THE COURT:  Let me ask you this.  So if the purpose

25  of the legislation is to remedy the history of discrimination

1    against minority farmers --

2              MS. NEWTON:  In USDA programs, I will note

3    specifically.  Sorry.

4              THE COURT:  Yes.  Doesn't your -- this remedy of loan

5    forgiveness actually exclude the actual victims of this past

6    discrimination, those who failed to obtain a loan or those who

7    already got foreclosed?

8              I know you said that there's -- in some other

9    sections of the bill, there's additional funding for -- for

10   loans going forward, but that doesn't change the fact that the

11   lion's share, the biggest remedy in this is complete loan

12   forgiveness, and that includes complete loan forgiveness for a

13   Native American farmer who got -- the first loan he or she ever

14   applied for on great terms and without any delay, in other

15   words, no discrimination whatsoever, but they get 100-percent

16   loan relief, and the farmer that was foreclosed on before and

17   lost his farm, perhaps as a result of discrimination, gets no

18   relief whatsoever.

19             MS. NEWTON:  Uh-huh.

20             That hits several points, I think, I would like to

21   address that individualized determinations of discrimination

22   are not required.  The Supreme Court has been very clear on

23   that.  I'd like to come back to that because it was a point

24   plaintiff's counsel mentioned.

25             It also goes to the fact that Congress need not

1    exhaust every conceivable race-neutral alternative.  I'd like

2    to go back to that.  But the record illustrates that the issue

3    was not just minority farmer's inability to obtain loans from

4    the USDA.  The record shows that they received smaller loans.

5    That they had those loans arbitrarily reduced.  That they had

6    their loan significantly delayed, negatively impacting that

7    season's harvest.  That they had their repayment schedules

8    accelerated without explanation.

9              THE COURT:  Right.  But this loan relief doesn't

10   target those people.

11             Certainly some individuals faced that.  This loan

12   relief gives relief based solely on race.  It doesn't -- it's

13   not like *Pigford* where you had to at least show that you were a

14   farmer.  In the very, very minor showing that was required to

15   be made for the *Pigford* settlements in the Track A cases, they

16   at least had to show that they had had a loan or had attempted

17   to get a loan and had received some sort of adverse something.

18             So isn't there a more narrowly tailored way to give

19   out this money that actually targets the history of

20   discrimination?

21             MS. NEWTON:  But I think this does, actually.  And if

22   you'll just indulge me for one second.

23             So we cited all kinds of statistics that minority

24   farmers have higher delinquency rates and rates of foreclosure

25   on their loans; right?  And the evidence I just recited is in

1    the record showing that that may have been the result of the
2    fact that they had their repayment schedules accelerated
3    without explanation.  That they weren't given loan servicing
4    options.
5           So loan servicing is essentially providing a borrower
6    with options to restructure the loan in the event that that
7    borrower becomes distressed, he or she thinks they won't be
8    able to pay off the loan, becomes delinquent, he or she falls
9    behind on the loan, or he or she is on the brink of
10   foreclosure.  Those are the loan servicing options.
11          There is all kinds of record evidence saying that
12   minority farmers simply weren't getting that.  So there are
13   minority farmers with loans who are delinquent at higher rates
14   and who are on the brink of foreclosure because of
15   discrimination in USDA loan programs.  And so it's not just
16   those who weren't able to obtain loans.
17          And I think the second point I would like to make in
18   that regard is that this actually is tailored to those minority
19   farmers who have not overcome the effects of that
20   discrimination.
21          So if you look at *Cone Corporation versus*
22   *Hillsborough County*, the Eleventh Circuit explains that the
23   premise behind that minority business participation goal was
24   that large and successful minority businesses were likely to
25   have overcome the effects of discrimination, while smaller,

 1   suffering businesses, were still likely experiencing

 2   discrimination's ill effects.

 3            So there it found that the law was narrowly tailored

 4   because most of the benefits went to the smaller businesses.

 5   So it's the same thing here.

 6            First of all, Section 1005 targets minority farmers,

 7   which the record reflects --

 8            THE COURT:  It targets minority farmers, but it

 9   doesn't necessarily -- if there's a large farmer who is a

10   minority, he's still going to -- he or she is still going to

11   get 100 percent -- well, 120-percent loan relief.

12            MS. NEWTON:  I think it's important to think about

13   what type of loans we have here.

14            So if I may just a couple more points.

15            Section 1005 targets minority farmers whose records

16   reflect have smaller farms and bring in less revenue.  But it

17   also goes to pay off certain loans.  We're not talking about --

18   there are very broad statements in plaintiff's brief saying

19   that this is loan forgiveness for everyone.  It's not.

20            If we look at the loan forgiveness at issue, these

21   are direct loans and guaranteed loans that are typically held

22   by individuals who cannot get credit in the private market.

23            So if you're a minority farmer and you've overcome

24   the ill effects of discrimination, you probably can get lending

25   in the private market.  So we're talking about people -- and I

1    understand that white farmers also have these loans.  But white
2    farmers don't have the same history of discrimination that
3    these groups do, and that is a compelling interest.
4         The Supreme Court has been very clear that remedying
5    prior discrimination in governmental programs is a compelling
6    interest.  It's also been clear that when Congress recognized
7    that it was a passive participant in that system of
8    discrimination that it could act to dismantle that system and
9    target the relief to these farmers.
10        THE COURT:  If it does it in a neutrally tailored
11   way.
12        MS. NEWTON:  A narrowly tailored way, yes.
13        THE COURT:  Sure.
14        MS. NEWTON:  And I do think it is here, because, like
15   I said, it's not only tailored to the groups who have been
16   shown to have suffered the ill effects of USDA discrimination
17   and those effects were ongoing, but it's also tailored to
18   minority farmers who can't obtain credit in the private market
19   and so are likely those farmers suffering those ill effects.
20        THE COURT:  With respect to it being narrowly
21   tailored to the groups who have been shown to have suffered the
22   ill effects of USDA discrimination, the inclusion of Asians,
23   Hawaiians, and Pacific Islanders, is there any support for
24   their inclusion in this Jackson Lewis report?
25        MS. NEWTON:  Yeah, there is a lot of support,

1   including the Jackson Lewis report --

2         THE COURT:  What other than the Jackson Lewis report?

3         MS. NEWTON:  So if I may -- and I think this is one

4   of the reasons why simply we have provided a lot of evidence

5   and plaintiff has not rebutted that.  So plaintiff does point

6   to the Jackson Lewis report as noting several times that

7   Pacific Islanders were not underrepresented in certain areas.

8         The same report found that Asians were

9   underrepresented in FSA's national workforce.  That's at

10  page 23 of the executive summary.

