# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

SCOTT WYNN, an individual,

      Plaintiff,

v.

THOMAS J. VILSACK, in his
official capacity as U.S. Secretary of
Agriculture and ZACH
DUCHENEAUX, in his official
capacity as Administrator, Farm
Service Agency,

      Defendants.

Case No.   3:21-cv-514-MMH-JRK

_____

# **O R D E R**

**THIS CAUSE** is before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. 11; Motion) filed May 25, 2021, Defendants Response in Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. 22; Response) filed June 4, 2021, and Plaintiff's Reply in Support of Motion for Preliminary Injunction (Doc. 23; Reply) filed June 9, 2021.[1] On June 16, 2021, the Court held a hearing on the Motion at which the parties argued their respective positions. Accordingly, the Motion is ripe for review.

---

[1] The Court also considered the brief filed by the National Black Farmers Association (NBFA) and Association of American Indian Farmers (AAIF). (Doc. 25; Amicus Brief).

## I.      Background

In this action, Plaintiff challenges Section 1005 of the American Rescue Plan Act of 2021 (ARPA), [2] which provides debt relief [3] to "socially disadvantaged farmers and ranchers" (SDFRs). (Doc 1; Complaint). Specifically, Section 1005(a)(2) authorizes the Secretary of Agriculture to pay up to 120% of the indebtedness, as of January 1, 2021, of an SDFR's direct Farm Service Agency (FSA) loans and any farm loan guaranteed by the Secretary (collectively, farm loans).   Section 1005 incorporates 7 U.S.C. § 2279's definition of an SDFR as "a farmer of rancher who is a member of a socially disadvantaged group." 7 U.S.C. § 2279(a)(5). A "socially disadvantaged group" is defined as "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." 7 U.S.C. § 2279(a)(6). Racial or ethnic groups that categorically qualify as socially disadvantaged are "Black, American Indian/Alaskan Native, Hispanic, Asian, and Pacific Islander." Complaint at ¶ 3; see also U.S. Dep't of Agric., American Rescue Plan Debt Payments, https://www.farmers.gov/americanrescueplan (last visited June 22, 2021). White or Caucasian farmers and ranchers do not.

---

[2] Pub. L. No. 117-2, 135 Stat. 4.
[3] At the hearing, counsel for the Government took exception to the Court's use of the term "loan forgiveness," arguing the relief is properly categorized as "debt relief." (Doc. 37; Hearing Transcript at 48). To avoid confusion, the Court will use the term debt relief throughout this Order to refer to the relief provided to SDFRs in Section 1005.

Plaintiff is a White farmer in Jennings, Florida who has qualifying farm loans but is ineligible for debt relief under Section 1005 solely because of his race. Complaint ¶ 9. He sues Thomas J. Vilsack, the current Secretary of Agriculture, and Zach Ducheneaux, the administrator of the United States Department of Agriculture (USDA) and head of the FSA, in their official capacities. Id. ¶¶ 10-11. In his two-count Complaint, Plaintiff alleges Section 1005 violates the equal protection component of the Fifth Amendment's Due Process Clause (Count I) and, by extension, is not in accordance with the law such that its implementation should be prohibited by the Administrative Procedure Act (APA) (Count II). See generally Complaint. Plaintiff seeks (1) a declaratory judgment that Section 1005's provision limiting debt relief to SDFRs violates the law, (2) a preliminary and permanent injunction prohibiting the enforcement of Section 1005, either in whole or in part, (3) nominal damages, and (4) attorneys' fees and costs. Id. at 20-21.

## II.   Legal Standard

A preliminary injunction is an extraordinary and drastic remedy. See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998); see also Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."); Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1300 (11th Cir. 2001). Indeed, "[a] preliminary injunction is a powerful exercise of judicial authority in advance of

trial." <u>Ne. Fla. Chapter of Ass'n of Gen Contractors of Am. v. City of Jacksonville</u>, 896 F.2d 1283, 1284 (11th Cir. 1990). This is particularly true with respect to preliminary injunctions of legislative enactments, which "must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts." <u>Id.</u> at 1287. This is because such injunctions "interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits . . . ." <u>Id.</u>; <u>see also</u> <u>Robinson v. Attorney General</u>, 957 F.3d 1171, 1178-79 (11th Cir. 2020) ("[t]he chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." (internal quotations and citation omitted)).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." <u>Winter</u>, 555 U.S. at 20. The Eleventh Circuit recently described the heavy burden on a party seeking preliminary injunctive relief as follows:

> A district court may grant a preliminary injunction only if the moving party establishes that: (1) [he] has a substantial likelihood of success on the merits; (2) [he] will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the

opposing party; and (4) the injunction would not be adverse to the public interest.

Gonzalez v. Governor of Georgia, 978 F.3d 1266, 1270-71 (11th Cir. 2020); see also Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). However, the court also instructed that "the third and fourth factors merge when, as here, the Government is the opposing party." Id. at 1271 (internal quotations and citation omitted).

The movant, at all times, bears the burden of persuasion as to each of these requirements. See Ne. Fla., 896 F.2d at 1285. In deciding whether a party has met its burden, "[a] district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995) (internal quotations and citation omitted); see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167, 1171 (11th Cir. 2002) ("Preliminary injunctions are, by their nature, products of an expedited process often based upon an underdeveloped and incomplete evidentiary record."). Notably, a party's failure to establish any one of the essential elements will warrant denial of the request for preliminary injunctive relief and obviate the need to discuss the remaining elements. See Pittman v. Cole, 267 F.3d 1269, 1292 (11th Cir. 2001) (citing Church v. City of Huntsville,

30 F.3d 1332, 1342 (11th Cir. 1994)); Del Monte Fresh Produce Co. v. Dole Food Co., 148 F. Supp. 2d 1326, 1339 n.7 (S.D. Fla. 2001).

### III.   Discussion

#### a.   Likelihood of Success

Beginning with the first element required to obtain preliminary injunctive relief, Plaintiff contends that the record before the Court shows that he has a likelihood of success on the merits of his claim that Section 1005 is unconstitutional because it violates his right to equal protection under the law. Motion at 10. This element is often considered the most important factor in granting preliminary injunctive relief. See Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986).

Since Section 1005 is a race-based governmental action, it is subject to strict scrutiny. Grutter v. Bollinger, 539 U.S. 306, 326 (2003). As noted by the Supreme Court,

> Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.

City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493 (1989) (plurality opinion). Indeed, the Supreme Court instructs that "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest of judicial scrutiny." Adarand Constructors, Inc. v. Peña, 515 U.S. 200, 224 (1995).

"Although all government uses of race are subject to strict scrutiny, not all are invalidated by it." Grutter, 539 U.S. at 326-27; see also Adarand, 515 U.S. at 237 (seeking to "dispel the notion that strict scrutiny is strict in theory, but fatal in fact." (internal quotations and citations omitted)). To survive strict scrutiny, a law must serve a compelling governmental interest and be narrowly tailored to further that interest. Adarand, 515 U.S. at 227 ("Federal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest."). Thus, Plaintiff's likelihood of success in this action turns on whether Section 1005 satisfies these requirements.

### i. Compelling Governmental Interest

In the Response, the Government states that its "compelling interest in relieving debt of [SDFRs] is two-fold: to remedy the well-documented history of discrimination against minority farmers in USDA loan (and other) programs and prevent public funds from being allocated in a way that perpetuates the

effects of discrimination." Response at 18. In cases applying strict scrutiny, the

Eleventh Circuit has instructed:

> In practice, the interest that is alleged in support of racial preferences is almost always the same—remedying past or present discrimination. That interest is widely accepted as compelling. As a result, the true test of an affirmative action program is usually not the nature of the government's interest, but rather the adequacy of the evidence of discrimination offered to show that interest.