11        The Asians and Native Hawaiians and Pacific Islanders

12  were underrepresented on a departmentwide basis.  That's at

13  page 525.

14        THE COURT:  Right.  But that's -- they weren't

15  underrepresented in terms of their receipt of direct loans or

16  guaranteed loans; right?

17        MS. NEWTON:  So the next data would cite Asian share

18  of the population benefiting from farm programs and of farm

19  program stallers, quote:  Lead substantially behind their

20  respective principal operator populations.  That's at page 434

21  to 435.

22        It also noted a general consensus among Southeast

23  Asian clients that they were not always treated fairly by the

24  USDA.  That's at page 87.  And that they were discriminated

25  against by parts of the USDA.  That's page 296.

1      Those are just a few of the specific findings in the
2  JL report.  And I would note that that report, like many
3  others, spoke to socially disadvantaged groups.  And so a lot
4  of --
5      THE COURT:  Including women, that you leave out of --
6      MS. NEWTON:  That report did include women.  A lot of
7  the other ones did not.  And the legislative history leading up
8  to the enactment of Section 1005 was certainly focused on
9  racial and ethnic minorities as is the statutory language.
10     In addition --
11     THE COURT:  Hold on.
12     So talking about the findings in the Jackson Lewis
13  report.  In terms of direct loans, the socially disadvantaged
14  group participation is reasonably well-reflected in their
15  respective principal operator populations with the exception of
16  females.
17     And then with respect to participation in guaranteed
18  loans, Asians and Native Hawaiians and Pacific Islanders
19  were -- their participation reflected their respective owner
20  populations.  It was only women and socially disadvantaged
21  groups that had a lesser participation.
22     So I know you cited statistics about them -- about
23  those groups not being included in the workforce and not --
24  otherwise fully represented, but it doesn't look like the
25  Jackson Lewis report supported a finding that those groups had

1   been discriminated against in the receipt of USDA actual

2   services, and none of the recommendations in the Jackson Lewis

3   report would support that.

4          So I guess --

5          MS. NEWTON:  I -- I don't think that's correct.  I

6   think if you look at page 434 to 435, the report states that

7   Asian's share of the population benefiting from farm programs

8   and of farm program dollars -- so farm programs generally and

9   farm programs dollars, so overall lead substantially behind

10  their respective principal operator's population.

11         And I think this goes to the fact that we have

12  provided a lot of evidence on this, and it is now plaintiff's

13  burden to rebut that evidence.  It's also his burden to show

14  that he is substantially likely to prevail on the merits, which

15  I don't think he has shown.

16         But to rebut the plaintiff's evidence or to rebut the

17  defendants' evidence, he cites to one piece of anecdotal

18  evidence in the legislative history, and one statistic in the

19  JL report; it's 674 pages long and it contains over 200

20  recommendations for the USDA.

21         THE COURT:  None of which included loan forgiveness.

22         MS. NEWTON:  Well, so -- and I think that goes -- so

23  there is all sorts of other evidence in the record with regard

24  to Asians and Pacific Islanders.  I would note the CRAT report

25  contains specific findings.

1       THE COURT:  Which one is that?

2       MS. NEWTON:  The Civil Rights Action Team report,

3  that was a team put together by the USDA.  And so does the 1982

4  U.S. Commission on Civil Rights Report.  And then it was also

5  noted that Black, Hispanic, and Native American farmers, as

6  well as Asian American farmers, were in default on their loans

7  at higher rates, putting them at risk of foreclosure just

8  before COVID.

9       The Cobb declaration confirmed this, that Asians and

10  Pacific Islanders are among the groups that account for a

11  disproportionate number of foreclosures.

12       So I -- respectfully, plaintiff's reliance on one

13  statistic in the JL report is just simply not enough to rebut

14  the evidence in the record.  And I think the narrow tailoring

15  point seems to be the one --

16       THE COURT:  Well, that's what I was -- part of what I

17  was getting at because one of their arguments is that when

18  you're including groups that arguably haven't suffered, then

19  that is evidence that it isn't narrowly tailored.

20       MS. NEWTON:  Right.  And I think there is --

21       THE COURT:  And I guess going straight at narrowly

22  tailored, how is forgiving debt of all individuals based solely

23  on race, not considering whether they have ever been subject to

24  past discrimination, not considering whether or not they got

25  COVID relief loans, not considering what crops, not considering

 1   the size of the farm, how is loan forgiveness a proper fit to
 2   remedy past discrimination?
 3          MS. NEWTON:  Just one -- one preliminary report, just
 4   for the record, is that it's debt relief and it's not
 5   technically a loan forgiveness.  That's an issue that's come up
 6   in the other cases, so just to be clear.  But, yes, it's paying
 7   off the debts, these loans of these farmers.
 8          And I think that is narrowly tailored because, as has
 9   been shown in the record, these farmers are the ones that, in
10   the midst of a global pandemic, are at higher rates of
11   delinquency and on the brink of foreclosure at much, much
12   higher rates.
13          THE COURT:  But every minority farmer gets the debt
14   relief, not just those that -- I mean, you could target those
15   farmers that are on the brink of foreclosure.  In this case,
16   you're giving 100-percent debt relief to every single person
17   based solely on their race.
18          MS. NEWTON:  And I think that is justified here given
19   the wealth of information in the record showing that there has
20   been USDA discrimination against these groups and the 30 years
21   of race-neutral alternatives that Congress has tried to remedy
22   this problem.
23          So going back to -- you know, we noted that each and
24   every alternative that plaintiff suggested in his brief,
25   Congress had tried.

```
 1            It then enacted legislation to provide agricultural
 2   funding and pandemic relief.  It found that the vast majority
 3   of that relief did not reach minority farmers because of the
 4   structure of the program.
 5            THE COURT:  And that relief has been paused; right?
 6   So the --
 7            MS. NEWTON:  Payments are currently not being made,
 8   yes.
 9            THE COURT:  So why not repurpose the remaining
10   payments of that to target the farmers that didn't get the
11   COVID relief?
12            MS. NEWTON:  I think it goes to what the Supreme
13   Court has said, is that, one, Congress need not exhaust every
14   conceivable race-neutral alternative; and, two, where it is
15   shown that it has been trying by a race-neutral means for years
16   it is not precluded from using a race-conscious remedy.
17            THE COURT:  But doesn't -- doesn't the Supreme Court
18   also say very specifically that race should be used only as a
19   last resort?
20            MS. NEWTON:  Yes.  But I think if you look at Fisher
21   versus University of Texas, there, for example, it found that
22   the university had tried for seven years to use race-neutral
23   means to meet its compelling interest at issue there.  And it
24   said that where it had been trying race-neutral means, where
25   the -- the arguments were that they had other means that they
```

1    could use.