Ensley Branch, N.A.A.C.P. v. Seibels, 31 F.3d 1548, 1564 (11th Cir. 1994)

(citations omitted). Thus, to survive strict scrutiny, the Government must show

a strong basis in evidence for its conclusion that past racial discrimination

warrants a race-based remedy. Id. at 1565. The law on how a governmental

entity can establish the requisite need for a race-based remedial program has

evolved over time. In Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cnty.,

the Eleventh Circuit summarized the kinds of evidence that would and would

not be indicative of a need for remedial action in the local construction industry.

122 F.3d 895, 906-07 (11th Cir. 1997). The court explained:

> A strong basis in evidence cannot rest on an amorphous claim of societal discrimination, on simple legislative assurances of good intention, or on congressional findings of discrimination in the national economy. However, a governmental entity can justify affirmative action by demonstrating gross statistical disparities between the proportion of minorities hired and the proportion of minorities willing and able to do the work. Anecdotal evidence may also be used to document discrimination, especially if buttressed by relevant statistical evidence.

Id. (internal quotations and citations omitted). Also, the court reaffirmed the Ensley Branch court's conclusion that although the Constitution requires strong evidence of discrimination to justify the need for a race-based remedy, a proponent of such a remedy need not have produced such evidence before adopting the remedy. Id. at 911 (quoting Ensley Branch, 31 F.3d at 1565). As such, the Government is not precluded from presenting post enactment evidence to establish a compelling governmental interest in this case. Id.

Here, to establish the requisite evidence of discrimination, the Government relies on substantial legislative history, testimony given by experts at various congressional committee meetings, reports prepared at Congress' request regarding discrimination in USDA programs, and floor statements made by supporters of Section 1005 in Congress.[4] See Response at 6-13 (citing

---

[4] Plaintiff contests the Government's ability to rely on such evidence, arguing there is no basis to determine what evidence Congress relied on when it passed Section 1005. See Motion at 4-6; Reply at 8-9. However, formal findings by a government entity "need neither precede nor accompany the adoption of affirmative action." Ensley Branch, 31 F.3d at 1565; see also Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 286 (1986) (rejecting any formal findings requirement). In reaching that conclusion in the public employer context, the Eleventh Circuit allowed the Government to justify its affirmative action plans post-hac using any evidence available to it. Ensley Branch, 31 F.3d at 1568 ("If the City and Board can now show strong evidence of the need for affirmative action in a department, then future affirmative action in that department is justified."); see also Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo, 981 F.2d 50, 60 (2d Cir. 1992) ("The law is plain that the constitutional sufficiency of a state's proffered reasons necessitating an affirmative action plan should be assessed on whatever evidence is presented, whether prior to or subsequent to the program's enactment."); Contractors Ass'n v. City of Philadelphia, 6 F.3d 990, 1004 (3d Cir. 1993) (observing that "[b]ecause injunctions are prospective only, it makes sense to consider all available evidence . . . including prospective evidence."). That said, there are several categories of evidence that are less significant than others. For example, any floor statement made by legislators advocating for Section 1005's passage that are not backed by statistical or anecdotal evidence should likely be afforded little or no weight. See N.L.R.B. v. SW General, Inc., 137 S. Ct. 929,

floor statements made by Senators Corey Booker (Booker Floor Statement), Debbie Stabenow (Stabenow Floor Statement), and others in the Congressional Record from March 5, 2021, reported at S.1262-66.). This evidence consists of substantial evidence of historical discrimination that predates remedial efforts made by Congress and, to a lesser extent, evidence the Government contends shows continued discrimination that permeates USDA programs.

The historical evidence includes things such as a dramatic decrease in minority owned farms from 1920 to 1992; USDA's discriminatory treatment of SDFRs when they applied for loans through USDA, resulting in lower approval rates among minority farmers; when loans were offered, they were frequently for reduced amounts compared to the amount sought by SDFR applicants and on less favorable terms; inequities in how the loans of minority farmers were serviced by USDA; lack of SDFR representation on local USDA committees that were responsible for overseeing USDA loan programs; and concerted efforts by USDA to ignore complaints of discrimination made by minority farmers. Response at 3-6, 20-25 (collecting evidence). It is undeniable—and notably uncontested by the parties—that USDA had a dark history of past discrimination against minority farmers. Compare id. with Reply at 4.

---

943 (2017) (noting "floor statements by individual legislators rank among the least illuminating forms of legislative history.").

Based on the historical evidence of discrimination, Congress took remedial measures to correct USDA's past discrimination against SDFRs. These measures included implementation of the "2501 Program" to increase outreach to SDFRs; entering into multiple class action settlements with various SDFR groups and awarding approximately $2.4 billion in relief to those who were discriminated against; extending the statutory limitations period for individuals to file discrimination claims against USDA; creating formal officers that are responsible for ensuring compliance with civil rights laws and nurturing relationships among SDFR populations; and adopting measures to increase SDFR participation on local USDA committees. Response at 7-8. Due to the significant remedial measures previously taken by Congress, for purposes of this case, the historical evidence does little to address the need for continued remediation through Section 1005. Rather, for the Government to show that additional remedial action is warranted, it must present evidence either that the prior remedial measures failed to adequately remedy the harm caused by USDA's past discrimination or that the Government remains a "passive participant" in discrimination in USDA loans and programs. See Eng'g Contractors, 122 F.3d at 911. This is where the evidence of continued discrimination becomes crucial, and may be inadequate.

The Government contends its prior measures were insufficient to remedy the effects of past discrimination because "state taxes eroded recoveries, debt

relief was incomplete, and reports before Congress showed that the settlements have not cured the problems faced by minority farmers." Response at 5 (citing Stabenow Floor Statement). However, the actual evidentiary support for the inadequacy of past remedial measures is limited and largely conclusory. For example, the Government points to the insufficiency of USDA's prior outreach efforts to SDFRs that has resulted in a general distrust among SDFRs in government programs. Stabenow Floor Statement (citing statistic that 73% of Black farmers were not aware of pandemic relief programs available to them due to poor efforts at outreach and lingering distrust of USDA). While this evidence could support a need for greater outreach efforts such as those provided for in Section 1006 of the ARPA, it is not tied in any way to a governmental interest in affording SDFRs broad race-based debt relief and does not support a finding that USDA continues to be a participant, passive or active, in discrimination.

The Government also relies on three reports by the Government Accountability Office. Two reports from 2019[5] document a number of barriers that make it more difficult for SDFRs to obtain financing—including smaller farm sizes, weaker credit histories, and lack of clear title to land—but similarly

---

[5] GAO-19-464, INDIAN ISSUES: Agricultural Credit Needs and Barriers to Lending on Tribal Lands (May 2019); GAO-19-539, AGRICULTURAL LENDING: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers is Limited (July 2019).

fail to connect those barriers to prior or ongoing discrimination by USDA or to a need for complete debt relief.[6] The Government also cites to a recent report from 2021,[7] but that report does not add any new evidence as it merely echoes the findings of the two 2019 reports as part of a more general discussion of minority owned businesses' limited access to credit. Thus, from an evidentiary standpoint, these reports do little to move the needle in the Government's favor.[8]

The Government also contends SDFRs received a disproportionately low proportion of pandemic relief assistance authorized in prior legislation, thereby suggesting it remains a passive participant in discrimination. Response at 9-10. Specifically, the Government cites to two statistics related to recent USDA programs that have disproportionately benefited White farmers. The first statistic shows 99.4% of relief under USDA's Market Facilitation Program (MFP) went to White farmers. Response at 10 (citing N. Rosenberg, USDA Gave

---

[6] Notably, both 2019 reports include qualifying language regarding the limited nature of information regarding SDFRs access to credit. Both reports also include recommendations to remedy the barriers identified, none of which include absolute debt relief, much less debt relief awarded strictly on the basis of race.

[7] GAO-21-399T, FIN. SERVS.: Fair Lending, Access, and Retirement Sec. (Feb. 24, 2021).