2          The Supreme Court said they were not required to

3    continue to attempt to use those when they had been trying for

4    seven years, and they could still show, as we have shown, that

5    the problem was not remedied.

6          And I would also note that Congress enacted Section

7    1005 because it wanted to get relief to these farmers quickly;

8    unfortunately, that has been delayed.  But the Supreme Court

9    noted in *United States versus Paradise* that when you're looking

10   at narrow tailoring and you're looking at whether the relief is

11   necessary, you have to look at the purposes for which the

12   remedy was made.

13         And one of the purposes in that case was the court

14   found it needed to move with alacrity, because there had been

15   delays in promoting minorities within the city organization in

16   Alabama that was found to have discriminated against

17   minorities.

18         And here, again, one of plaintiff's -- one of

19   Congress's purposes was in this emergency legislation to get

20   relief to these farmers quickly.  It found that they were on

21   the brink of foreclosure.

22         So the only other alternative that plaintiff proposes

23   in his reply is that if Congress found that the loan terms were

24   unfair, it could have gone through all of the minority farmers'

25   loans and revised the terms, figured out which ones were unfair

1   and revised the terms.  What Congress found was that they were

2   on the brink of foreclosure and they needed to get funding

3   quickly.

4           So I think that's just another reason why this is

5   narrowly tailored.

6           THE COURT:  Hasn't the -- I think it's both the

7   Supreme Court and the Eleventh Circuit, but haven't they

8   rejected the idea that an administratively convenient or simple

9   approach is not narrowly tailored?

10          So a rigid approach like this that gives relief to

11  all socially disadvantaged farmers, including beginning farmers

12  who haven't suffered any harm at all, any prior discrimination,

13  they're included.  And while it's administratively convenient

14  and fast, it doesn't seem to be narrowly tailored in that

15  regard.

16          MS. NEWTON:  So the Supreme Court has said that

17  administrative convenience alone is not sufficient to justify a

18  remedy.

19          I think what we've cited here is Congress trying for

20  30 years by race-neutral alternative, congress identifying

21  groups and providing specific evidence of discrimination

22  against those groups.  Those groups being at higher rates of

23  delinquency and foreclosure, such that they were going to

24  suffer an imminent harm, and so narrowly tailoring towards

25  smaller loans that are held by farmers who can't obtain them in

1  a private market, on an emergency basis in the middle of a
2  global pandemic to provide them quick relief.  That is narrowly
3  tailored.
4         THE COURT:  Narrowly tailored for smaller loans the
5  statute doesn't do.  Unless you are relying on the fact that
6  the socially disadvantaged farmers hold a larger percentage of
7  small farms --
8         MS. NEWTON:  They do.
9         THE COURT:  -- which the statistics would say.  But
10 the legislation isn't narrowly tailored to them.  The large
11 farmer -- any large farmer that is a racial minority is going
12 to get the exact same relief.
13        MS. NEWTON:  But I think that --
14        THE COURT:  -- actually even greater relief because
15 they have bigger farms.
16        MS. NEWTON:  I think that's very, very unlikely for a
17 number of reasons.  For one which Your Honor noted, which is
18 these minority farmers tend to have smaller farms, bring in
19 less revenue.
20        The second part, which is they only go to pay off
21 certain direct loans and certain guaranteed loans, and those
22 are only loans that folks can't -- they get when they show that
23 they cannot obtain credit in the private market.  So these tend
24 to be -- they do tend to be smaller loans.  Plaintiffs make
25 that argument in another case that we're litigating.  These are

generally loans by folks new to the industry, starting their farms, things like that.  Although they are operating loans and other loans.

And then the point that if the minority farmer could get lending in the private market, he or she likely has overcome the ill effects of discrimination.

And I would like to note a point that was brought up when plaintiff's counsel was speaking and that seemed to kind of be on the periphery of this discussion, and that's this notion that there has to be some individualized showing of discrimination in order for Congress to use a race-conscious remedy, and that's just not the case.

The Supreme Court has confirmed repeatedly that the government can use race classifications, erase conscious measures that pertain to groups.

So in the *United States versus Paradise*, it said: It's now well-established that governmental bodies, including courts, may constitutionally employ racial classifications essential to remedy unlawful treatment of racial or ethnic groups subject to discrimination.

In *Wygant versus Jackson Board of Education*, Justice O'Connor wrote that the Court has forged a degree of unanimity. It is agreed that a plan need not be limited to remedying specific instances of identified discrimination for it to be deemed sufficiently narrowly tailored or substantially related

1    to the correction of prior discrimination by a state actor.

2           And in Local 28 of *Sheet Metal Workers International*

3    *Association vs. EEOC*, the Supreme Court said again, quote:

4    voluntary action available to employers and unions seeking to

5    eradicate race discrimination may include reasonable

6    race-conscious relief that benefits individuals who are not

7    actual victims of discrimination.

8           THE COURT:  And I think that the biggest concern that

9    I have in looking at this, is, you know, you quoted from

10   *Wygant*, but, of course, in *Wygant*, the Supreme Court pointed

11   out that the means chosen to accomplish the state's purpose

12   must be specifically narrowly tailored to accomplish that

13   purpose and directs that you have to examine the connection

14   between the purpose and the means, and strict scrutiny requires

15   the most exact connection between that purpose and means, and

16   found in *Wygant* that the layoffs were not narrowly tailored to

17   address the concern.

18          And in *Paradise*, where the court found that the

19   affirmative action program was warranted, there were specific

20   findings of a failure by the employer to comply with the

21   consent decree requiring them to establish a procedure

22   affirmatively -- oh, and also found that they had affirmatively

23   employed delaying tactics.

24          Those are -- those are pretty significant findings

25   that -- that would appear to be different than we have here,

1  but I think the biggest concern I have is on the -- whether

2  this is -- is the question of whether it's narrowly tailored.