[8] The Government's reliance on the Jackson Lewis report does not fill the gap. Jackson Lewis, LLP, "Civil Rights Assessment" (Mar. 31, 2011). Notably, the Jackson Lewis report found SDFR "participation reasonably well reflected their respective Principal Operator populations," with respect to FSA loan programs and, with respect to Rural Development loan programs, SDFR "participation for all groups exceeded their respective rural populations, with some by substantial margins." Id. at xxi. Also, despite presenting numerous detailed recommendations to address the challenges faced by SDFRs, none included outright debt relief.

Almost 100 Percent of Trump's Trade War Bailout to White Farmers, Farm Bill Law Enterprise (July 24, 2019)). The second statistic shows 97% of the $9.2 billion in pandemic relief provided through USDA's Coronavirus Food Assistance Program in 2020 went to nonminority farmers. Stabenow Floor Statement at 1264 (citing J. Hayes, USDA Data: Nearly all Pandemic Bailout Funds Went to White Farmers, Envir'l Working Group (Feb. 18, 2021)). Even taking these statistics at face value, they are less useful than they may appear to be.

The first statistic is qualified by the fact that: "[a]pproximately seven percent of the funds went to entities owned by corporations or individuals whose race was not reported." N. Rosenburg, supra. The report also identifies farm size and specific crops—namely, soybeans—as being the target of MFP funding, not racial identity. Id. As to the second statistic, both parties at least tacitly acknowledge the 2020 relief went primarily to nonminority farmers because the legislation targeted large farms that were disproportionately owned by nonminority farmers—not because the relief efforts were facially discriminatory. See Response at 10; Reply at 8. Where a race-neutral basis for a statistical disparity can be shown, the Court can give that statistical evidence less weight. Eng'g Contractors, 122 F.3d at 923. Here, the statistical discrepancies presented by the Government can be explained by non-race related factors—farm size and crops grown—and the Court finds it unlikely that

this evidence, standing alone, would constitute a strong basis for the need for a race-based remedial program.

Additionally, the Government argues that SDFRs were in a more precarious financial position headed into the pandemic due to prior discrimination, citing evidence of higher delinquency and foreclosure rates among SDFRs compared to nonminority farmers. Booker Floor Statement (citing statistics that 13% of FSA direct loan recipients are currently delinquent, but that group is made up of 35% of Black farmers and 24% of Hispanic, Asian-American, and Indigenous farmers). The problem with the Government's reliance on this evidence lies in the fact that the statistical evidence for the Government's broader proposition is lacking. The Government has not connected SDFRs disproportionate delinquency status to actual discrimination by USDA outside of conclusory remarks made in support of the legislation. Courts must be wary of finding statistical disparities untethered to evidence of discrimination sufficient grounds for implementation of a race-based program. See Croson, 488 U.S. at 499-500 (criticizing the district court's reliance on speculative statistics and finding they did not amount to evidence of discrimination).

On the record presented here, the Court expresses serious concerns over whether the Government will be able to establish a strong basis in evidence warranting the implementation of Section 1005's race-based remedial action.

The statistical and anecdotal evidence presented appears less substantial than that deemed insufficient in Eng'g Contractors, which included detailed statistics regarding the governmental entity's hiring of minority-owned businesses for government construction projects; marketplace data on the financial performance of minority and nonminority contractors; and two studies by experts. Id. at 912. To the extent remedial action is warranted based on the current evidentiary showing, it would likely be directed to the need to address the barriers identified in the GAO Reports such as providing incentives or guarantees to commercial lenders to make loans to SDFRs, increasing outreach to SDFRs regarding the availability of USDA programs, ensuring SDFRs have equal access to the same financial tools as nonminority farmers, and efforts to standardize the way USDA services SDFR loans so that it comports with the level of service provided to White farmers. Nevertheless, at this stage of the proceedings, the Court need not determine whether the Government ultimately will be able to establish a compelling need for this broad, race-based remedial legislation.[9] This is because, assuming the Government's evidence establishes

---

[9] While the Court expresses reservations regarding the sufficiency of the Government's evidence of a compelling governmental interest supporting the need for further broad ongoing relief, the Court recognizes that this record – consisting only of a complaint and briefing and evidence pertinent to the Motion for Preliminary Injunction – is limited.  On a more fully developed record, the Government may be able to establish that despite past remedial efforts the harm caused by the disgraceful history of discrimination by the USDA in farm loans and programs is ongoing or that the Government is in some way a participant in perpetuating that discrimination such that further narrowly tailored affirmative relief is warranted.

the existence of a compelling governmental interest warranting some form of race-based relief, for the reasons discussed below, Plaintiff has convincingly shown that the relief provided by Section 1005 is not narrowly tailored to serve that interest.

### ii.  Narrow Tailoring

Even if the Government establishes a compelling governmental interest to enact Section 1005, Plaintiff has shown a substantial likelihood of success on his claim that, as written, the law violates his right to equal protection because it is not narrowly tailored to serve that interest. The narrow tailoring requirement ensures that "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." Croson, 488 U.S. at 493 (plurality opinion). "The essence of the 'narrowly tailored' inquiry is the notion that explicitly racial preferences ... must be only a 'last resort' option." Eng'g Contractors, 122 F.3d at 926 (quoting Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207, 217 (4th Cir. 1993)); see also Croson, 488 U.S. at 519 (Kennedy, J., concurring) ("[T]he strict scrutiny standard ... forbids the use even of narrowly drawn racial classifications except as a last resort."). In determining whether a race-conscious remedy is appropriate, the Supreme Court instructs courts to examine several factors, including the necessity for

the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." U.S. v. Paradise, 480 U.S. 149, 171 (1987).

Here, little if anything about Section 1005 suggests that it is narrowly tailored. As an initial matter the Court notes that the necessity for the specific relief provided in Section 1005—debt relief for all SDFRs with outstanding qualifying farm loans as of January 1, 2021—is unclear at best. As written, Section 1005 is tailored to benefit only those SDFRs who succeeded in receiving qualifying farm loans from USDA, but the evidence of discrimination provided by the Government says little regarding how this particular group of SDFRs has been the subject of past or ongoing discrimination. See Section III(a)(i), supra.[10] Thus, the necessity of debt relief to the group targeted by Section 1005, as opposed to a remedial program that more narrowly addresses the discrimination that has been documented by the Government, is anything but evident.

More importantly, Section 1005's rigid, categorical, race-based qualification for relief is the antithesis of flexibility. The debt relief provision

_____

[10] Although the Government argues that historical discrimination against SDFRs also included things such as higher interest rates, less advantageous loan terms, and delayed approvals, the record evidence does not appear to show that SDFRs with current loans suffered such discrimination.

applies strictly on racial grounds irrespective of any other factor. Every person who identifies him or herself as falling within a socially disadvantaged group[11] who has a qualifying farm loan with an outstanding balance as of January 1, 2021, receives up to 120% debt relief—and no one else receives any debt relief. Although the Government argues that Section 1005 is narrowly tailored to reach small farmers or farmers on the brink of foreclosure, it is not. Regardless of farm size, an SDFR receives up to 120% debt relief. And regardless of whether an SDFR is having the most profitable year ever and not remotely in danger of foreclosure, that SDFR receives up to 120% debt relief. Yet a small White farmer who is on the brink of foreclosure can do nothing to qualify for debt relief. Race or ethnicity is the sole, inflexible factor that determines the availability of relief provided by the Government under Section 1005.