3          Has Congress actually employed the means that has the

4  most exact connection to the purpose of -- of the legislation,

5  and is there not a race-neutral way to handle it?

6          Because the Supreme Court says:  If there is a

7  race-neutral -- if a race-neutral remedy is sufficient to cure

8  a race-based problem, then a race-conscious remedy can never be

9  narrowly tailored to that problem.

10          That -- actually, that was -- that quote is from

11  *Engineering Contractors* that they were citing the Supreme

12  Court.

13          MS. NEWTON:  Yeah.  I mean, I'm -- I want to address

14  that issue, but I think it's largely what's been stated, that

15  Congress tried race-neutral alternatives for 30 years.  It

16  found that those remedies weren't working, that there were

17  lingering effects of that discrimination that led to farmers

18  being at higher rates of delinquency and foreclosure, so they

19  targeted the relief to the types of loans that minority farmers

20  would have who can't get them in the private market.  And it

21  also did so -- I don't think it can be overemphasized, in the

22  midst of a global pandemic, when there were numerous findings

23  about the fact that they are at risk of foreclosure at much,

24  much higher rates, and so they're on the brink of foreclosure.

25          If you look at the Cobb declaration, there are

1    hundreds of minority farmers in bankruptcy.  He cited stats

2    about them being subject to foreclosure at higher rates.  And

3    so I think getting that money out -- alacrity is that

4    purpose-meaning connection.

5            THE COURT:  But are they -- but are they subject to

6    that higher foreclosure rate because of ongoing discrimination

7    by the USDA?

8            MS. NEWTON:  So the --

9            THE COURT:  Hold on.

10           MS. NEWTON:  Yep.

11           THE COURT:  Because Congress -- what Congress

12   recognized and has tried to remedy in the past is

13   discrimination by the USDA.

14           So if the extent that it just wants to address

15   lingering effects of that old discrimination, that would be

16   seeking parity, which the Supreme Court says you can't do.

17           If there's an additional remedy now, it has to be

18   because there is ongoing discrimination by the USDA now.

19           MS. NEWTON:  So two things.  I think that's not true.

20   So the court has also been very clear in noting that the

21   USDA -- or, I'm sorry, that the government can remedy the

22   lingering effects of discrimination.

23           And so again, plaintiff does not dispute -- he says

24   it's indisputable that there has been discrimination in the

25   USDA.

1    THE COURT:  No one disputes that.

2    MS. NEWTON:  Right.  And that was, he says, up to

3    2010 when the last settlement agreement was reached.  So that

4    was only ten years ago.

5    The Supreme Court has been very clear that the

6    government can have a compelling interest in remedying the

7    lingering effects of discrimination.

8    So in *Adarand Constructers*, the Supreme Court said

9    that, quote:  The unhappy persistence of both the practice and

10   the lingering effects of racial discrimination against minority

11   groups in this country is an unfortunate reality, and the

12   government is not disqualified from acting in response to it.

13   The Eleventh Circuit has said the same in *Cone*

14   *Corporation versus Hillsborough County*.  They stated that,

15   quote:  Racial classifications must be necessary and must be

16   narrowly tailored to achieve the goal of remedying the effects

17   of past discrimination.

18   And in *Franks versus Bowman Transportation Company*,

19   the Supreme Court called, quote:  The end of ameliorating the

20   effect of past racial discrimination a national policy

21   objective of the highest priority, unquote.

22   So there is just no question under Supreme Court case

23   law about the government having a compelling interest in

24   remedying the effects.

25   And plaintiff's whole argument comes down to his

1  position that as of 2010, the settlement agreements

2  instantaneously remedied the effects of decades of USDA

3  discrimination.

4          And we just don't think that's borne out by the

5  record and it's certainly not rebutted on a preliminary basis

6  sufficient to justify a preliminary injunction when plaintiff

7  cites to one statistic in the Jackson Lewis report.

8          I don't want to let the merits sit if Your Honor has

9  other questions.

10         THE COURT:  No, you can go ahead.

11         MS. NEWTON:  Okay.  Okay.

12         I did want to note -- I did want to speak to

13  irreparable harm.

14         As Your Honor noted, that is key to a showing that a

15  preliminary injunction is warranted.

16         At the outset, I'd note that plaintiff tried to

17  conflate the showing of irreparable harm with the merits in

18  order to show that he is subject to irreparable harm.  They are

19  independent factors.  It's well established that he has to make

20  a showing of irreparable harm in order to be qualified to get a

21  preliminary injunction.  And we think, for many of the reasons

22  Your Honor pointed out, he has simply not made that showing.

23         So plaintiff noted that he is seeking -- his primary

24  basis is that he says that he has suffered monetary harm

25  because he is not getting his loans repaid.  But it's well

1　established that monetary harm is generally not sufficient to

2　establish irreparable harm.

3　　　　　And if plaintiff ultimately shows that he is entitled

4　to the debt relief under Section 1005, that is indeed relief

5　that he can obtain at the conclusion of these proceedings.

6　　　　　THE COURT:  How?  The Court can't order the

7　government to pay.  Sovereign immunity would bar it.

8　　　　　MS. NEWTON:  So I think -- agreed, damages.  The

9　Court cannot direct the government to pay damages to plaintiff.

10　But I think there are two things.  Plaintiff's counsel said

11　that this is a limited pot of funds.  That is not correct.

12　Under Section 1005, Congress appropriated such sums as may be

13　necessary to remain available until expended.

14　　　　　It's not a limited pot of funds.

15　　　　　THE COURT:  But the Court can't order -- because of

16　sovereign immunity, the Court is prohibited from ordering

17　the -- Congress or the government to expend funds.

18　　　　　MS. NEWTON:  So I think that -- so plaintiff makes

19　the argument that he can't get damages, but I think that's

20　beside the point here.

21　　　　　THE COURT:  No, no, no.  I said something different.

22　What I -- the debt relief is an expenditure of government

23　funds.  I mean, it's not paid out to somebody; it's not paid to

24　him in damages, but it's money coming from the treasury.