At the preliminary injunction hearing, the Government cited the Eleventh Circuit decision in Cone Corp. v. Hillsborough Cnty., 908 F.2d 908, 910 (11th Cir. 1990) as support for a finding that Section 1005 is a constitutional exercise of Congress' authority, but a review of the differences between the

---

[11] Presently, this means only the five racial classifications addressed above. See Section I, supra. However, an individual can petition the Secretary to deem his or her group socially disadvantaged. See Response at 13; see also Hearing Transcript at 27-28 (noting various petitions being made to the Secretary to declare additional ethnic groups as socially disadvantaged for purposes of Section 1005). As noted previously, the definition of a socially disadvantaged group is limited and extends only to a "group that has been subjected to racial or ethnic prejudice because of their identity as a member of a group without regard to their individual qualities." 7 U.S.C. § 2279(a)(6).

affirmative action scheme reviewed in <u>Cone Corp.</u> only highlights the failure of Section 1005. In <u>Cone Corp.</u>, the Eleventh Circuit reviewed the entry of summary judgment and a permanent injunction against a county that implemented a minority business enterprise (MBE) program designed to promote the use of minority-owned businesses on certain county construction projects. 908 F.2d 908, 910 (11th Cir. 1990). Under the program, after evaluating available data regarding a project and the number of qualified MBE contractors available in a given area, the county would set a goal for MBE participation on the project before soliciting bids for it. <u>Id.</u> If there were not at least three qualified MBEs in the relevant area, no MBE participation goal would be set for that project. <u>Id</u>. Also, low bidders that did not satisfy the MBE participation goal had an administrative review process during which the low bidder could qualify to be awarded the contract by meeting other established race neutral criteria. <u>Id.</u> at 911.

Seeing substantial similarity between the county's MBE program and that found unconstitutional in <u>Croson</u>, the district court entered summary judgment against the county and enjoined the use of the MBE program. <u>Id.</u> at 911-12. On appeal, the Eleventh Circuit found that decision to be in error. <u>Id.</u> at 912. In doing so, the court pointed to several critical factors that distinguished the county's MBE program from that rejected in <u>Croson</u>: (1) the county had tried to implement a less restrictive MBE program for six years

without success; (2) the MBE participation goals were flexible in part because they took into account project-specific data when setting goals; (3) the program was also flexible because it provided race-neutral means by which a low bidder who failed to meet a program goal could obtain a waiver; and (4) unlike the program rejected in <u>Croson</u>, the county's program did not benefit "groups against whom there may have been no discrimination," instead its MBE program "target[ed] its benefits to those MBEs most likely to have been discriminated against . . . ." <u>Id.</u> at 916-17. Section 1005's inflexible, automatic award of up to 120% debt relief only to SDFRs stands in stark contrast to the flexible, project by project <u>Cone Corp.</u> MBE program.

The Eleventh Circuit's decision in <u>Ensley Branch</u> is also instructive as to the contours of race-based relief that would be sufficiently narrowly tailored to withstand constitutional scrutiny. There, in considering the constitutionality of consent decrees that contained race-based annual goals and long-term goals, the court contrasted the remedy provided in those decrees with programs that provided narrowly tailored relief. <u>Ensley Branch</u>, 31 F.3d at 1569. First, the court pointed to <u>Howard v. McLucas</u>, 871 F.2d 1000 (11th Cir. 1989), in which it explained:

> we applied strict scrutiny to a consent decree provision that reserved a certain number of promotions for blacks. The number of promotions reserved matched the number of promotions that had been lost by blacks due to past discrimination. The "set aside"

> was thus narrowly tailored to correct the precisely identified effects of past discrimination.

Ensley Branch, 31 F.3d at 1569 (internal citations omitted). Next, the court turned to Cone Corp., noting that although the MBE program included a minority participation goal, the county "would grant a waiver if qualified minority businesses were uninterested, unavailable, or significantly more expensive than non-minority businesses." Id. In this way the court observed the county's MBE program "had been carefully crafted to minimize the burden on innocent third parties." Id. (citing Cone Corp., 908 F.2d at 911). Rejecting the race-based goals contemplated in the Ensley Branch decrees, the court concluded that the decrees "lack both the extreme specificity of the Howard plan and the generous flexibility of the Cone Corp. plan. They are not narrowly tailored." Id. at 1569-70.

Section 1005 appears to suffer from similar deficiencies. Unlike the Howard plan, the 120% debt relief program is untethered to an attempt to remedy any specific instance of past discrimination. And unlike the Cone Corp. MBE program, Section 1005 is absolutely rigid in the relief it awards and the recipients of that relief and provides no waiver or exception by which an individual who is not a member of a socially disadvantaged group can qualify. In this way, Section 1005 is far more similar to the remedial schemes found not to be narrowly tailored in Croson and other similar cases. See In re Birmingham

Reverse Discrimination Employment Litigation, 20 F.3d 1525, 1548 (11th Cir. 1994) (finding requirement that 50% of all promotions to lieutenant be filled by "qualifying blacks" not narrowly tailored); Gratz v. Bollinger, 539 U.S. 244, 271-72 (2003) (rejecting as not narrowly tailored a law school admissions policy that automatically distributed "20 points to every single applicant from an 'underrepresented minority' group," which had "the effect of making 'the factor of race . . . decisive' for virtually every minimally qualified underrepresented minority applicant.").

Moreover, on the record before the Court, it appears that in enacting Section 1005 Congress relies, albeit without any ill intention, on present discrimination to remedy past discrimination. But the Eleventh Circuit disapproved of such a course of action in Ensley Branch. 31 F.3d at 1553-56. There the court noted that despite having been ordered years earlier to implement a nondiscriminatory selection process, the City of Birmingham continued to use a discriminatory test to make hiring and promotion decisions. Id. Never having fixed the test, the solution proposed to address the ongoing effects of the city's discriminatory practices involved instituting a race-based quota system for promotions to ensure racial parity. Id. at 1572. The Eleventh Circuit unequivocally rejected such a plan as constitutionally inappropriate, stating

> By permitting the continued use of discriminatory tests, the decrees compound the very evil they were designed to eliminate. The Constitution will not allow such a discriminatory construct. One color of discrimination has been painted over another in an effort to mask the peeling remnants of prejudice past, leaving a new and equally offensive discoloration rather than a clean canvas.

Id. at 1572-73; see also In re Birmingham, 20 F.3d at 1548 (rejecting the use of a strict racial quota system for promotion within a city department, noting the approach was "designed to achieve government-mandated racial balancing—[which is] the perpetuation of discrimination by government."). To allow the perpetuation of discrimination in such a manner would undermine the Supreme Court's "ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race . . . ." Croson, 488 U.S. at 495.[12] If the compelling interest sought to be remedied by the legislature through Section 1005 is continued discrimination in USDA loans and programs, then relief directed at ending that discrimination would appear to be more narrowly tailored than providing complete and automatic debt relief on the basis of race.

---

[12] The use of race to achieve parity has long been considered a slippery slope that reinforces prejudice rather than eliminates it. See Univ. of Cal. Regents v. Bakke, 438 U.S. 265, 298 (1978) (plurality opinion of Powell, J.) ("[P]referential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relation to individual worth."). The Government's own positions in this case appear to fall prey to this evil, as they require certain broad assumptions to be made about all SDFRs in order to avoid close scrutiny. See, e.g., Hearing Transcript at 52-53 (suggesting, among other things, that it is "unlikely" any SDFR will receive a double benefit under prior pandemic relief and Section 1005 because minority farmers tend to have smaller farms, bring in less revenue, and are less credit worthy and therefore excluded from obtaining loans in the private market).