25　　　　　MS. NEWTON:  Exactly.  And so --

```
1          THE COURT:  The Court -- doesn't sovereign immunity
2   bar the Court from doing that?
3          I can't -- I can't backdoor getting around sovereign
4   immunity.
5          MS. NEWTON:  No, we deal with it all the time under
6   the APA; right.  So you can't get damages under the APA, yes,
7   well established, but so you can get monetary relief.
8          And so what plaintiff is seeking here is a
9   forward-looking injunction to get access to programmatic funds.
10  And the Supreme Court explained in Bowen vs. Massachusetts that
11  the APA permits specific remedies that attempt to give the
12  plaintiff the very thing to which he was entitled, which in
13  some cases is money owed under a federal program.
14         THE COURT:  Give me the cite to Bowen.
15         MS. NEWTON:  Yeah, it's Bowen vs. Massachusetts, it's
16  487 U.S. 879.  That's a 1988 decision.
17         And, I mean, there are programs all the time where
18  plaintiffs are seeking access to a monetary remedy by virtue of
19  wanting access to programmatic funds or to be included within a
20  program.  And as Your Honor well knows, for an equal protection
21  violation, one remedy is an inclusive one that would include
22  plaintiff.
23         And so I think the two -- two -- the factual
24  inaccuracy, one, this is not a limited pot of funds.  It's such
25  sums as may be necessary.  It's actually a no-year
```

1    appropriation.  That's what that language "to remain available
2    until expended indicates," so it's not even limited to this
3    fiscal year.  So -- and plaintiff can receive monetary relief,
4    he just can't get it in the form of damages.
5           I mean, he hasn't alleged a past term that would make
6    damages available, which is why he's seeking forward-looking
7    injunctive relief.
8           THE COURT:  Why isn't the denial -- if he shows a
9    substantial likelihood of success on the merits, so if, then
10   why wouldn't the violation of his equal protection rights be an
11   injury sufficient to show irreparable harm in light of the
12   absence of money damages?
13          MS. NEWTON:  So I think it's two things.  One, I
14   think the absence of money damages really is beside the point.
15   He hasn't claimed a past harm that would even make damages
16   available to him, much less like even not taking sovereign
17   immunity into account.  But he can get monetary relief, and
18   monetary harm is well established as if you can get that relief
19   at the conclusion of the case.  It's not irreparable harm in
20   the interim.
21          So I don't think you can combine the two.  And
22   plaintiff concedes that a substantially likely equal protection
23   violation is not sufficient to presume irreparable harm.  So
24   that's what the court -- the Eleventh Circuit said in *Northeast*
25   *Florida*.

1          THE COURT:  Where there were -- where money damages
2     were available?
3          MS. NEWTON:  Exactly.  But again, monetary relief is
4     the question; right?
5          And I think that is illustrated by the fact that
6     plaintiff seeks access to the programmatic funds.  He knows he
7     can get that at the conclusion of this case if he shows that
8     he's entitled to it.
9          He tries to get around the general rule that monetary
10    harm isn't sufficient to establish irreparable harm by relying
11    on this notion of competitive disadvantage.
12         But as Your Honor pointed out, he simply has not
13    provided any independent proof that he would suffer competitive
14    harm in the interim.
15         He relies on the declaration of Mr. Wynn, in which
16    Mr. Wynn simply states that he could use that money for other
17    things.
18         But if you look at what courts have required in this
19    district, that just falls far short of what courts have
20    required to establish competitive harm.
21         THE COURT:  Go back to why this isn't a limited fund
22    again.
23         MS. NEWTON:  Sorry.  Yes, Your Honor.  In Section
24    1005, Congress specifically appropriated, quote:  "Such sums as
25    may be necessary to remain available until expended to carry

1   out Section 1005."

2          So not only is it such sums as may be necessary, you

3   know, it's not a particular appropriation, but also that

4   language "to remain available until expended," that -- the

5   language that Congress uses when it's a no-year appropriation,

6   meaning that the government isn't restricted to a particular

7   fiscal year to spend the funds?

8          And so I'd like to come back to the equal protection

9   point, but on the competitive disadvantage, just we cited the

10  *Nivel* case in our brief.

11         THE COURT:  Yeah, I don't think you need to spend

12  much --

13         MS. NEWTON:  Okay.  Okay.  Thank you.

14         On the equal protection violation, so it is binding

15  circuit precedent that irreparable harm cannot be presumed from

16  a substantially likely equal protection violation.

17         And plaintiff tries to analogize his alleged

18  violation to a First Amendment violation, which the 11th --

19         THE COURT:  I don't -- I don't think that's what he

20  does.  What he says is -- is that what's different here is the

21  lack of access to monetary relief, which you are disputing.

22         MS. NEWTON:  Yeah.  So he does both.  I think that --

23  I would just note that *Northeast Florida* noted the same

24  rationale that plaintiff notes with regard to a First Amendment

25  violation and said that that did not apply to an equal

1   protection violation, found that those allegations weren't
2   sufficient.
3           And I would also note that in Kate versus Oldum
4   [phonetic], the Court said that one reason for such stringent
5   protection of the First Amendment rights is the intangible
6   nature of the benefit and the deterrence on speech.
7           It's not the intangible nature of the right, it's the
8   intangible nature of the benefit.  And here, the benefit is
9   access to programmatic funds.  It's very tangible.  It's debt
10  relief under Section 1005.
11          And so the Eleventh Circuit rejected the very same
12  argument the plaintiff is making, even while citing the same
13  rationale about it being intangible.
14          Plaintiff says it's the intangible nature of the
15  right; that's not correct.
16          And then, yes, with respect to damages, plaintiffs do
17  argue that that is a distinguishing feature in that case.  And
18  I think the question isn't can you obtain damages, it's can you
19  obtain a monetary relief that you are seeking and entitled to,
20  because that is what you will lose, right, if you don't get
21  what you're seeking.
22          And plaintiff hasn't shown that he is suffering any
23  competitive harm that would have to be remedied by any sort of
24  damages.  What he's seeking is access to these programmatic
25  funds, and those funds are going to be available at the

1    conclusion of this case.

2            THE COURT:  And that -- that would address the

3    monetary relief that he's seeking, but the Supreme Court has

4    recognized that the injury-in-fact in an equal protection case

5    is the denial of legal treatment resulting from the imposition

6    of the denial of equal treatment and the imposition of the

7    barrier.

8            So it's not the ultimate inability to obtain the

9    benefit, according to the Supreme Court that is the injury,

10   it's the denial of equal protection.  So wouldn't that cut

11   against your argument that the benefit is tangible?

12           MS. NEWTON:  No, Your Honor, because -- so what I

13   think you're referring to there is that an equal protection

14   violation can be sufficient to establish standing, a legally

15   cognizable injury for standing.