Additionally, on this record, it appears that Section 1005 simultaneously manages to be both overinclusive and underinclusive. It appears to be overinclusive in that it will provide debt relief to SDFRs who may never have been discriminated against or faced any pandemic-related hardship. For example, a new SDFR who applied for and received the only farm loan he or she ever sought on terms equivalent or even better than those given to other farmers is entitled to up to 120% debt relief despite never having faced any of the discrimination catalogued by the Government. This is highly likely, as the Government conceded at the preliminary injunction hearing that the farm loans that will qualify for repayment "are generally loans by folks new to the industry, starting their farms, things like that." Hearing Transcript at 52-53. Additionally, Section 1005 provides debt relief to groups including Asians, Native Hawaiians, and Pacific Islanders, groups for which the evidence of prior discrimination by the USDA in farm loans, programs and services appears to be exceedingly thin. The overinclusive nature of the relief casts doubt on its necessity. Croson, 488 U.S. at 506 ("The gross overinclusiveness of Richmond's racial preference strongly impugns the city's claim of remedial motivation."). see also O'Donnell Const. Co. v. District of Columbia, 963 F.2d 420, 427 (D.C. Cir. 1992) (noting that the inclusion of groups for whom there is no history of discrimination raises doubts as to the remedial nature of a government's plan).

Moreover, there is little evidentiary support for the magnitude of relief provided by Section 1005—up to 120% debt relief to all SDFRs with qualifying farm loans—which appears to duplicate or in some instances exceed the relief provided to those who actually suffered the well-documented historic discrimination Congress sought to remedy through prior settlements. See, e.g. Pigford v. Glickman, 185 F.R.D. 82 (D.D.C. 1999) aff'd, 206 F.3d 1212 (D.C. Cir. 2000).[13] To the extent Section 1005 is intended to address the alleged erosion of prior relief identified by Senators Booker and Stabenow in their floor statements, the Government presents no evidence that the recipients of Section 1005's relief are the same persons or in any way—but race—similarly situated to the persons that received the previous, potentially inadequate relief. Nor does it explain how providing this debt relief to current loan holders is narrowly tailored to address the concern of previously inadequate relief. On the record before the Court at this stage in the case, it does not appear that Section 1005

---

[13] In Pigford, a consent decree was entered that provided victims of USDA discrimination between January 1, 1981 and January 1, 1997 two alternatives for obtaining relief. 185 F.R.D. at 95. Claimants who proceeded under "Track A" would receive $50,000 in a capped monetary award if they could provide some evidence of discrimination, while claimants who proceeded under "Track B" were not subject to the monetary cap but were required to meet the more exacting preponderance of the evidence standard in establishing discrimination. Id. at 95-97. Successful claimants under either track received loan forgiveness of their USDA loans and tax payments made on their behalf in the amount of 25% of the total debt forgiveness and cash payment. Id. at 97. However, subsequent stipulations and court orders interpreting the consent decree limited the debt forgiveness available to claimants to amounts incurred after the first date of discrimination. See Pigford v. Schafer, 536 F. Supp. 2d 1, 5 (D.D.C. 2008). Therefore, although some Pigford claimants received complete loan forgiveness of their USDA loans, the relief afforded in Pigford was not as expansive as Section 1005's debt relief provision.

is narrowly tailored such that it "eliminates no more than the exact source of the 'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485 (1988). Rather, it appears to be rigidly overinclusive in both its reach and its remedy.

Section 1005 also appears to be underinclusive in that, as mentioned above, it fails to provide any relief to those who suffered the brunt of the discrimination identified by the Government. It provides no remedy at all for an SDFR who was unable to obtain a farm loan due to discriminatory practices or who no longer has qualifying farm loans as a result of prior discrimination. While the Government argues that a remedy for past discrimination need not be limited to remedying specific instances of discrimination, Hearing Transcript at 53, or include an individualized determination of prior discriminatory treatment, it fails to explain how a remedy that by its own terms may have the effect of excluding past victims of the very discrimination it seeks to remedy is actually tailored, narrowly or not, to remedy that discrimination. Section 1005's debt relief also does not increase SDFR representation within USDA; address alleged discrepancies in the way USDA has serviced farm loans held by SDFRs or change how they will be serviced in the future; help SDFRs who were denied funding for farm loans; improve access to farm loans for SDFRs; or restore farms or land to SDFRs who have had their farms taken away through discriminatory foreclosure practices—all of which are concerns the Government raises in support of the need for remedial measures.

The Government attempts to justify Section 1005's broad race-based relief without any showing of past harm or any effort to craft a more narrowly tailored remedy by arguing that Congress wanted to get relief to SDFRs quickly because they are disproportionately on the brink of foreclosure. Hearing Transcript at 50. However, the Eleventh Circuit has explicitly rejected what it describes as "administrative convenience" as a substitute to finding "a narrowly tailored means to remedy prior discrimination." In re Birmingham, 20 F.3d at 1548 ("We can imagine nothing less conducive to eliminating the vestiges of past discrimination than a government separating its [people] into two categories, black and non-black, and allocating a rigid, inflexible number of promotions to each group . . . ."); see also Gratz, 539 U.S. at 275 ("the fact that the implementation of a program capable of providing individualized consideration might present administrative challenges does not render constitutional an otherwise problematic system."). The court also has instructed that while a more narrowly tailored approach may be administratively burdensome, "minimizing inconvenience is not a constitutional value." Ensley Branch, 31 F.3d at 1574 ("[t]he Constitution does not put a price on constitutional rights, in terms either of time or money. The rights guaranteed by the Constitution are to be made effective in the present.") (alteration in original). Thus, the use of race based on an intention to act quickly does not overcome the failure to identify and provide a remedy that is narrowly tailored

to address the specific interest the Government has found to be a compelling interest.[14]

Finally, there is little evidence that the Government gave serious consideration to, or tried, race-neutral alternatives to Section 1005. The Government recounts the remedial programs Congress previously implemented that allegedly have failed to remedy USDA's discrimination against SDFRs. Response at 7-8. However, almost all of the programs identified by the Government were not race-neutral programs; they were race-based programs that targeted things like SDFR outreach efforts, improving SDFR representation on local USDA committees, and providing class-wide relief to SDFRs who were victims of discrimination. The main relevant race-neutral program the Government referenced was the first round of pandemic relief, which did go disproportionately to White farmers. Response at 10 (citing floor statements that in turn reference an advocacy group's findings that 97% of the

---

[14] There are many ways in which Section 1005 could have been more narrowly tailored to address pandemic-related concerns. For example, USDA already implemented a foreclosure and eviction moratorium and a broad forbearance policy for Direct and Guaranteed loans, which constitutes a narrowly tailored remedy that keeps farmers facing financial hardships from losing their farms or falling further behind on their payments. See, e.g., Press Release No. 0026.21, USDA Extends Evictions and Foreclosure Moratorium to June 30, 2021 and Provides Additional Guidance for Servicing Loans Impacted by COVID-19 (Feb. 16, 2021). Congress could then have targeted the approximately 13% of farmers currently delinquent on their farm loans, which are made up of approximately 35% Black farmers and 24% Hispanic, Asian-American, and Indigenous farmers, as opposed to targeting 100% of all SDFRs without regard for their individual financial positions. Laws targeting small farms or specific crops that were left out of prior relief bills would also represent narrowly tailored relief, even though, according to the Government, that relief would disproportionately benefit SDFRs.

$9.2 billion in USDA pandemic relief went to White farmers). However, as discussed above, the underlying cause of the statistical discrepancy may be disparities in farm size or crops grown, rather than race. Response at 10; Reply at 8.[15]

To satisfy the narrow tailoring requirement, "given the odious nature of race-based decisionmaking, race-neutral alternatives should be considered before a government implements an affirmative action plan using race as the sole criteria upon which [decisions] are based." In re Birmingham, 20 F.3d at 1545-46; see also Eng'g Contractors, 122 F.3d at 927 ("[i]f a race-neutral remedy is sufficient to cure a race-based problem, then a race-conscious remedy can never be narrowly tailored to that problem."). The record before the Court does not show that Congress undertook that consideration when enacting Section 1005. Indeed, the statements by legislators that prior efforts by Congress have been insufficient to remedy past discrimination appear to be more akin to the "perfunctory" findings found to be entitled to little weight in Eng'g Contractors, 122 F.3d at 927-28.[16] Thus, on the current record, in addition to showing that Section 1005 is inflexible and both overinclusive and underinclusive, Plaintiff is likely to show that Congress "failed to give serious good faith consideration

_____

[15] And a remedy for the disparity could be a targeted allocation of the remaining pandemic relief.