16           THE COURT:  Sure.

17           MS. NEWTON:  But it's well-established that an injury

18   for purposes of establishing standing is very different than

19   irreparable harm that you have to establish; right?

20           THE COURT:  Right.  Otherwise every case would have

21   irreparable harm; right?

22           MS. NEWTON:  Exactly.  Exactly.

23           And so plaintiff relies on monetary harm, that can be

24   remedied at the conclusion of this case.  And plaintiff relies

25   on equal protection violation, not only as the Eleventh Circuit

 1    said that that's not sufficient, but also if you look at the

 2    remedy there, right, the Supreme Court has said that the remedy

 3    for an equal protection violation is either excluding those who

 4    have been improperly benefited or including those who have been

 5    improperly excluded.

 6            So plaintiff again can get that remedy at the

 7    conclusion of this case.  And I think the *Northeast Florida*

 8    case is binding precedent precluding the argument that he can

 9    establish irreparable harm based on even a substantially likely

10    equal protection violation, and we don't even think he's

11    established that.

12            THE COURT:  All right.  Let me hear from Mr. Fa.

13            Why don't you start where we started with the

14    irreparable harm.

15            MR. FA:  Sure, Your Honor.

16            The words that the Court used in the *Jacksonville*

17    case is:  Cannot be compensated by monetary damages.

18            And I think that really makes sense in the context

19    here.  We do ask for two alternative types of relief in our

20    complaint, either opening up to everybody or not giving it

21    up -- not giving these funds to anybody.

22            We're asking for the right to equal treatment on the

23    basis of race, and, you know, I do think that the government's

24    response didn't even mention opening up the possibility of

25    opening it up to everybody.

1    And I think that's perhaps addressed in the Wisconsin
2    court decision that we cited in our notice of supplemental
3    authority, because the Wisconsin court estimated that if this
4    program that was, you know, in defendants' -- in the
5    government's own words, poor struggling farmers, was opened up
6    to everybody, it would increase the size, the anticipated scope
7    of the program, from $4 billion to $400 billion.

8    So I suspect when we get to the merit stage, you
9    know, a lot about severability and remedy is about what
10   Congress would have intended if a certain provision got struck
11   down.  I suspect that the government would be arguing that what
12   Congress would have intended was to get rid of the program and
13   join these debt payments all together.

14   So, you know, I think -- I think there is irreparable
15   harm here in that it forecloses one avenue of relief that we
16   seek, and, you know, in my view, the most likely form of relief
17   that we would likely get at the conclusion of the merits.

18   THE COURT:  Well, if at the conclusion of the case he
19   can get the debt relief that he seeks, why is the harm
20   irreparable?

21   MR. FA:  So I think it's certainly one remedy that
22   we're asking for, but I think it would -- it is the less likely
23   of the two types of remedies because it would substantially
24   increase.

25   It's true, as defendants' counsel noted, there's no

1  specific funds earmarked to -- for this program, but you have

2  to look at congressional intent.  And when congressional --

3  when Congress passed this law, it was only targeted for

4  minority farmers and ranchers.

5          THE COURT:  All right.  But the relief that he would

6  get at the end of this case is just his inclusion in the debt

7  relief.  That wouldn't substantially increase the program.

8          If the Court -- I mean, he -- this is -- this is a

9  single-plaintiff case.  He would get single-plaintiff relief.

10          MR. FA:  I would respectfully disagree, Your Honor,

11  because the -- that would require, essentially, a rewriting of

12  the statute.

13          So the two alternative forms of relief that we

14  propose would involve either striking down the socially

15  disadvantaged provision of the statute or striking down the

16  statute as a whole.

17          But to give just Mr. Wynn his money, I think, would

18  be inconsistent with the statute.  And that kind of goes --

19  that goes somewhat to irreparable harm, but I also think it

20  goes somewhat to the merits in that the statute does not allow

21  for an individual himself to qualify for debt relief.  It only

22  allows for groups to qualify for debt relief.

23          So, you know, it's true that -- as the government's

24  counsel mentioned earlier, one can apply to have their group

25  recognized as socially disadvantaged, but I think it's

```
 1    important here that one cannot -- this is not like in the
 2    contracting cases where one can have -- apply for himself to be
 3    recognized as socially disadvantaged.  Mr. Wynn can only apply
 4    for, you know, whites or Caucasians to be recognized as
 5    socially disadvantaged.
 6              THE COURT:  So you don't -- you don't disagree with
 7    Ms. Newton's suggestion that at the end of the case, that there
 8    would -- there could be a remedy in terms of debt relief, what
 9    you're saying is that that's not a realistic remedy because
10    that would give debt relief to all farmers that have loans as
11    of January 2021?
12              MR. FA:  That would have to be, I think, the remedy
13    that --
14              THE COURT:  Well, my question is you're not
15    disagreeing with her statement that at the end of the case, if
16    the Court found -- found the statute unconstitutional, the
17    Court could order the limited benefit, that is, giving the
18    plaintiff the loan relief that he seeks?
19              MR. FA:  Yeah.  I'm not necessarily disagreeing with
20    that, Your Honor.  I'm not familiar -- I think Ms. Newton cited
21    a case involving sovereign immunity.  I don't believe that was
22    raised in the response and am not, you know, familiar with that
23    case, so there may be issues with that.  But, you know, for
24    purposes of my argument now, I think that could be one of
25    the -- one of the remedies that would afford race-neutral
```

1    treatment.

2          But we believe that remedy is, you know, the less

3    likely of the two.  And in any event, this would certainly

4    foreclose -- if the government were able to give out this --

5    funds to minority farmers and ranchers based on the statute as

6    it is written now, it would certainly foreclose one of the

7    two alternative types of remedies that plaintiffs are seeking

8    in this case.

9          THE COURT:  And address Ms. Newton's argument with

10   regard to you're relying only on one statistic in the Jackson

11   Lewis report and the failure of Congress' past efforts to

12   remedy discrimination.  Address those two arguments, please.

13         MR. FA:  Sure.  So we absolutely do dispute that

14   there's a compelling interest here.

15         As stated earlier, Congress made no findings as to

16   the specific scope of --

17         THE COURT:  But they don't -- they don't have to make

18   findings in the statute or in the bill; right?  I mean, the

19   Eleventh Circuit has plainly said in the *Ensley Branch* case

20   that the -- they can rely on evidence that Stevens presented up

21   to the date of trial.