[16] As noted in footnote 4 supra, these statements, in the absence of supporting evidence are of limited value.

to the use of race and ethnicity-neutral measures" to achieve the compelling interest supporting Section 1005. Ensley Branch, 122 F.3d at 927. Congress does not appear to have turned to the race-based remedy in Section 1005 as a "last resort," but instead appears to have chosen it as an expedient and overly simplistic, but not narrowly tailored, approach to addressing prior and ongoing discrimination at USDA.

Having considered all of the pertinent factors associated with the narrow tailoring analysis and the record presented by the parties, the Court is not persuaded that the Government will be able to establish that Section 1005 is narrowly tailored to serve its compelling governmental interest. The constitutional right to equal protection guarantees that racial classifications will be permitted only with "the most exact connection between the justification and classification." Wygant, 476 U.S. at 280. The evidence regarding Section 1005's enactment presents some connection between the justification and the race-based relief but falls short of presenting an "exact connection." Moreover, Section 1005 does not appear to contain any of the hallmarks of a narrowly tailored race-based affirmative action plan, such as those identified in Howard, 871 F.2d at 1008-11, and Cone Corp., 908 F.2d at 916-17. Rather, it appears to create an inflexible, race-based discriminatory program that is not tailored to make the individuals who experienced discrimination whole, increase participation among SDFRs in USDA programs, or irradicate the evils of

discrimination that remain following Congress' prior efforts to remedy the same. Therefore, the Court is satisfied that Plaintiff has established a strong likelihood of showing that Section 1005 violates his right to equal protection under the law because it is not narrowly tailored to remedy a compelling governmental interest. As such, Plaintiff has shown a strong likelihood of success on his equal protection and APA claims.

### b. Irreparable Harm

Regardless of a party's showing of a likelihood of success, a party seeking preliminary injunctive relief must show that he or she will suffer irreparable harm if the Court does not issue an injunction. See Ne. Fla., 896 F.2d at 1285. Indeed, "[a] showing of irreparable harm is the sine qua non of injunctive relief." Id. (reversing a grant of preliminary injunctive relief absent irreparable harm). The asserted irreparable harm "must be neither remote nor speculative, but actual and imminent." Id.; see also Winter, 555 U.S. at 21-22 (noting a preliminary injunction may not be entered "based only on a possibility of irreparable harm"). The Eleventh Circuit has instructed:

> An injury is "irreparable" only if it cannot be undone through monetary remedies. "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

Id. (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)). Notably, more than conclusory allegations of irreparable harm or speculative assertions of economic injury will be sufficient to warrant the extraordinary relief of a preliminary injunction.

Plaintiff argues he will suffer three distinct forms of irreparable harm in this case: (1) monetary harm because of his exclusion from the loan assistance provided to SDFRs; (2) intangible harm related to the alleged violation of his right to equal protection under the law; and (3) competitive disadvantage. Hearing Transcript at 11-17. With respect to Plaintiff's claim of irreparable harm by virtue of the loss of competitive advantage, the Government argues that his declaration fails to show that he will suffer any such harm. Response at 14-16. The Court agrees. Plaintiff has not provided any evidence in support of his conclusory statement of future competitive disadvantage. He has not alleged to whom he sells his farm products, whether any of his competitors qualify as SDFRs, whether any of his competitors intend to seek loan assistance under Section 1005, or to what extent loan assistance would result in his competition gaining a competitive advantage against him. As such, it is impossible to conclude with any certainty that Plaintiff will actually suffer competitive disadvantage as a result of Section 1005 or to what extent. While it is certainly possible and perhaps even likely that Plaintiff competes with at least one SDFR who will receive loan assistance under Section 1005, the need

for such an inference renders the alleged harm speculative, and therefore insufficient for purposes of obtaining a preliminary injunction. See Ne. Fla., 896 F.2d at 1285.

In finding that, on the record before the Court, Plaintiff's alleged competitive disadvantage harm is speculative the Court does not suggest that at trial Plaintiff could not present evidence that he will suffer a competitive disadvantage as a result of the one-time transfer of wealth contemplated by Section 1005 and actual monetary harm as a result. Of course, if Plaintiff were to present evidence of such damages, he would be barred from being awarded any compensation due to sovereign immunity. Nevertheless, the Court finds that the current evidence is insufficient to support a conclusion that Plaintiff's alleged loss of competitive advantage is actual and imminent, and thus it cannot justify the extraordinary remedy of preliminary injunctive relief.

As to his claims of either monetary harm or the violation of his constitutional right, the Government argued at the hearing that neither is irreparable because either can be remedied at the conclusion of the case. At the hearing, the Government argued that, although sovereign immunity would bar an award of money damages, if Plaintiff prevails, his harm could be remedied by giving him specific equitable relief under the APA—i.e., the debt relief he seeks in the Complaint. Hearing Transcript at 58-66. Specifically, the Government argued that the Court can award Plaintiff the same debt relief

being provided to SDFRs at the end of this case. Id. at 59-61. While Plaintiff's counsel did "not necessarily disagree," he noted that he was not familiar with and had not reviewed the authority on which the Government relied for this argument as it was not cited in the Response. Id. at 69.

As support for its contention, the Government relied on Bowen v. Mass., which involved a review of the Secretary of Health and Human Services' decision to disallow a state's reimbursement request under a federal healthcare program. 487 U.S. 879, 882-83 (1988). However, that case and others like it involve eligibility determinations for funds to which the plaintiffs were entitled to receive under a specific law. See id. at 893; see also America's Cmty. Bankers v. F.D.I.C., 200 F.3d 822, 830 (D.C. Cir. 2000) (noting the purpose of a similar award was "an attempt to restore to the plaintiff that to which it was entitled from the beginning."). In other words, in those cases the plaintiffs alleged a deprivation of a benefit Congress intended for them to receive. In such cases, upon a finding that the government has deprived a plaintiff of a specific benefit to which the plaintiff was entitled under the law, the APA authorizes an award of specific relief, i.e., an award of the specific funds to which the plaintiff was entitled under the statute. See America's Cmty. Bankers, 200 F.3d at 829.

Here, the Court has no authority to award Plaintiff any debt relief under Section 1005. The statute as written by Congress unambiguously authorizes the expenditure of funds for loan assistance only to SDFRs or other qualifying

socially disadvantaged groups. There is no way to construe the law to provide debt relief to a White farmer. The Court has no authority to rewrite the law to extend that assistance to persons that Congress did not intend to benefit. See Aptheker v. Sec. of State, 378 U.S. 500, 515 (1964) ("It must be remembered that although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not carry this to the point of perverting the purpose of a statute or judicially rewriting it." (internal quotations, alterations, and citations omitted)); U.S. v. Stevens, 559 U.S. 460, 481 (2010) (noting courts "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." (citations omitted)); cf. Bostock v. Clayton Cnty., Ga., 140 S. Ct. 1731, 1738 (2020) (noting "only the words on the page [of a law] constitute the law adopted by Congress and approved by the President."). To do so would run afoul of separation of powers principles, which dictate that Congress, through the Appropriations Clause, has the constitutional authority to allocate funds. See America's Cmty. Bankers v. F.D.I.C., 200 F.3d 822, 830 (D.C. Cir. 2000) (noting the "separation of powers encroachment" that would result if courts were to control the appropriation of funds in cases involving program eligibility). Thus, contrary to the contention of the Government, if Plaintiff prevails in this action, the Court has no authority to order that he be given debt relief equal to that given to the SDFRs under Section 1005.