22         MR. FA:  Well, you can rely on evidence, Your Honor,

23   but you still have to determine the precise scope of the

24   discrimination at issue.

25         So on the contracting cases, for example, they can --

1    they rely on very narrowly tailored disparity between how many
2    minority contractors were expected to get the job and how many
3    did get the job, and, you know, that's why they call it a
4    disparity study in those cases.
5            They would say, for example, there's a 5-percent
6    disparity attributable to discrimination in the private
7    marketplace.  And because it's the government paying funds to
8    the contractors on public contracting projects, the
9    government -- they use that as a basis for the government to
10   enact a narrowly tailored -- a plan to make up the difference.
11           But here, you know, I don't think it's a surprise
12   that there's no scope -- no findings as to the precise scope of
13   the discrimination.  Because if they had made a finding, they
14   would have had to say, given the breadth of this law at issue,
15   that 100 percent of minority farmers and ranchers have been
16   discriminated.  And I think that strains credulity.
17           And, again, you know, they talk about our rebuttal
18   evidence.  But the burden in an equal protection case involving
19   strict scrutiny is always on the government to prove both that
20   it has a compelling interest and that the law is narrowly
21   tailored to that interest.
22           And I might add that the Wisconsin court actually
23   looked at the exact same evidence that the government's counsel
24   cited in her argument.  And I know that because the government
25   cited its response in this case as an exhibit in the TRO

1   response in that case.

2           THE COURT:  But, of course, the TRO, it's only --

3   it's limited.  It's only 14 days; right?

4           MR. FA:  Right.  That TRO is only limited until the

5   Court rules on the preliminary injunction in that case.  But

6   the Court looked at the exact same evidence and found three

7   reasons why the evidence was deficient.

8           It relied on statistical disparities -- on true

9   statistical disparities.  There were no specific findings of

10  past discrimination, and, you know, it was the exact same

11  evidence.

12          And I think here, you know, we don't -- there have

13  been, I think, some misstatements about what our arguments are

14  in this case.  We don't contend that there was discrimination

15  all the way up until 2010.  The settlement was finalized in

16  2010, but it was meant to attract discrimination against

17  certain farmers, certain black farmers, certain Hispanic

18  farmers, and female farmers earlier than that.  And even if

19  there were findings of discrimination, you still would have to

20  make a showing as to the scope.

21          If there were current discrimination against, for

22  example, five Asian farmers and ranchers, you can't then have a

23  government enact a program that gives relief or gives payment

24  to all Asian farmers and ranchers in the -- in the industry.

25  And I think that's -- for that reason -- it's for that reason

1    that you haven't really seen a program as broad in scope as

2    this program is.

3         With respect to the narrow tailoring, there are

4    several points I'd like to address with respect to narrow

5    tailoring.  It's not the case that our only argument is that

6    defendants -- that defendants have not addressed race-neutral

7    alternatives, but that is one of our arguments.

8         Defendants rely on the *Fisher* case, but I think it's

9    meaningful in that case, the Supreme Court said race is only a

10   factor of a factor of a factor in admissions decisions.

11        If the -- if the University of Texas in *Fisher* went

12   with a straightforward and true racial quota, I think that

13   would have been an 8-0 Supreme Court decision saying that the

14   program was not narrowly tailored and was thus

15   unconstitutional.

16        With respect to individuals -- you know, I touched

17   upon this earlier.  With respect to individuals -- individual

18   determination, individual determination is key in an equal

19   protection case.

20        They -- an individual here cannot himself -- unlike

21   in the contracting cases, an individual cannot himself apply to

22   be recognized as socially disadvantaged.  He can only apply for

23   his racial group to be recognized as socially disadvantaged.

24        And with respect -- you know, going back to the GAO

25   report, the GAO report actually identified different, you know,

1  I think I heard different race-neutral methods.  And I think
2  the burden is on defendants to use those race-neutral methods.
3  And in any event, this -- the scope of this program, one that
4  includes every single minority farmer and rancher, one that
5  exclude any white farmer and rancher, and including any women
6  farmer and rancher, that has been recognized -- previously
7  recognized as socially disadvantaged by the USDA is not
8  narrowly tailored.
9          THE COURT:  Give me a moment.
10         MR. FA:  Thank you.
11         THE COURT:  Ms. Newton, anything further from the
12 defendant?
13         MS. NEWTON:  I'm happy to address any specific
14 questions Your Honor still has but did want to make sure I
15 touched on the remedy that was just discussed.
16         I believe plaintiff's counsel just said that his
17 client could get the relief that he's seeking at the end of
18 these proceedings.  And the fact that they're seeking other
19 relief in the alternative doesn't mean that plaintiff can't be
20 made whole at end of these proceedings.
21         And also he noted that we look to congressional
22 intent when determining the appropriate remedies.  I think it's
23 very clear Congress wants these funds to go out to minority
24 farmers.  So the better remedy here would be an inclusive one.
25 And then if plaintiff shows that he's entitled to the relief,

1   he be included in the group who gets it, as opposed to an

2   exclusive remedy cutting off the funds to minority farmers who

3   need it.

4         There are several other points that I think I would

5   dispute that were just said, but I think I've already covered

6   that ground.

7         I would also note regarding findings, the *Wygant*

8   court also said particularized findings are not required.

9         THE COURT:  I'm thinking in terms of what would -- in

10  the government's view, if Mr. Wynn has shown irreparable

11  harm -- if -- in the government's view, what would be -- what

12  would the remedy be at this stage of the proceeding?

13        MS. NEWTON:  Uh-huh.  And, yeah, as is evident, you

14  know, we dispute that he has --

15        THE COURT:  Absolutely.  You are conceding nothing.

16        MS. NEWTON:  Thank you.  So I think it would be a

17  limited remedy.  If there's any concerns that he couldn't be

18  made whole at the end of this case -- which we think he can,

19  the funds aren't going to run out -- the Court could require

20  the USDA to set aside a sum sufficient to ensure that plaintiff

21  gets his qualifying loans -- otherwise qualifying loans repaid.

22        And we think that's appropriate here because, as

23  plaintiff's counsel mentioned, the Supreme Court has said an

24  injunction should be no more burdensome than necessary to

25  provide complete relief to the plaintiff.