The Government also argues that Plaintiff's exclusion from debt relief under Section 1005 does not amount to any harm at all. See Response at 15-17 (focusing primarily on Plaintiff's alleged competitive disadvantage). The Court disagrees. The harm he purports to suffer is the denial of his right to equal protection–his exclusion, solely on account of his race, from eligibility for an extraordinary government benefit under Section 1005. This constitutional harm is a real harm. Indeed, the Supreme Court has recognized in the context of a standing analysis, that the injury in an equal protection case is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate ability to obtain the benefit . . . the injury is the inability to compete on an equal footing." Gratz, 539 U.S. at 262 (internal citations and quotations omitted). Thus, that injury—the unequal treatment based solely on race—and not merely Plaintiff's inability to benefit from Section 1005 is the harm Plaintiff will suffer in the absence of injunctive relief.

Satisfied that Plaintiff's alleged constitutional injury is actual harm for purposes of obtaining a preliminary injunction, the question becomes whether Plaintiff has shown that the specific constitutional harm he will suffer is irreparable harm. The Government contends that circuit precedent unequivocally answers the question in the negative. As stated by the Eleventh Circuit:

> No authority from the Supreme Court or the Eleventh Circuit has been cited to us for the proposition that the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation. In this case, no witnesses or other evidence was submitted on the issue of irreparable injury. The only area of constitutional jurisprudence where we have said that an on-going violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence. The rationale behind these decisions was that chilled free speech and invasions of privacy, because of their intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole. The facts of this case do not fit the rationale of these decisions. This case involves neither a first amendment nor a right of privacy claim; and the damage to plaintiff here is chiefly, if not completely, economic.

Ne. Fla., 896 F.2d at 1285-86 (citations omitted); see also Siegel v. LePore, 234 F.3d 1163, 1177-78 (11th Cir. 2000) (collecting cases). While on its face Ne. Fla. appears to resolve this issue in the Government's favor, a closer reading of the case calls that conclusion into doubt.

The significant distinction between the present case and Ne. Fla. is that, in Ne. Fla., the plaintiffs stood to suffer "chiefly, if not completely, economic" damage for which they could obtain monetary relief. 896 F.2d at 1286 (noting that "contractors can, by taking reasonable steps, quantify their claims for the purpose of seeking monetary relief from the City"). Ne. Fla. did not involve a situation where the chief harm was an intangible constitutional violation for which damages cannot be measured, and even if they could, there could be no monetary remedy. See id. Other courts in this circuit, and the Eleventh Circuit

itself, have distinguished <u>Ne. Fla.</u> on this basis, finding the unavailability of money damages in the Eleventh Amendment context can render harm irreparable for purposes of obtaining preliminary injunctive relief. <u>See, e.g.</u>, <u>Odebrecht Const., Inc. v. Prasad</u>, 876 F. Supp. 2d 1305, 1320-21 (S.D. Fla. 2012) <u>aff'd</u> <u>Odebrecht Const., Inc. v. Fla. Dept. of Transp.</u>, 715 F.3d 1268, 1288 (11th Cir. 2013) (distinguishing <u>Ne. Fla.</u> and finding "[w]hen a plaintiff faces significant economic harm but cannot sue the state of Florida for money damages, harm is irreparable as a matter of law." (internal citations and quotations omitted)); <u>cf.</u> <u>ABC Charters, Inc. v. Bronson</u>, 591 F. Supp. 2d 1272, 1310 (S.D. Fla. 2008) (collecting out-of-circuit cases in support of the proposition that irreparable harm can be presumed where the Eleventh Amendment bars a plaintiff from recovering money damages). In fact, the rationale that led the Eleventh Circuit to recognize a presumption of irreparable harm in First Amendment and right of privacy cases—namely, the inability for money damages to make a plaintiff whole in those instances and the intangible nature of the harm—supports a finding that the Plaintiff's constitutional harm in this case is irreparable. <u>See</u> <u>Ne. Fla.</u> 896 F.2d at 1285-86; <u>Odebrecht Const.</u>, 715 F.3d at 1288. Thus, the Court rejects the Government's contention that Plaintiff's constitutional harm cannot be irreparable harm as a matter of law.

Nevertheless, the Court does not go so far as to suggest that a showing of a violation of the right to equal protection would give rise to a presumption of

irreparable harm. The Court has no need to consider that question, because under the unique circumstances of this case, Plaintiff has shown that the specific harm he stands to suffer here in the absence of an injunction is indeed irreparable.

As discussed above, the Court cannot rewrite Section 1005 to include White farmers like Plaintiff; those decisions are left to Congress. See Stevens, 559 U.S. at 481 ("To read [the law] as the Government desires requires rewriting [by Congress], not just reinterpretation[ by the Court]."). Thus, the Court cannot order the Government to provide Plaintiff with the debt relief that it has chosen to give to SDFRs but not to him. Even if the Court could rewrite the law, it would be creating a new program that Congress did not intend.[17] Judicially rewriting Section 1005 to create a debt relief program that would include a White farmer and ordering the Government to provide Plaintiff debt relief from it would not be monetary relief through inclusion in a governmental program, as urged by the Government. Hearing Transcript at 59-61. Rather, it would be an alternate form of money damages. In Bowen, the Supreme Court made the following observation:

> The term money damages, 5 U.S.C. § 702, we think, normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to substitute for a suffered loss, whereas

---

[17] Specifically, Congress only appropriated "such sums as may be necessary, to remain available until expended, for the cost of loan modifications and payments under [Section 1005]"—that is, "payment[s] in an amount up to 120 percent of the outstanding indebtedness of each [SDFR] as of January 1, 2021 . . . ." Section 1005(a).

> specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled. Thus, while in many instances an award of money is an award of damages, occasionally a money award is also a specie remedy.

487 U.S. at 895 (quoting Maryland Dept. of Human Resources v. Dept. of Health and Human Services, 763 F.2d 1441, 1446 (D.C. Cir. 1985)) (internal quotations, alterations, and citations omitted); see also Modoc Lassen Indian Housing Authority v. U.S. Dept. of Housing and Urban Development, 881 F.3d 1181, 1196-98 (10th Cir. 2017) (outlining the distinction between monetary relief and money damages in the context of the APA). Here, Section 1005 unambiguously creates a debt relief program for the benefit of SDFRs, not Plaintiff. As such, any award of debt relief to Plaintiff cannot originate from Section 1005; it must come from a substitute source and would constitute a substitute remedy. Therefore, such relief would be an award of money damages and any award of money damages in this case is barred by sovereign immunity.

Plaintiff has established that he has a substantial likelihood of success on the merits of his claim that Section 1005 violates his constitutional right to equal protection. The violation of this right is imminent because in the immediate future, the Government will provide up to 120% debt relief to qualifying SDFRs, but not to Plaintiff solely because of his race. This, he has shown, is an actual constitutional harm that cannot be undone. Absent an injunction, if Plaintiff prevails in establishing that Section 1005's debt relief

violates his constitutional right, he will have no remedy. The debt relief cannot be clawed back or undone, the Court will have no power to order Congress to provide the substitute remedy of debt relief not authorized by Section 1005, and sovereign immunity will preclude any award of money damages. In short, Plaintiff will have no remedy at all. Under the specific circumstances of this case, Plaintiff has shown that the constitutional harm he stands to suffer, which cannot be undone by money damages and for which no other remedy exists, constitutes an irreparable harm for which injunctive relief is proper. For these reasons, the Court finds Plaintiff has met his burden of establishing that absent an injunction, he will suffer irreparable harm if the Government proceeds with the debt relief authorized under Section 1005.

### c. Balance of Equities

As a final consideration in determining the need for a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (quoting Amoco Production Co. v. Village of Gambell, AK, 480 U.S. 531, 542 (1987)); see also Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017) (noting "[i]t is ultimately necessary ... to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large" before ruling on the necessity for a preliminary injunction). In exercising this "sound discretion,

courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24 (quoting Weinberger v. Romero–Barcelo, 456 U.S. 305, 312 (1982)). This is particularly true where the potential injunctive relief impacts a legislative enactment. Ne. Fla., 896 F.2d at 1284.