1     Plaintiff is only raising his own right and can only

2  raise his own rights.  This is not a class action.  The Court

3  has admonished that that's what class actions are for.  So

4  plaintiff can't get relief on behalf of farmers nationwide.

5     I think a nationwide injunction is particularly

6  unwarranted here where we do have a TRO in place that is

7  currently preventing the issuance of funds.

8     Plaintiff's request for a district-wide or a

9  circuit-wide injunction to, as he says, forestall harm with

10  respect to his nearby competitors is also particularly

11  unwarranted because he hasn't identified one competitor.  He

12  hasn't alleged that there is a minority farmer who is in this

13  district who received funds that's his competitor.  He hasn't

14  identified a business opportunity that he would lose.

15     So the competitive harm rationale, I just think, is

16  not a basis for a broader injunction here.

17     THE COURT:  All right.  Thank you.

18     MS. NEWTON:  Thank you.

19     THE COURT:  I can see Mr. Wynn -- or Mr. Fa that you

20  have something more you want to say.  Go ahead.

21     MR. FA:  Sure, Your Honor.  I appreciate your

22  indulgence.  Just a few quick points about the remedy.

23     I don't think it's sufficient -- I mean, it is true

24  that there are class actions, but there are also many, many

25  equal protection cases going from *Croson*, *Fisher*, *Scooter* that

1    are not class actions.  And individual plaintiffs have always

2    been entitled to bring those type of cases, not just to obtain

3    a benefit like getting a contract or going into a university,

4    but also vindicate the very important and fundamental right of

5    equal treatment under the law.  So I don't think it would -- I

6    don't think it would be any remedy for, you know, say the

7    Court -- the Supreme Court in the Texas case, if it had ruled

8    for the plaintiff, just to say:  Well, the remedy is just to

9    let this individual into the school, but the university can

10   still discriminate on the basis of race.

11            So I think here --

12            THE COURT:  Well, but the difference -- those cases

13   were -- those were all on a developed record.  We're talking

14   about what's the appropriate relief at the preliminary

15   injunction stage.

16            So if the Court, at the end of the case, were to find

17   the statute unconstitutional, then, yes, it would find it

18   unconstitutional and that would apply broadly.  But as of right

19   now for preliminary injunction, I mean, none of the cases you

20   cited addressed relief on a preliminary injunctive basis.

21            MR. FA:  I -- I -- I don't think so, Your Honor.  I'm

22   not sure about that.

23            THE COURT:  I'm pretty sure.

24            MR. FA:  Okay.  So here I think it's true we're on a

25   motion for preliminary injunction, but I think that goes to

1  show that the individual relief -- and I'm sure we'll have, you

2  know, discussions about relief down the road in this case.  But

3  individual relief is simply not an adequate relief here, and I

4  think it would require a rewriting of the statute.

5         So I think the case here involves, you know,

6  two alternative forms of remedy, the most likely form of

7  remedy, the remedy that defendants focused on in their response

8  brief, closing off the -- this debt repayment statute and

9  allowing Congress to go back to the drawing board and enacting

10  a new race-neutral alternative, that would be foreclosed -- as

11  the Wisconsin court found, that would be foreclosed if the

12  defendants were able to distribute these payments at the push

13  of a button.

14         THE COURT:  All right.  Thank you.

15         All right.  I want to thank counsel for being very

16  prepared.  And your briefing was thorough and well-done, so

17  thank you for your efforts.  And I'll take the matter under

18  advisement and will enter a written order.

19         We're in recess.

20         COURT SECURITY OFFICER:  All rise.

21         THE COURT:  Oh, you know what?  Let's not be in

22  recess.  Let me address one other thing.

23         Do you-all want to talk about an expedited schedule

24  for resolving the merits of the case?

25         MS. NEWTON:  May I?

1          MR. FA:  Sure.

2          MS. NEWTON:  Your Honor, I hear the word "expedited"

3    and it does not sound great at this point.  We have eight

4    lawsuits currently; four of them are also preliminary

5    injunctions.  As you know, there is one for a TRO.

6          THE COURT:  Has a motion for preliminary injunction

7    been filed in the Wyoming case?

8          MS. NEWTON:  No.  No, Your Honor.  And I think we

9    would just ask that we be able to confer with plaintiff's

10   counsel and try to come up with some sort of agreed-upon

11   schedule for proceeding.  We would very much appreciate it.

12         THE COURT:  And there is not -- there is not an

13   appetite amongst you-all to carry the motion for preliminary

14   injunction and resolve it on the merits?

15         MS. NEWTON:  That is a possibility that we could

16   consider and probably need to discuss with folks, with our

17   clients.  We could -- we'd be happy to discuss and confer.

18         THE COURT:  So let me use the right language.

19         Rule 65(a)(2) allows the Court to consolidate the

20   hearing with the trial on the merits, which means that we would

21   simply move forward with a trial on the merits rather than

22   preliminary injunctive relief.

23         Is that something that you-all have discussed?

24         MS. NEWTON:  It's not something we've discussed.  I

25   apologize, Your Honor.  So, again, I think I'd like to confer

80

1  with my clients, if possible, and confer with opposing counsel

2  and report back to the Court, if that's okay.

3           THE COURT:  Let me ask you-all to file -- to file by

4  Tuesday the 22nd, a party -- the parties position on whether or

5  not under Rule 65(a)(2) we should consolidate this matter with

6  the trial on the merits.

7           MS. NEWTON:  Yes, Your Honor.

8           THE COURT:  All right.  Mr. Wynn, can you do that?

9           MR. FA:  Yes, Your Honor.

10          So I just wanted to add real quick, I think that's

11 something that we would be, at this point, strongly leaning

12 against, but we will certainly confer and submit a --

13          THE COURT:  All right.  At this time we're really in

14 recess.

15          COURT SECURITY OFFICER:  All rise.

16     (Proceedings concluded at 11:52 a.m.)

17                         -  -  -

18

19

20

21

22

23

24

25

1
2
3                    C E R T I F I C A T E
4
5   UNITED STATES DISTRICT COURT)
6
7   MIDDLE DISTRICT OF FLORIDA  )
8        I hereby certify that the foregoing transcript is a true
9   and correct computer-aided transcription of my stenotype notes
10  taken at the time and place indicated herein.
11
12
13            Dated this 17th day of June 2021.
14
15
16
17                    /s/Cindy Packevicz Jarriel
18                    Cindy Packevicz Jarriel, RPR, FCRR
19
20
21
22
23
24
25