Plaintiff argues the public interest element is satisfied because Section 1005 is an unconstitutional infringement on every citizen's right to be free from racial discrimination of any kind. Reply at 17-18. Indeed, the Eleventh Circuit has held "the public interest is served when constitutional rights are protected." Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1327 (11th Cir. 2019); see also Fla. Businessmen for Free Enterprise v. City of Hollywood, 648 F.2d 956, 959 (11th Cir. 1981) ("The public interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional."). The Government responds by citing the public's interest in enforcing the laws enacted by its democratically selected representatives. Response at 39 (citing Maryland v. King, 567 U.S. 1301, 1303 (2012) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")). The Government, NBFA, and AAIF also highlight the significant detriment SDFRs will face if Section 1005 cannot be implemented. Some SDFRs have made plans in anticipation of Section 1005's debt relief and entered into

agreements with the understanding that their farm loan balances would be paid. Amicus Brief at Exs. C and D; see also Response at Ex. A ¶ 40 (noting FSA is excluding loan balances owed by SDFRs in its loan application review process and has approved new farm loans on the understanding that Section 1005 would be implemented in full).

In weighing the interests identified by the parties, the Court returns to core aspects of this case. To the extent Section 1005 is discriminatory, it will result in an imminent, one-time act of discrimination that cannot be remedied through an award of monetary damage or other relief in this case. It also cannot be reversed after the fact, as the Government has no way to recover the debt relief once it is paid out. The effect on Plaintiff of such a large-scale debt relief program will not be quantifiable in the near future, if at all. Meanwhile, the Government's interests are largely conditioned on Section 1005 being constitutional. If the statute in fact violates the Constitution, the Government does not have a legitimate interest in its implementation regardless of whether it was passed through the democratic process. Likewise, if Section 1005 is discriminatory, SDFRs have no legitimate right to the proceeds of a facially unconstitutional legislative enactment. While the Government argues Plaintiff's interest as an individual could not possibly outweigh the interests of thousands of SDFRs, this argument ignores the fact that Plaintiff challenges the very premise that the Constitution permits the specific race-based debt

relief provided under Section 1005 to proceed at all, regardless of how well-intended the program may be or how many beneficiaries stand to be impacted. In light of Plaintiff's strong likelihood of success at this stage of the proceedings, and the Court's finding that absent an injunction he is likely to suffer irreparable harm, the Court finds that the balance of equities weigh in favor of maintaining the status quo by issuing a preliminary injunction.

## IV.  Conclusion

In enacting Section 1005, Congress expressed the intention of seeking to remedy a long, sad history of discrimination against SDFRs in the provision and receipt of USDA loans and programs. Such an intention is not only laudable it is demanded by the Constitution. See Wygant, 476 U.S. at 277. But in doing so, Congress also must heed its obligation to do away with governmentally imposed discrimination based on race. Id. "These related constitutional duties are not always harmonious, reconciling them requires [Congress] to act with extraordinary care." Id. On the record before the Court, it appears that in adopting Section 1005's strict race-based debt relief remedy Congress moved with great speed to address the history of discrimination, but did not move with great care. Indeed, the remedy chosen and provided in Section 1005 appears to fall well short of the delicate balance accomplished when a legislative enactment employs race in a narrowly tailored manner to address a specific compelling governmental interest.

For purposes of this Motion, Plaintiff has established a substantial likelihood that he will prevail on his claim that Section 1005, as written, violates his right to equal protection under the law. He also has shown that absent an injunction, all SDFRs with qualifying farm loans will receive up to 120% debt relief and he will suffer the harm of being excluded from eligibility for that debt relief program solely on the basis of his race. That harm, he has shown, is irreparable. The debt relief given to the SDFRs cannot be undone, the Court cannot order that Plaintiff receive equivalent relief, and money damages are precluded. The harm will be complete and its effects will be cast in stone. Only a preliminary injunction halting the distribution of payments and debt relief under Section 1005 can give Plaintiff an opportunity to obtain any redress. Such an injunction certainly impacts the SDFRs counting on the debt relief. But the Court has carefully balanced the equities and is convinced that they favor the halting of a program that is significantly likely to violate the constitutional guarantee of equal protection under the law.

In reaching this conclusion, the Court proceeds with great caution in determining that an injunction that will have nationwide effect is warranted. Justices Gorsuch and Thomas have questioned a district courts' authority to enter nationwide injunctions, see, e.g., Dep't of Homeland Sec. v. N.Y., 140 S. Ct. 599, 599-601 (2020) (concurring opinion); see also Trump v. Hawaii, 138 S. Ct. 2392, 2423 (2018) (noting the "disposition of the case makes it unnecessary

to consider the propriety of the nationwide scope of the injunction," leaving the question unresolved), and courts and scholars have been critical of their use. See Trump, 138 S. Ct. at 2429 (collecting scholarly articles criticizing the issuance of nationwide preliminary injunctions). This Court has never gone so far as to issue such an injunction and is firmly of the view that a narrow injunction that maintains the status quo in the specific circumstances of the plaintiff before the Court and nothing more is the appropriate remedy.

Here, despite exploring any possible more narrow option, the Court cannot identify any relief short of enjoining the distribution of Section 1005's payments and debt relief that will maintain the status quo and provide Plaintiff the opportunity to obtain any relief at all. As noted by the Supreme Court, "[o]nce a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." Dayton Bd. of Ed. v. Brinkman, 433 U.S. 406, 420 (1977) (internal quotations and citations omitted); see also Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (noting, in the context of a nationwide class action, "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."). Plaintiff has shown a likelihood of success on the merits of his claim that Section 1005 is unconstitutional and, if implemented, would deprive him of his right to equal protection under the law. The implementation of Section 1005 will be swift and irreversible, meaning the

only way to avoid Plaintiff's irreparable harm is to enjoin the program.[18] The Court can envision no other remedy that will prevent the likely violation of Plaintiff's constitutional right which absent an injunction cannot be remedied in this action.

In recognition of the magnitude of the effect of the injunction entered here, the Court will require the parties to proceed with the greatest of speed in reaching a final adjudication in this case. The parties must immediately present the Court with a proposed schedule to complete any discovery that may be required on an expedited basis as well as a swift deadline for the submission of dispositive motions.

Accordingly, it is

**ORDERED:**

1.  Plaintiff's Motion for Preliminary Injunction (Doc. 11) is **GRANTED**.

2.  Defendants Thomas J. Vilsack, in his official capacity as U.S. Secretary of Agriculture and Zach Ducheneaux, in his official capacity as Administrator, Farm Service Agency, their agents, employees and all others acting in concert with them, who receive actual notice of this Order by personal service or otherwise, are

---

[18] The Court reaches this conclusion without regard to any incidental benefit to other similarly situated White farmers.

immediately enjoined from issuing any payments, loan assistance, or debt relief pursuant to Section 1005(a)(2) of the American Rescue Plan Act of 2021 until further order from the Court.[19]

3.    Plaintiff is not required to provide a bond or other security before this preliminary injunction becomes effective.[20]

4.    No later than **June 29, 2021**, the parties must confer and submit to the Court a proposed expedited schedule to resolve the merits of this action.

**DONE AND ORDERED** in Jacksonville, Florida this 23rd day of June, 2021.

MARCIA MORALES HOWARD
United States District Judge

lc29
Copies to:

Counsel of Record
Pro Se Parties

---

[19] The Court's injunction prohibits the distribution of payments, loan assistance, or debt relief, but does not enjoin Defendants from continuing to prepare to effectuate the relief under Section 1005 in the event it is ultimately found to be constitutionally permissible.

[20] Defendants did not request a bond nor did they provide any evidence that they will suffer monetary losses as a result of the injunction.